**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KRISTOPHER FARRELL JENKINS,<br><br>               Plaintiff,<br><br>      v.<br><br>NATIONAL COLLEGIATE ATHLETIC<br>CONFERENCE; PAC-12 CONFERENCE;<br>THE BIG TEN CONFERENCE, INC.; THE<br>BIG 12 CONFERENCE, INC.;<br>SOUTHEASTERN CONFERENCE;<br>ATLANTIC COAST CONFERENCE; AND<br>BIG EAST CONFERENCE, INC.<br><br>            Defendants. | **Case No.:**_____<br><br><u>**COMPLAINT**</u><br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ....................................................................................................1

II.     JURISDICTION AND VENUE ............................................................................14

III.    PARTIES ...............................................................................................................15

        A.      Plaintiff .....................................................................................................15
        B.      Defendants .................................................................................................16
        C.      Co-Conspirators .........................................................................................22

IV.     THE ILLEGAL AGREEMENTS TO RESTRAIN COMPETITION ..............23

        A.      NCAA NIL-Specific Compensation Rules ...............................................24
        B.      NCAA Compensation Rules ......................................................................28
        C.      NCAA Scholarship Limits .........................................................................29
        D.      Conference Rules .......................................................................................30

V.      RELEVANT MARKETS .....................................................................................32

VI.     FACTUAL ALLEGATIONS ................................................................................37

        A.      An Overview of the NCAA ........................................................................37

                1.      History and Purpose ........................................................................37
                2.      Governance Structure ......................................................................39
                3.      Bylaws and Enforcement .................................................................41

        B.      The Commercial Nature of Division I Sports ...........................................44
        C.      The NCAA's History of Antitrust Violations ...........................................59
        D.      The Supreme Court's *Alston* Decision, this Court's Motion to Dismiss and Class
                Certification Orders in *In re Collegiate Athletics NIL Litigation*, 4:20-cv-03919-
                CW, and State Laws Result in the NCAA and Conference Defendants' Interim
                Suspension of Many of Their NIL Restraints. ......................................................63
        E.      The Challenged Restraints Are Not Necessary to Serve Any Purported
                Procompetitive Purpose. .....................................................................................66

                1.      Any Procompetitive Justification Based on Consumer Demand for College
                        Sports Is Legally Irrelevant Because It Concerns an Entirely Different
                        Market. .....................................................................................................66
                2.      Even if Effects on Consumer Demand in Output Markets Were Relevant,
                        the Restraints at Issue Are Not Necessary to Preserve Consumer Demand
                        for College Sports. ...................................................................................68
                3.      Education and Compensation are not Mutually Exclusive. .......................73
                4.      NCAA Compensation Restrictions do not Prevent Exploitation-They are
                        Exploitative. ............................................................................................77
                5.      The Challenged Restraints Cannot be Justified by the Purported Need to
                        Protect Women's Sports or Cross-Subsidize Non-Revenue Sports............79

        F.      There is Significant Support for Allowing Athletes to Receive NIL Compensation
                and Plaintiff Has Been Damaged by Defendants' Anticompetitive Restraints. .....81

Table of Contents (continued)

Page

1.   The NCAA and Its Members Have Made Numerous Statements
     Supporting NIL Compensation, in a Stark Departure from Previous
     Positions Taken Before Federal Courts........................................................80
2.   Statements from the Knight Commission on Intercollegiate Athletics......91
3.   The NCAA Has Made Exceptions for Several Years That Have Allowed
     Some Athletes to Profit from the Value of Their NIL Rights....................92
4.   NCAA Division I Athletes Have Sought the Ability to Compete Without
     Anticompetitive Restraint in the Labor Markets and Would Receive Such
     Compensation Absent Defendants' Unlawful Restraints. ..........................93
5.   Corporate Sponsors Value Student-Athlete NIL Rights and Would
     Compete for the Rights to Use Kris Jenkins' and Other College Athletes'
     NIL Rights absent Defendants' anticompetitive restraints.......................100
6.   When the NAIA Withdrew NIL Restrictions, Athletes Prospered
     Financially and Academically. ................................................................103

VII.    SECTION B: ACTS PERMITTED BY NAIA AMATEUR CODE ................................104

VIII.   ANTITRUST ALLEGATIONS ................................................................................105

IX.     DEFENDANTS' ILLEGAL, ANTICOMPETITIVE CONDUCT CAUSED GREAT
        HARM TO PLAINTIFF KRISTOPHER FARRELL JENKINS ................................106

X.      CAUSES OF ACTION ........................................................................................120

FIRST CLAIM FOR RELIEF ........................................................................................120

SECOND CLAIM FOR RELIEF ....................................................................................122

THIRD CLAIM FOR RELIEF ........................................................................................123

XI.     REQUEST FOR RELIEF ......................................................................................124

XI.     JURY DEMAND ................................................................................................124

"The only thing I think about truly when it comes to . . . players getting paid or . . . capitalizing off their name and likeness is Kris Jenkins . . . that's what I think about, truly. Like the amount that he could have made off just . . . that shot . . . what could have been for Kris, that's what I think about when I think of . . . NIL . . . . [T]hat whole moment could have been so impactful for him."

-    Jalen Brunson, New York Knicks 2022-present, Villanova 2015-2018[1]

Plaintiff Kristopher Farrell Jenkins, who formerly worked as a college basketball player at Villanova University, a member of the Big East Conference and of the National Collegiate Athletic Association ("NCAA"), exercised his right to opt-out of the class of individuals represented in *In re Collegiate Athlete NIL Litigation*, *et al.*, 4:20-cv-03919-CW (N.D. Cal.). For his Complaint against Defendants NCAA, Pac-12 Conference, Big Ten Conference ("Big Ten"), Big Twelve Conference ("Big 12"), Southeastern Conference ("SEC"), Atlantic Coast Conference ("ACC"), and the Big East Conference ("Big East"), Mr. Jenkins alleges as follows:

## I.    INTRODUCTION

1.    It was April 4, 2016, at the NCAA Division I men's basketball Tournament Championship game in Houston, Texas. With Villanova leading 74-71, a packed house of 74,340 in-person attendees at NRG Stadium and 17.8 million television viewers watched UNC's Marcus Paige contort his body mid-air to avoid Villanova's Ryan Arcidiacono's defensive hustle, hitting a 3-point shot to tie the game for the favored Tarheels. A mere 4.7 seconds remained in Villanova's—and the Big East's—national championship hopes as Villanova coach Jay Wright called a timeout. With the crowd still roaring, Coach Wright called a play his team had practiced countless times –"Nova."  Coach Wright directed his players like pieces on a chessboard—"Kris [Jenkins], you take the ball out, Arch [Ryan Arcidiacono], you take it in, Josh [Hart], you go here

---

[1]Jalen & Josh Relive College with Their Coach Jay Wright & Share Hilarious Untold Stories, Roommates Show, Ep. 17, June 20, 2024, *available at*  https://youtu.be/RvrakO6iRiQ?si=RBiuMIsvcEz4ypAl.

- Arch, come off the screen, make a play." As Ryan Arcidiacono received the inbound pass, nearly everyone expected he would take the shot. Everyone except Kris Jenkins. "Just get close enough to where he can hear you," thought Jenkins. After throwing the ball in to Arcidiacono, Jenkins sprinted through midcourt screaming his name, "Arch! Arch! Arch!" With :02 on the clock, Arcidiacono crossed the 10-second line and looked for a moment like he might shoot. Hearing Jenkins trailing just behind, Arcidiacono dished it to him, and true to Jenkins' nickname, "Big Smoove" caught the pass, stopped, and stepped into the shot. With less than :01 on the clock, Kris Jenkins took a shot from nearly 5' behind the 3-point line; the same shot he had taken hundreds, if not thousands of times – as a young boy playing basketball with his mom in their Columbia, South Carolina driveway, and in countless hours of practice at Villanova. To his teammates, and the expectant crowd, it was like slow motion. The legendary Jim Nantz and Grant Hill on the call set the stage for millions of viewers - "Gives it to Jenkins," Nantz exclaimed, "for – the – Championship!"[2] *Swish*. Just as the clock expired and the final buzzer sounded, that shot became "The Shot." Kris Jenkins stood motionless on the court, both arms raised high in the air signaling "three" with both hands, as the crowd roared, the Villanova bench rose in unison, the confetti cascaded down, and his teammates stormed the court.



---

[2]https://www.ncaa.com/news/basketball-men/article/2022-02-16/ncaa-video-vault-villanovas-kris-jenkins-hits-championship-winning-buzzer-beater.

2.      Coach Jay Wright said, "Kris Jenkins lives for that moment."[3]

3.      Jenkins' teammate, Daryl Reynolds said after the game, "We're immortal now. As much as this earth can give you, we're immortal now. This moment will be cemented in history forever . . . . [Kris] is legend now . . . . To me this is better than Christian Laettner. This is the greatest shot in NCAA history."[4]

4.      The significance was immediately clear to the legends of the game, including commentator Grant Hill, who was the Ryan Arcidiacono to Christian Laettner's Kris Jenkins, hitting Laettner with the pass that Laettner scored to put Duke in the 1992 Final Four over rival Kentucky in overtime. Hill expressed the import of the moment in its historic context, "I was involved in a play that was similar but different; it wasn't for a championship. It's something that's remembered. Twenty-plus years later, they still talk about it. So 20, 30, 50 years later, they'll still talk about this play, and that shot by Jenkins."[5]

5.      After the game, Big East Commissioner Val Ackerman recognized the impact of Kris Jenkins' shot on elevating the stature of the newly reconstituted Big East, "For the conference, it's a shining moment. This is kind of what everybody hoped for . . . . All these things were set in motion with this end in mind, and now it's here. I don't think probably any of us can put into words what this means."[6] Doubling down, Ackerman continue to describe the existential impact winning the 2016 NCAA Tournament had on the new Big East, "I think the

---

[3]https://www.ncaa.com/news/basketball-men/article/2016-04-05/march-madness-villanovas-buzzer-beater-ended-8-greatest.

[4]Lopresti, Mike, March Madness: Villanova's buzzer-beater ended 8 of the greatest seconds in basketball history, NCAA.com (Apr. 5, 2016), https://www.ncaa.com/news/basketball-men/article/2016-04-05/march-madness-villanovas-buzzer-beater-ended-8-greatest.

[5]https://www.ncaa.com/news/basketball-men/article/2016-04-05/march-madness-villanovas-buzzer-beater-ended-8-greatest.

[6]Id.

vision of our presidents was that it would be different, but it could still be good, if not great." She declared, "I hope, now that we're three years in and we've had this crowning moment, that people will begin to fully appreciate that the Big East can, and I hope still will, continue to be a basketball force." As a result of Mr. Jenkins' Shot and Villanova's Tournament win, the NCAA reportedly paid the Big East $19.1 million to distribute among its member schools.[7]

6.      The NCAA recognized this win as the "glorious and indisputable validation of Jay Wright's Villanova program. The Wildcats had become notorious for their early tournament flameouts. Not anymore."[8]

7.      On or about April 20, 2016, approximately two weeks after the Shot, Villanova University received its largest athletic donation in school history from Alumnus William B. Finneran to advance renovation of the Men's Basketball arena, The Pavilion, and support the Men's Basketball program. In receiving the generous gift, Villanova President, the Reverand Peter M. Donohue, OSA, PhD, recognized the impact of the 2016 NCAA Championship, "After the team captured the 2016 NCAA National Championship, the enthusiasm surrounding our University is at an all-time high. Given Villanova's increased visibility nationally--and the world-class stature of our Athletics program--this remarkable gift allows Villanova to continue its forward momentum and further solidify our reputation as a national powerhouse in academics and athletics."[9]

---

[7] https://www.indystar.com/story/sports/college/butler/2016/04/06/ncaa-tournament-worth-191-million-big-east/82709442/.

[8] https://www.ncaa.com/news/basketball-men/article/2020-03-26/closer-look-villanovas-last-second-victory-over-north.

[9] https://villanova.com/news/2016/4/20/Villanova_University_Designates_22_6_Million_Gift_from_Alumnus_William_B_Finneran_to_Advance_Renovation_of_The_Pavilion_and_Support_the_Men_s_Basketball_Program; https://www.espn.com/mens-college-basketball/story/_/id/15283973/villanova-wildcats-receive-226-million-gift-arena-renovation.

8.    That Pavilion prominently features an etched glass plaque of Jenkins, enshrined front-and-center in the entrance. Mr. Jenkins' footprints, with the words of Jim Nantz's call are emblazoned into the championship floor, reconstructed as the centerpiece of the premier season ticket holder lounge area. The Shot remains central in the hype video that plays during player introductions for every Villanova home game.






9.       In 2016, due largely to the Championship win, Villanova's Men's Basketball team generated $11.4 million in revenue and fully funded Villanova's non-revenue sports.[10]

10.      And, in fiscal year 2016, alumni participation in donations hit a then record-high 27%, raising a total of $105,688,164, using the 2016 National Championship logo to drive additional donations.[11]

11.      Overall, Villanova estimated the publicity value of winning the 2016 Championship was about $250 million, exploding up to $1 billion if the value of the game broadcasts is factored in.[12] Additionally, applications rose more than 22% to a record level 21,095, crushing the record from 2015 of 17,266, and Villanova branded merchandise sales at the university bookstore soared from approximately $600,000 to $2 million after the 2016 Championship.[13]

12.      Due to the NCAA's anticompetitive rules and bylaws, Villanova was prohibited from sharing any of that revenue with Mr. Jenkins or any other Wildcat student athletes.

13.      In an instant, Kris Jenkins became a household name and the whirlwind began. Mr. Jenkins was shuttled from one event to the next. The morning after the Championship Game, Jenkins was featured on Good Morning America. He was nominated for an ESPY. He and his Wildcats team went to Harrisburg to meet the Governor. They were feted with a ticker-tape parade in Philadelphia. They went to the White House to meet President Obama.

---

[10] https://www.cbsnews.com/news/how-villanova-gets-its-moneys-worth-from-basketball/.

[11] https://www.case.org/system/files/media/file/Villanova_AwdNomineeDocs_Final%20FY16%20TY%20Mailing%20Package%20%281%29.pdf.

[12] https://www.cbsnews.com/news/how-villanova-gets-its-moneys-worth-from-basketball/

[13] https://www.cbsnews.com/news/how-villanova-gets-its-moneys-worth-from-basketball/.



14.     President Obama said the 2016 Tournament Championship game was "maybe the best title game of all time," and that Kris Jenkins "shot his team this team into basketball lore" when he took that iconic shot, comparing it to Christian Laettner's shot in 1992 sending Duke to the NCAA tournament final and James "Jimmy V" Valvano's NC State team winning the tournament in 1983 in buzzer-beater fashion.[14]



15.     Both before and after The Shot, Mr. Jenkins and his teammates were scheduled for countless autograph signing events where they were required to sit for hours and sign item after item for donors, fans, and collectors. Mr. Jenkins was not allowed to be and was not paid for this time nor for his autographs. Fans, fundraisers, and collectors who received the autographed items could sell them on eBay and other memorabilia marketplaces. Anyone who wanted to earn money on Mr. Jenkins' autograph could do so; except for Mr. Jenkins himself.

---

[14] *See* https://www.washingtonpost.com/news/early-lead/wp/2016/06/01/president-obama-knows-that-theres-never-really-a-bad-time-for-a-charles-barkley-joke/.







16.     During an autograph signing event Mr. Jenkins was scheduled to attend on alumni weekend in the summer of 2016 at Villanova, the size of the crowd necessitated that, for the first time, Villanova had to engage security officers to protect the players, including Mr. Jenkins. The fans at alumni weekend were so rabid for Kris's autograph that, after security said he had to leave after signing for hours, or would have had to stay all night, a woman close to the front of the line literally threw her infant child at Kris. Fortunately for everyone, as one teammate said, Kris had "hands like Odell [Beckham, Jr.]," and he caught the infant.

17.     Institutions like Villanova have reportedly already commenced preparation for a potential rule change that would permit them to share revenue with athletes.[15] Throughout Mr. Jenkins' career, including this critical post-Championship period, the NCAA's anticompetitive and unlawful rules restrained Villanova from sharing revenue with or otherwise compensating Jenkins.

18.     After The Shot, Mr. Jenkins' followers on Instagram, Twitter, and Facebook nearly quadrupled. While non-athlete students with sizable followings could monetize that influence, Mr. Jenkins' was prohibited from receiving any compensation.

19.     Mr. Jenkins' shot remains the most-viewed moment in NCAA basketball history. By way of example, "The Shot" is both the first and third most viewed video on the NCAA March Madness YouTube channel, inundated with paid commercial content, with a combined 10.1M+ views in that instance alone. It is prominently featured in multiple places, also inundated with commercial content, on the NCAA's website,[16] social media, and in annual television advertisements promoting the billion-dollar revenue-generating NCAA March Madness Tournament – including current advertisements promoting this year's tournament—which, without limitation, aired in a primetime slot on January 26, 2025, during the 2025 AFC Championship Game that drew a record-setting 57.7 million viewers, and throughout the 2025 NCAA Tournament, including during the Sweet 16, which averaged 9.8 million viewers per

---

[15] https://frontofficesports.com/schools-are-scrambling-to-prepare-for-the-ncaa-revenue-sharing-era/.

[16] *See, e.g.,* https://www.ncaa.com/news/basketball-men/article/2016-04-05/march-madness-villanovas-buzzer-beater-ended-8-greatest; https://www.ncaa.com/news/basketball-men/article/2020-03-26/closer-look-villanovas-last-second-victory-over-north; https://www.ncaa.com/news/basketball-men/article/2018-03-29/villanovas-regal-aura-returns-another-final-four-where-its; https://www.ncaa.com/video/basketball-men/2020-04-16/watch-kris-jenkins-iconic-game-winner-every-angle.

game, and the Elite 8, which averaged 9 million viewers per game, across CBS, TBS, and truTV.[17]





20.    The Big East has used and continues to use Mr. Jenkins' name, image, and likeness to promote its brand. By way of example and not limitation, Mr. Jenkins' name and image appears on at least 22 current pages on the www.bigeast.com website (and in a variety of social media posts), including https://www.bigeast.com/news/2016/4/5/MBB_0405162746.aspx and https://www.bigeast.com/news/2017/3/11/MBB_0311171614.aspx. The latter example prominently features the below photo memorializing Mr. Jenkins' promotion of the 2017 BIG

---

[17]https://frontofficesports.com/march-madness-ratings-dip-after-record-start-will-final-four-
       deliver/#:~:text=That's%20down%2010%25%20from%20last,2024%20and%20flat%20with%202023.

EAST tournament and corporate partner Jeep, whose logo is printed on the Big East's

championship signage provided to Mr. Jenkins.



21.    In prior years, Mr. Jenkins' image was featured on the cover of Sports Illustrated

twice.



22.    The hard work of college athletes like Kris Jenkins has translated into billion-

dollar media rights deals, multi-million-dollar coaching salaries, extravagant facilities, and

lucrative commercial licensing and sponsorship agreements that greatly benefit the NCAA and

its member conferences and schools, as well as NCAA executives, conference administrators,

and college coaches. For those in positions of power at the NCAA or a Division I conference or

school, the college sports industry has become immensely profitable. Indeed, each of the Power

Five (or "P5") Conference commissioners are making more than $2.5 million annually, with the

highest paid—former Big Ten commissioner, Jim Delany—reportedly earning $10.3 million in

his final year at the conference.[18] The salaries for the top head coaches in FBS football and

Division I men's basketball exceed $11 million per year,[19] and compensation packages for the

top head coaches in Division I women's basketball exceed $3 million per year.[20] This

compensation continues to rise, with salaries for coaches in the Power Five Conferences

increasing in 2023 by a "whopping 14.3% . . . from 2022."[21] The head football or basketball

coach is the highest-paid public employee in states throughout the country, dwarfing the salaries

of college presidents and all other state employees.[22]

   23. Rapidly increasing compensation for the contributions of coaches, athletic

directors, and conference commissioners is unrelenting. A September 2023 report from the

Knight Commission on Intercollegiate Athletics contains a financial analysis from

CliftonLarsonAllen (CLA), which has projected that within ten years, P5 public institutions'

spending on football coaches ($1.363 billion) would virtually equal the spending on athletic

---

[18] Zach Barnett, *Heres' how much each Power 5 conference raked in last year*, Footballscoop (July 10, 2020), https://footballscoop.com/news/heres-how-much-each-power-5-conference-raked-in-last-year.

[19] Amanda Christovich and Doug Greenberg, *Who Is Highest-Paid Coach in College Football?*, Front Office Sports (October 4, 2023), https://frontofficesports.com/who-are-highest-paid-college-football-coaches/.

[20] Greg Lee and Amanda Christovich, *Who Is The Highest-Paid Womens' College Basketball Coach?*, (November 6, 2023), https://frontofficesports.com/who-is-the-highest-paid-womens- college-basketball-coach/.

[21] Tom Schad and Steve Berkowitz, *Why College Football is King in Coaching Pay–Even at Blue Blood Basketball Schools*, USA Today (October 3, 2023), https://www.usatoday.com/story/sports/ncaaf/2023/ 10/03/college-football-coach-pay-is-soaring-even-at-basketball-schools/70924373007/.

[22] Charlotte Gibson, *Whos' Highest-Paid in Your State?*, ESPN (last accessed on November 30, 2023), https://www.espn.com/espn/feature/story/_/id/28261213/dabo-swinney-ed-orgeron-highest-paid-state-employee.

scholarships and medical expenses for *all athletes* across *all sports* at those same schools ($1.372 billion).[23]

24.    Although student-athletes, like Kris Jenkins when he worked as an NCAA basketball player, provide their labor to fuel this multi-billion-dollar industry, and they are the individuals whose athleticism, hard work, and character make college sports so popular, these same young men and women have received only a tiny fraction of the revenues they generate, if any, while facing severe penalties for failing to abide by a labyrinth of rules that restrict meaningful financial participation in the Division I football/basketball financial juggernaut, and restrict for all athletes, in whole or now in part, the compensation they may receive from their schools, conferences, or third parties for their athletic services and the use of their "NIL."[8]

25.    Through its Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports, including the conduct of schools, conferences, third-party business partners, and student-athletes. Among the many areas that the NCAA regulates are the compensation and benefits that athletes may receive while participating in college sports. At various points in time, the NCAA has claimed that these rules are necessary to promote the NCAA's principle of "amateurism" and to preserve "a clear line of demarcation between intercollegiate athletics and professional sports"—a demarcation that applies only to athletes but not to coaches, administrators, schools, or non-athlete college students.

26.    The NCAA proclaims that its overarching purpose is "to create a safe, and equitable environment that allows student-athletes to reach their full potential in academics, athletics and life," and that it is "united around one goal: creating opportunities for college

---

[23] Financial Projections Through 2032 For Division I FBS Programs, https://www.knightcommission.org/wp-content/uploads/2023/09/cla_financial_projections_report_2023.pdf, at p. 2.

athletes." The NCAA further purports to protect college athletes from commercial exploitation, yet it has conspired to create an anticompetitive market where student-athletes have been unable to benefit from the same opportunities that are available to their fellow classmates and powerless to realize the commercial value available for their athletic services and NIL rights. These young men and women—many from socio-economically disadvantaged backgrounds—are deprived of the economic and other benefits that the market would pay.

27.     The NCAA and its members have committed violations of the federal antitrust laws and common law by engaging in an overarching conspiracy to: (a) fix the amount that student-athletes may be paid for the licensing, use, and sale of their names, images, and likenesses at zero; (b) foreclose student-athletes from the market for licensing, use, and sale of their names, images, and likenesses entirely; (c) fix the amount that student-athletes may be paid for their athletic services at no more than the value of a scholarship; and (d) limit the quantity of athletic scholarships available in the market for student-athletes' labor services. In addition to violating the antitrust laws, Defendants have also unjustly enriched themselves and their for-profit business partners while causing extensive damage to the student-athletes.

28.     Plaintiff Kris Jenkins seeks the compensation that he would have received absent Defendants' unlawful restraints on pay-for-play compensation, a share of game telecast revenue and compensation that he would have received for media broadcast uses of his NIL ("BNIL"), and the compensation that he would have received for his NIL from third parties for use in video games and other opportunities including marketing, sponsorship, social media, branding, promotional, and other NIL deals.

## II.      JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under

Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. 28 U.S.C. §§ 15(a) and 26.

30.     Venue is proper because Defendants reside, are found, have agents, and transact business in this District as provided in 28 U.S.C. §§ 1391(b) and (c) and in Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22.

31.     This Court has personal jurisdiction over Defendants because, *inter alia*, they: (a) transacted business throughout the United States, including in this District; (b) participated in organizing intercollegiate athletic contests, and/or licensing or selling merchandise throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and (d) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Numerous NCAA Division I universities or colleges also are found within this District, *e.g.,* the United States Military Academy (West Point), Fordham University, Columbia University, New York University, Iona University, and Hofstra University.

### III.    PARTIES

#### A.    Plaintiff

32.     Plaintiff, **Kristopher Farrell Jenkins**, an individual, is a resident of Florida. He worked as a college basketball player at Villanova University in the Big East 2013-2017.



**B.    Defendants**

33.    **National Collegiate Athletic Association ("NCAA")** describes itself as an "unincorporated not-for-profit educational organization founded in 1906," and maintains its principal place of business at 700 W. Washington Street, Indianapolis, Indiana 46204. The NCAA further states that it "is the organization through which the colleges and universities of the nation speak and act on athletic matters at the national level." It is composed of more than 1,200 colleges, universities, and athletic conferences located throughout the United States.

34.    Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports. The Constitution and Bylaws were adopted by votes of the member institutions and may be amended by votes of the member institutions. The NCAA has also established an enforcement program to ensure that institutions and athletes comply with NCAA rules. Through its enforcement program, the NCAA has the authority to impose severe penalties on member schools and athletes for non-compliance.

35.    The NCAA includes 1,099 active member schools, and these schools are organized into three Divisions. Division I includes 352 schools, including 267 with major football programs. Divisions II and III include schools with much less extensive or no football programs.

16

36.     As a practical matter, any academic institution that wishes to participate in any meaningful way in the highest and most popular levels of college sports must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members.

37.     In its Consolidated Financial Statements for the fiscal year ending August 31, 2015, the NCAA reported total revenues of $912.3 million.[24] That jumped up to $1,376,591,143 in total revenue for the fiscal year ending August 31, 2024.[25]

38.     **Pac-12 Conference ("Pac-12")** is an unincorporated association, with its principal place of business located in this District at 360 3rd Street, Third floor, San Francisco, California 94107. The Pac-12 is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2017 IRS Form 990 the Pac-12 identified itself as a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and stated that, for the fiscal year ending June 30, 2018, it obtained gross revenues of $496,930,601. The Pac-12's "2018-19 Handbook" states that the conference was organized for purposes including: "[t]o provide its members with a jointly governed body for sponsoring, supervising and regulating intercollegiate athletics as a conference member of the National Collegiate Athletics Association ('NCAA') in accordance with the principles, policies, constitution and bylaws of the NCAA" and "[t]o assist its members in funding and promoting their intercollegiate athletics programs."

39.     The Pac-12's current members are the following institutions: Oregon State University and Washington State University.

---

[24]https://www.usatoday.com/story/sports/college/2016/03/04/ncaa-loses-9-million-2015-associations-investments-take-hit/81324884/.

[25] NCAA Consolidated Financial Statements August 31, 2024 and 2023.

40.    Defendant Pac-12 participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Plaintiff, and will continue to damage him.

41.    **The Big Ten Conference, Inc. ("Big Ten")** is a nonprofit corporation, organized under the laws of Delaware, with its principal place of business located at 5440 Park Place, Rosemont, Illinois 60018. The Big Ten is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2017 IRS Form 990 the Big Ten identified itself as a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and stated that, for the fiscal year ending June 30, 2018, it obtained gross revenues of $758,899,883.

42.    The Big Ten's members are the following institutions: University of California, Los Angeles, University of Illinois at Urbana-Champaign, Indiana University, University of Iowa, University of Maryland, University of Michigan, Michigan State University, University of Minnesota, University of Nebraska–Lincoln, Northwestern University, Ohio State University, University of Oregon, Pennsylvania State University, Purdue University, Rutgers University, University of Southern California, University of Washington, and University of Wisconsin–Madison. All of the Big Ten's football members are also members of the NCAA's Division I, Football Bowl Subdivision.

43.    Defendant Big Ten participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Plaintiff, and will continue to damage him.

44.    **The Big 12 Conference, Inc. ("Big 12")** is a nonprofit corporation organized under the laws of Delaware, with its principal place of business located at 400 East John

Carpenter Freeway, Irving, Texas 75062. The Big 12 is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2017 IRS Form 990 the Big 12 stated that it is a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and that, for the fiscal year ending June 30, 2018, it obtained gross revenues of $373,924,498. The Big 12 further stated in its IRS filing that its mission is to "organize, promote and administer intercollegiate athletics among its member institutions" and to "optimize revenues and provide supporting service sompatible [sic] with both academic and competitive excellence."

45.     The Big 12's current members are the following institutions: Arizona State University, University of Arizona, Baylor University, Brigham Young University, University of Central Florida, University of Cincinnati, University of Colorado, University of Houston, Iowa State University, University of Kansas, Kansas State University, Oklahoma State University,

46.     Texas Christian University, Texas Tech University, University of Utah, and West Virginia University. All of the Big 12's football members are also members of the NCAA's Division I, Football Bowl Subdivision.

47.     Defendant Big 12 participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Plaintiff, and will continue to damage him.

48.     **Southeastern Conference ("SEC")** is an unincorporated association, with its principal place of business located at 2201 Richard Arrington Boulevard North, Birmingham, Alabama 35203-1103. The SEC is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2017 IRS Form 990 the SEC identified itself as a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal

Revenue Code, and stated that, for the fiscal year ending August 31, 2018, it obtained revenues of $659,938,592. It further identified its mission is to "promote and administer intercollegiate athletic competition among its member institutions located in the Southeastern United States."

49.     The SEC's current members are the following institutions: University of Florida, University of Georgia, University of Kentucky, University of Missouri, University of Oklahoma, University of South Carolina, University of Tennessee, University of Texas-Austin, Vanderbilt University, University of Alabama, University of Arkansas, Auburn University, Louisiana State University, University of Mississippi, Mississippi State University, and Texas A&M University. All of the SEC's football members are also members of the NCAA's Division I, Football Bowl Subdivision.

50.     Defendant SEC participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Plaintiff, and will continue to damage him.

51.     **Atlantic Coast Conference ("ACC")** is an unincorporated association with its principal place of business located at 620 South Tryon Street, Suite 1200, Charlotte, North Carolina 28202. The ACC is a multi-sport collegiate athletic conference and a formal "conference member" of Defendant NCAA's Division I. In its 2017 IRS Form 990 the ACC stated that it is a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and that, for the fiscal year ending June 30, 2018, it obtained gross revenues of $464,677,828. The ACC further stated in its IRS filing that it "exists to promote and regulate inter-collegiate athletic programs for and among twelve member institutions, all of which are non-profit educational institutions."

52.     The ACC's current members are the following institutions: Boston College,
University of California, Berkeley, Clemson University, Duke University, Florida State
University, Georgia Institute of Technology ("Georgia Tech"), University of Miami, University
of North Carolina–Chapel Hill, North Carolina State University, University of Pittsburgh,
Southern Methodist University, Stanford University, Syracuse University, University of Virginia,
Virginia Polytechnic Institute and State University ("Virginia Tech"), Wake Forest University,
and the University of Louisville. Also, as the ACC stated in its 2012-13 annual report, the
University of Notre Dame "officially joined the ACC on July 1, 2013 . . . Notre Dame will
compete as a full member in all conference sponsored sports with the exception of football,
which will play five games annually against league programs."

53.     Defendant ACC participated in the collusive restraint of trade and other violations
of law alleged in this Complaint, has thereby damaged Plaintiff, and will continue to damage
him.

54.     **The Big East Conference, Inc. ("Big East")** is a nonprofit corporation organized
under the laws of Delaware, with its principal place of business located at 655 Third Avenue,
Suite 711, New York, New York, 10017. The Big East is a multi-sport collegiate athletic
conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2023 IRS
Form 990 the Big East stated that it is a tax-exempt organization pursuant to section 501(c)(3) of
the U.S. Internal Revenue Code, and that, for the fiscal year ending June 30, 2018, it obtained
gross revenues of $87,177,962. The Big East further stated in its IRS filing that its mission is to
"provide its members with a jointly governed body for sponsoring, supervising and regulating
intercollegiate athletics as a conference member of the National Collegiate Athletic Association
'NCAA,' in accordance with the principles, policies, constitution and bylaws of the NCAA; to

assist its members in funding and promoting their intercollegiate athletics programs; enhance the opportunities for participation in, and the level of competition of, men's and women's intercollegiate athletics on an equitable basis its member institutions; effectuate such other or additional purposes as may, from time to time, be adopted by the conference; and take any and all actions necessary to effectuate the above purposes." In fiscal year ending June 2023, Big East Commissioner, Val Ackerman, earned $1,159,612 in wages and $49,740 in other compensation from her employment with the Big East. Deputy Commissioner Vince Nicastro earned $496,923 in wages and $81,594 in other compensation.

55.     The Big East's current members are the following institutions: Butler University, Creighton University, DePaul University, Georgetown University, Marquette University, Providence College, St. John's University, Seton Hall University, University of Connecticut, Villanova University, and Xavier University.

56.     Defendant Big East participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Mr. Jenkins, and will continue to damage him.

57.     Defendants Pac-12, Big Ten, Big 12, SEC, and ACC are collectively referred to herein as the "Power Five Conference Defendants," when the Big East is also included, the term "Conference Defendants" is used.

58.     Whenever in this Complaint Plaintiff makes reference to any act, deed, or transaction of a Defendant, the allegation means that the Defendant engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the Defendant's business or affairs.

22

### C.    Co-Conspirators

59.    Various persons, firms, corporations, organizations, and other business entities, some unknown and others known, have participated as unnamed co-conspirators in the violations alleged herein, including the NCAA's member-schools and other NCAA Division I athletic conferences not named as defendants in this Complaint. Representatives of those schools and conferences serve on NCAA committees which promulgate rule changes. Representatives of those schools and conferences voted to adopt the rules prohibiting NIL compensation and compensation for athletic services, as well as the rules limiting the number of athletic scholarships available to college athletes, and thus agreed to impose the restraints on trade described herein. All Division I schools and conferences continue to benefit from those restraints of trade by virtue of their agreement to abide by the restraints.

## IV.    THE ILLEGAL AGREEMENTS TO RESTRAIN COMPETITION

60.    Defendants' anticompetitive agreements are not secret or disputable. They are a matter of public record, codified in the NCAA Division I Manual (the NCAA's rulebook) and the rulebooks of each Conference Defendant. They are proposed, drafted, voted upon, and agreed to by the NCAA members—including the Conference Defendants—that compete for the services of college athletes in the various relevant labor markets. These anticompetitive rules are also strictly enforced, or they were throughout the entirety of Mr. Jenkins' career from 2013-2017, so that the competing NCAA member institutions have no choice but to comply with them or face severe cartel penalties.

61.    Plaintiff brings this suit to challenge and seek damages caused by the NCAA and the Conference Defendants' rules that prohibited, capped, or otherwise limited the compensation that he and other Division I student-athletes may receive from schools or conferences including for the use of their names, images, likenesses, and athletic reputations in the manners discussed

23

in this Complaint, as well as compensation for their athletic services. Plaintiff also challenges the NCAA and Conference Defendants' rules limiting his and other Division I athletes' ability to enter into NIL transactions with third parties.

62.     Article 4 of the NCAA Constitution ("Rules, Compliance and Accountability") provides: "Each member institution . . . shall hold itself accountable to support and comply with the rules and principles approved by the membership. Further, each school shall ensure that its staff, student-athletes, and other individuals and groups representing the institution's athletics interests comply with applicable rules (institutional, conference, divisional and Association-wide) in the conduct of the institution's intercollegiate athletics program."

63.     The NCAA rules, and each Conference Defendant's rules, that prohibit or otherwise limit the compensation that players may receive for their athletic services are illegal cartel agreements. The NCAA rules, and each Conference Defendant's rules, that limit the scholarships and roster spots available to players for their athletic services are illegal cartel agreements. These rules include, but are not limited to NCAA Bylaws 12.01.4, 12.1.2, 12.1.2.1, 12.4.1, 12.4.1.1, 12.4.2.3, 12.4.4, 12.5.2.1, 12.5.2.2, 15.02.2, 15.02.6, 15.1, 15.5.1, 15.5.2, 15.5.3, 15,5,4, 15.5.5, 15.5.6, 16.02.3, 16.1.4, 16.11.2 (individually, and as interpreted and applied in conjunction with each other).

64.     Any Division I school that deviates from NCAA rules may be subject to severe sanctions. Potential punishments for rules violations include a complete ban on participation, as well as a reduction in the number of grants-in-aid a school can offer, or even expulsion from the NCAA. This was especially so during the entirety of Mr. Jenkins' career as a basketball player at Villanova from 2013-2017.

24

A.      **NCAA NIL-Specific Compensation Rules**[26]

65.      The NCAA's rules in force during Mr. Jenkins' Collegiate Athletic Career

prohibited student-athletes from endorsing any commercial product or service while they

66.      are in school, regardless of whether or not they receive any compensation for

doing so. NCAA Bylaw 12.5.2.1 ("Advertisements and Promotions After Becoming a Student-

Athlete") states:

> After becoming a student-athlete, an individual shall not be eligible
> for participation in intercollegiate athletics if the individual:
>
> (a)      Accepts any remuneration for or permits the use of his or her
> name or picture to advertise, recommend or promote directly the sale
> or use of a commercial product or service of any kind; or
>
> (b)      Receives remuneration for endorsing a commercial product or
> service through the individual's use of such product or service.

67.      The NCAA also burdens student-athletes with the responsibility of policing any

commercial uses of their NIL rights that take place without their knowledge or permission.

NCAA Bylaw 12.5.2.2 ("Use of a Student-Athlete's Name or Picture Without Knowledge or

Permission") states:

> If a student-athlete's name or picture appears on commercial items
> (e.g., T-shirts, sweatshirts, serving trays, playing cards, posters) or is
> used to promote a commercial product sold by an individual or
> agency without the student-athlete's knowledge or permission, the
> student-athlete (or the institution acting on behalf of the student-
> athlete) is required to take steps to stop such an activity in order to
> retain his or her eligibility for intercollegiate athletics.

68.      NCAA rules further restrict student-athletes' outside employment and the

compensation that they may receive from third-party employers. The NCAA rules allow athletes

to obtain outside employment while attending college and participating in NCAA sports. And

---

[26]These rules refer to the rules in effect during Mr. Jenkins' career as a basketball player at Villanova from 2013-
2017.

they even permit multi-sport athletes to retain their college eligibility in one sport while simultaneously competing (and receiving a salary) as a professional in a different sport.[27] However, the NCAA rules restrict virtually all NIL-related opportunities and compensation that athletes can obtain through outside employment. This was so during the entirety of Mr. Jenkins' career as a basketball player at Villanova from 2013-2017.

69.     While a student-athlete may generally earn money from any "on- or off-campus employment" unrelated to his or her athletic ability, NCAA Bylaw 12.4.1 ("Criteria Governing Compensation to Student-Athletes") limits the remuneration that athletes can receive from outside employers to "a rate commensurate with the going rate in that locality for similar services." And NCAA Bylaw 12.4.1.1 ("Athletics Reputation") specifically prohibits athletes from receiving "any remuneration for value or utility that the student-athlete may have for the employer because of the publicity, reputation, fame or personal following that he or she has obtained because of athletics ability." While, as of July 1, 2021, the NCAA temporarily suspended enforcement of this rule, it has not been removed from the NCAA's bylaws. Moreover, the interim policy continues to prohibit schools from licensing athletes' NIL rights and bundling those rights to feature the athletes as part of the school's licensing arrangements. And Mr. Jenkins has not been able to benefit from this policy change at all because his entire career at Villanova (2013-2017) took place before the NCAA implemented the policy change.

70.     NCAA Bylaw 12.4.2.3 ("Athletics Equipment Sales") provides that "a student-athlete may not be employed to sell equipment related to the student-athlete's sport if his or her name, picture or athletics reputation is used to advertise or promote the product, the job or the employer. If the student-athlete's name, picture or athletics reputation is not used for advertising

---

[27] NCAA Bylaw 12.1.3.

or promotion, the student-athlete may be employed in a legitimate sales position, provided he or she is reimbursed at an hourly rate or set salary in the same manner as any nonathlete salesperson." While, as of July 1, 2021, the NCAA has temporarily suspended enforcement of this rule, it has not been removed from the NCAA's bylaws, nor has Mr. Jenkins ever been able to benefit from the temporary suspension. And again, the interim policy continues to prohibit schools from licensing athletes' NIL rights and bundling those rights to feature the athletes as part of the school's licensing arrangements.

71.    The NCAA's rules also restrict the NIL-related compensation that athletes can obtain through self-employment and personal business ventures. Bylaw 12.4.4 ("Self-Employment") states that "a student-athlete may establish his or her own business, provided the student-athlete's name, photograph, appearance or athletics reputation are not used to promote the business." While, as of July 1, 2021, the NCAA has temporarily suspended enforcement of this rule, it has not been removed from the NCAA's bylaws, nor has Mr. Jenkins ever been able to benefit from the temporary suspension.

72.    The NCAA, effective July 1, 2021, adopted an "interim" NIL policy to suspend enforcement of some aspects of its NIL rules. But the NIL restraints at issue have not been withdrawn or removed from the NCAA rules, and the NCAA remains free to change its NIL rules at any time in the future at its discretion and/or to revert back to full enforcement of all of the NIL rules, and it has stated that "the current legal and legislative landscape prevents a permanent solution at this time."[28]  Moreover, even under its interim policy, the NCAA has not suspended enforcement of some of the most restrictive aspects of its NIL rules. For example, the

---

[28] *See Name | Image | Likeness Quick Guide to New NCAA Interim Policy*, https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_QuickGuideToNewPolicy.pdf (last visited July 25, 2021).

NCAA states that under its interim policy, NIL compensation still cannot be "contingent upon enrollment at a particular school" or based on "athletic participation or performance."[29]  That is an onerous restriction, as a sponsor could otherwise have language in an endorsement deal that ties payment to being actively playing the sport, achieving an athletic accomplishment (such as playing in or winning a championship or hitting an iconic winning shot)—or playing the sport at a particular school. A sponsor may refuse to enter into an endorsement deal if it is not able to put this language in a contract. Furthermore, "Institutions providing compensation in exchange for the use of a student-athlete's name, image or likeness" remains prohibited under the interim policy.[30]  And, again, Mr. Jenkins has never been allowed to benefit from the July 1, 2021, interim policy.

### B.     NCAA Compensation Rules[31]

73.     Article 12 of the NCAA Bylaws ("Amateurism and Athletics Eligibility") is the foundation of Defendants' unlawful agreements to fix the amount of compensation that may be paid to student athletes for their athletic services. Bylaw 12.1.2 provides:

> A [student athlete] loses amateur status and thus shall not be eligible
> for intercollegiate competition in a particular sport if the individual:
> (a) [u]ses athletics skill (directly or indirectly) for pay in any form in
> that sport; [or] (b) [a]ccepts a promise of pay even if such pay is to be
> received following the completion of intercollegiate athletics
> participation . . . .

74.     Bylaw 12.1.2.1 then includes a non-exhaustive, two-page list of "Prohibited Forms of Pay," including any "direct or indirect salary, gratuity or comparable compensation";

---

[29] *Name, Image and Likeness Policy Question and Answer*,
https://ncaaorg.s3.amazonaws.com/ncaa/NIL/NIL_QandA.pdf (last visited July 25, 2021).

[30] *Id.*

[31] These rules refer to the rules in effect during Mr. Jenkins' career as a basketball player at Villanova from 2013-2017.

any "division or split of surplus (bonuses, game receipts, etc.);" any "[e]ducational expenses not permitted by the governing legislation of this Association [i.e., the NCAA]"; and any "[p]referential treatment, benefits or services." The NCAA rules then continue with nearly two pages of "Exceptions to Amateurism Rule." Bylaw 12.1.2.4, et seq. Unless an exception applies, the NCAA Bylaws categorically prohibit conferences and schools from providing any form of pay to college athletes.

75.     Article 15 of the NCAA Bylaws ("Financial Aid") restricts the amount and type of, and method by which, schools can provide financial aid to athletes. Financial aid "is not considered to be pay or the promise of pay for athletics skill, provided it does not exceed the financial aid limitations set by [NCAA's] membership." *See* Bylaw 12.01.4. Bylaw 15.1 allows athletes to receive financial aid "based on athletics ability" "up to the value of a full grant-in-aid, plus any other financial aid up to the cost of attendance." "Full Grant-in-Aid" is "financial aid that consists of tuition and fees, room and board, books and other expenses related to attendance at the institution up to the cost of attendance." NCAA Bylaw 15.02.6. "Cost of attendance" (or COA) is the "amount calculated by an institutional financial aid office, using federal regulations, that includes the total cost of tuition and fees, living expenses, books and supplies, transportation, and other expenses related to attendance at the institution." NCAA Bylaw 15.02.2. If an athlete receives financial aid in excess of the COA, they "shall not be eligible to participate in intercollegiate athletics." NCAA Bylaw 15.1.

76.     Article 16 ("Awards, Benefits and Expenses for Enrolled Student-Athletes") similarly prohibits NCAA members from providing benefits to athletes based on their athletic abilities. Bylaw 16.11.2 provides, "The student-athlete shall not receive any extra benefit." "Extra benefit" is defined as "any special arrangement by an institutional employee or

representative of the institution's athletics interests to provide the student-athlete or the student-athlete's family members or friends with a benefit not expressly authorized by NCAA legislation." *See* NCAA Bylaw 16.11.2; *see also* NCAA Bylaw 16.02.3.

C.    **NCAA Scholarship Limits[32]**

77.    The NCAA bylaws artificially restrain the athletic scholarships available for college-athlete labor services by setting maximum numbers or amounts of scholarships that can be provided in each sport. For example, NCAA Bylaw 15.5.2 states that "[a]n institution shall be limited in any academic year to the total number of counters (head count) in ... Women's Gymnastics 12[,] Women's Tennis 8[, and] Women's Volleyball 12." This means that each institution can provide athletic scholarships (in any amount up to the NCAA cap) to this maximum number of athletes set for each sport. Similarly, the NCAA sets maximum numbers of scholarship recipients at 85 for FBS football (NCAA Bylaw 15.5.6.1), 13 each for men's and women's basketball (NCAA Bylaws 15.5.5.1 and 15.5.5.2), and a maximum value of 11.7 scholarships to a maximum of 27 athletes for baseball (NCAA Bylaw 15.5.4.1).

78.    The NCAA Bylaws 15.5.3.1.1 ("Maximum Equivalency Limits, Men's Sports") and 15.5.3.1.2 ("Maximum Equivalency Limits, Women's Sports") also "limit [] the value (equivalency) of financial aid awards that an institution may provide in any academic year" in the other NCAA sports.

D.    **Conference Rules[33]**

79.    As NCAA members, the Conference Defendants have agreed to the NCAA rules restricting NIL and other types of compensation as well as the number of scholarships. To that

---

[32]These rules refer to the rules in effect during Mr. Jenkins' career as a basketball player at Villanova from 2013-2017.

[33]*Id.*

end, Conference Defendants have also adopted their own rules (which may be more restrictive but not more permissive than the NCAA's rules) that adopt NCAA rules and otherwise restrict the monies and benefits that may be provided to student-athletes, including limitations on the number of scholarships.

80.    Examples of the Conference Defendants' anticompetitive rules include:

a.    <u>ACC Constitution, Article 1.2.1 ("General Purpose")</u>: "The Conference aims to . . . [c]oordinate and foster compliance with Conference and NCAA rules."[34]

b.    <u>ACC Manual, Bylaw 2.2 ("NCAA Regulations")</u>: "All [ACC] Members are bound by NCAA rules and regulations, unless Conference rules are more restrictive."[35]

c.    <u>Big Ten Conference Handbook, Rule 14.01.3 ("Compliance with NCAA and Conference Legislation")</u>: "The Constitution and Bylaws of the National Collegiate Athletic Association shall govern all matters of student-athlete eligibility except to the extent that such rules are modified by the Conference Rules and Agreements."[36]

d.    <u>Big 12 Bylaw 1.2.3 ("Adherence to NCAA Rules")</u>: "All Members of the Conference are committed to complying with NCAA rules and policies.... In addition, the conduct of Members shall be fully committed to compliance with the rules and regulations of the NCAA and of the Conference."[37]

---

[34] ACC Manual, 2020–21, https://virginiatech.sportswar.com/wp- content/uploads/sites/15/2022/08/2020-21-ACC-Manual-2020-9-17-2.pdf (last visited July 10, 2024).

[35] *Id.*

[36] Big Ten Conference Handbook, 2017–2018, https://iuhoosiers.com/documents/2018/4/5// 2017_18_Big_Ten_Conference_Handbook.pdf?id=2732 3 (last visited July 10, 2024).

[37] Big 12 2021–22 Conference Handbook, https://s3.amazonaws.com/big12sports.com/documents/2021/8/16/ Handbook_v_3_08_16_2021_.pdf (last visited July 10, 2024).

e.      <u>Big 12 Bylaw 6.1 ("Eligibility")</u>: "A student-athlete must comply with appropriate minimum requirements of the NCAA and the Conference in order to be eligible for athletically related aid, practice, and/or competition in any intercollegiate sport."[38]

f.      <u>Big 12 Bylaw 6.4.3 ("Financial Aid Reports")</u>: "Each institution shall comply with all financial aid legislation of the NCAA and the Conference."[39]

g.      <u>Pac-12 Bylaw 4-2 ("Application of NCAA Legislation")</u>: "The Conference is a member of the NCAA, therefore, all member institutions are bound by NCAA rules and regulations unless the Conference rules are more demanding."[40]

h.      <u>Pac-12 Executive Regulation 3-1 ("NCAA Rules")</u>: "The rules of the National Collegiate Athletic Association shall govern all matters concerning financial aid to student-athletes except to the extent that the CEO Group modifies such rules to be applied on a conference wide basis."[41]

i.      <u>SEC Constitution, Article 5.01.1 ("Governance")</u>: "The Conference shall be governed by the Constitution, Bylaws, and other rules, regulations, and legislation of the Conference and the NCAA."[42]

j.      <u>SEC Bylaws 15.01.1 ("Institutional Financial Aid Permitted")</u>: "Any scholarship or financial aid to a student-athlete must be awarded in accordance with all NCAA and Conference regulations."[43]

---

[38] *Id.*

[39] *Id.*

[40] Pac-12 Conference 2021–22 Handbook, Aug. 1, 2021, https://pac-12compliance.org/wp-content/uploads/2021/08/ 2021-22-P12-Handbook.V1.pdf (last visited July 10, 2024).

[41] *Id.*

[42] Southeastern Conference Constitution and Bylaws, 2023–2024, https://a.espncdn.com/sec/media/2023/2023-24%20SEC%20Bylaws.pdf (last visited July 10, 2024).

[43] *Id.*

k.     On information and belief, the Big East has equivalent restrictive rules and bylaws.

## V.    RELEVANT MARKETS

81.    The relevant markets are the nationwide markets for the labor of NCAA Division I college athletes in the various sports in which they compete. Most relevant to this case is the nationwide market for the labor of NCAA Division I college Men's Basketball athletes. In these labor markets, current (nor former) and prospective athletes compete to participate on the various Division I athletic teams. NCAA Division I member institutions compete to recruit and retain the best players by offering unique bundles of goods and services including scholarships to cover the cost of attendance, tutoring, and academic support services, as well as access to state-of-the-art athletic training facilities, premier coaching, medical treatment, and opportunities to compete at the highest level of college sports, often in front of large crowds and television audiences. In exchange, student-athletes must provide their athletic services and acquiesce in the use of their NIL rights by the NCAA and its members for commercial and promotional purposes without compensation. They also implicitly agree to pay any costs of attending college and participating in intercollegiate athletics that are not covered by their scholarships.

82.    All of the colleges and universities in Division I, which the NCAA itself defines as the highest level of competition in college sports, compete in the relevant labor markets. This includes all colleges and universities that are members of the Conference Defendants, as well as the schools and conferences that collude with the Defendants through NCAA rules to fix the maximum compensation to athletes in exchange for the commercial use of their NIL rights and their athletic services while working on Division I teams. These colleges and universities also fix the maximum number of athletic scholarships available to student-athletes at each college or university through NCAA rules.

33

83.    The NCAA and its members have the ability to control price and exclude competition in these labor markets. All NCAA members have agreed to utilize and abide by the NCAA's bylaws, including the provisions detailed herein. The NCAA and its members have the power to exclude from these markets any member who is found to violate its rules.

84.    The NCAA imposes a wide variety of restraints on student-athletes as a condition for their being able to play for a Division I team. For example, athletes may not receive compensation beyond educational expenses approved by the NCAA; they must meet minimum requirements for educational progress; and they are strictly limited in their ability to receive compensation for any services that might be understood to reflect on their athletic ability or reputation. If student-athletes had the opportunity to receive a college education and compete at an elite level of intercollegiate competition without these restrictions, many would choose to do so. The fact that they agree to these conditions demonstrates the market power of the NCAA and its members in each of the relevant labor markets for Division I athletes.

85.    These NCAA restraints were in force during Mr. Jenkins' career as a basketball player at Villanova from 2013-2017. Mr. Jenkins was forced to abide them, and he would have chosen to receive a college education and compete at an elite level of intercollegiate competition without these restrictions if he had had the opportunity to do so.

86.    There are no reasonable substitutes for the educational and athletic opportunities offered by NCAA Division I schools in the relevant labor markets. No other division or association of collegiate athletics provides the same combination of goods and services offered in Division I. Schools in NCAA Division II, for example, provide fewer athletic scholarships than Division I schools, which results in a lower level of athletic competition, and much lower notoriety. Schools in NCAA Division III do not provide any athletic scholarships at all and a

34

lower level of competition. The National Intercollegiate Athletic Association (NAIA), National Junior College Athletic Association (NCCAA), and United States Collegiate Athletic Association (USCAA) likewise provide less scholarship money and offer a much lower level of competition. And schools in these other divisions and associations are often smaller than Division I schools, spend far less resources on athletics, and many do not even provide the opportunity to attend a four-year college. Nor are equivalent labor market opportunities offered by the professional leagues. Indeed, neither the National Football League (NFL) nor the National Basketball Association (NBA) permit players to enter the league immediately after high school. And, although some minor leagues and professional leagues in other sports do permit athletes to compete immediately after high school, recruits rarely forego opportunities to play Division I sports in order to play professionally. The qualitative differences between the opportunities offered in NCAA Division I, including the opportunity to receive a college education, and those offered by other sports leagues illustrate that Division I schools operate in distinct labor markets for their athletes.

87.     Because Division I schools are the only suppliers in these relevant labor markets, they have the power, when acting in concert through the NCAA and its conferences, to fix the quantity and price of labor. They have chosen to exercise this power by enacting collectively agreed-to, horizontal rules that strictly limit the compensation and terms of employment for Division I athletes. If any school seeks to depart from these fixed employment terms, that school may be subject to sanctions or expulsion by the NCAA.

88.     As discussed above, effective July 1, 2021, the NCAA suspended the enforcement of rules prohibiting NIL compensation from third parties, but only on an interim basis. That has led to an explosion of NIL compensation currently being provided to student-athletes. The fact

that this occurred only after the NCAA stated that it was temporarily suspending enforcement of some of the NIL restraints is further evidence of the NCAA's market power, and of the anticompetitive impact of their use of this market power to eliminate an entire category of welfare-enhancing commercial activity.

89.    By contrast, because the NCAA has not suspended the enforcement of its rules barring schools and conferences from providing compensation in addition to the fixed financial-aid amount allowed, including any NIL compensation to student-athletes, no NCAA member institution has begun to directly provide NIL compensation to student-athletes. This further demonstrates the monopsony power of the NCAA.

90.    The agreement to abide by the NCAA's compensation and scholarship maximum rules is anticompetitive because, among other things, it undermines schools' efforts to compete freely for the best college recruits.

91.    Absent these nationwide restraints, there would have been free and vigorous competition for the services of college athletes with schools or conferences offering more scholarships and compensation for athletic services and the use of NIL rights.

92.    Again, the events since July 1, 2021, have proven this to be true, as schools and conferences have permitted student-athletes to commercialize their NIL rights once the NCAA restraints were suspended, and the quantity of output has exploded, resulting in higher compensation to a large number of athletes who had previously been subject to the pre-July 1, 2021, cap. To date, Plaintiff is unaware of any Division I school or conference that has chosen to prohibit NIL compensation that is currently permitted by the NCAA and applicable law. But no NIL compensation has been provided directly by NCAA institutions to athletes, as the NCAA has not suspended its rules barring such NIL compensation by its members. If these NCAA rules

were not in effect, such compensation by the schools, including for group licensing rights for broadcasts and other purposes, would be provided.

93.    The harm to student-athletes and former student-athletes like Kris Jenkins from the NCAA's restraints is obvious. Absent the challenged restraints, more student-athletes would obtain scholarships, and many student-athletes would receive additional compensation from conferences or schools and/or third parties for the use of their NIL rights and providing athletic services. These young men and women, including Mr. Jenkins—often from socio-economically disadvantaged backgrounds—have been deprived of the economic benefit the market would otherwise pay. The adverse impact of this harm is exacerbated by the fact that only a small percentage of student-athletes will ever play professionally.  The injuries that Plaintiff is incurring and will continue to incur may not be fully compensable by monetary damages alone. This is particularly true due to the short length of NCAA careers and the ongoing nature of the NCAA's and Big East's use of Mr. Jenkins' NIL.

## VI.    FACTUAL ALLEGATIONS

### A.    An Overview of the NCAA

#### 1.    History and Purpose

94.    Former NCAA Executive Director Walter Byers, in his 1995 book, *Unsportsmanlike Conduct: Exploiting College Athletes*, wrote: "[t]he first intercollegiate competition in the United States was conceived and organized by students in the mid-1840s. By the turn of the century, eastern colleges were competing in some 19 sports. This all came about through student initiative and effort. The students set in place the underlying structure for college sports. Today, professional coaches, professional managers, and money-minded presidents have

total control. It is time to give back to the students who play sports the freedoms they deserve. At a minimum, they are entitled to freedoms enjoyed by their fellow students."

95.    The NCAA "was founded in 1906 to protect young people from the dangerous and exploitative athletics practices of the time."[44]  According to the NCAA, "[t]he rugged nature of early-day football, typified by mass formations and gang tackling, resulted in numerous injuries and deaths," prompting President Theodore Roosevelt to convene two White House conferences with college athletics leaders to encourage safety reforms. As a result of several subsequent meetings of colleges and universities to initiate changes in football playing rules to protect the safety of student-athletes, on March 31, 1906, 62 institutions became charter members of the Intercollegiate Athletic Association of the United States (IAAUS). The IAAUS took its present name, the NCAA, in 1910.

96.    For several years, the NCAA was a discussion group and rules-making body, but in 1921 the first NCAA national championship was conducted: the National Collegiate Track and Field Championships. Gradually, more rules committees were formed and more championships were created, including a basketball championship in 1939.

97.    According to the NCAA, "[a]s college athletics grew, the scope of the nation's athletics programs diverged, forcing the NCAA to create a structure that recognized varying levels of emphasis. In 1973, the Association's membership was divided into three legislative and competitive divisions—I, II, and III. Five years later, Division I members voted to create subdivisions I-A and I-AA (renamed the Football Bowl Subdivision and the Football Championship Subdivision in 2007) in football." The NCAA "began administering women's

---

[44] Dan Treadway, *Why Does the NCAA Exist?* HuffPost.com, Dec. 6, 2017, https://www.huffpost.com/entry/johnny-manziel-ncaa-eligibility_b_3020985 (last visited July 25, 2021).

athletics programs in 1980 when Divisions II and III established 10 championships for 1981-82. A year later, the historic 75th Convention adopted an extensive governance plan to include women's athletics programs, services, and representation. The delegates expanded the women's championships program with the addition of 19 events, many of them Division I and National Collegiate (all division) championships."

98.    Article 1 of the NCAA Constitution states that the NCAA's basic purpose is "to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports."

99.    The NCAA proclaims it is "dedicated to the well-being and lifelong success of college athletes," and "united around one goal: creating opportunities for college athletes."[45]

### 2.    Governance Structure

100.    The NCAA describes itself as an "unincorporated not-for-profit educational organization . . . through which the colleges and universities of the nation speak and act on athletic matters at the national level."[46] The NCAA proclaims it is "a voluntary association of more than 1,200 institutions, conferences, and organizations devoted to the sound administration of intercollegiate athletics in all its phases," and that "[t]hrough the NCAA, its members consider any athletics issue that crosses regional or conference lines and is national in character."

---

[45] 2018 IRS Form 990.

[46] NCAA Consolidated Financial Statements, FY 2018 & 2019.

According to its IRS tax returns, the NCAA's "active member institutions and voting conferences are the ultimate voice in all Association decisions."[47]

101.    The NCAA "oversees 89 championships in 23 sports," and "more than 400,000 college athletes competing in three divisions at over 1,000 colleges and universities." The NCAA website further states:

> Each member school is able to choose a level of competition that best fits its mission. Competition is offered in Division I (the largest programs that provide the most athletically related financial aid for student-athletes), Division II (limited financial aid) and Division III (no athletically related financial aid).
>
> There are 1,066 active member schools in the NCAA membership—340 in Division I, 290 in Division II and 436 in Division III. The NCAA also contains 95 member conferences in all three divisions. Overall membership membership—counting schools, conferences and related associations—is 1,273.
>
> Division I is subdivided based on football affiliation. A total of 120 schools are members of the Football Bowl Subdivision (FBS). That subdivision is characterized by postseason play outside the NCAA structure and also by higher financial aid allocations. The second Division I subdivision is the Football Championship Subdivision, which contains 122 schools that participate in the NCAA's Division I Football Championship. The remaining 98 Division I schools do not sponsor football.

102.    According to the NCAA, "Division I offers three classes of membership: active, conference and affiliated." NCAA Constitution Article 3.02.3, titled "Membership Categories," provides:

> **3.02.3.1 Active Member.**  An active member is a four-year college or university that is accredited by the appropriate regional accrediting agency and duly elected to active membership under the provisions of this article (see Constitution 3.2.3). Active members have the right to compete in NCAA championships, to vote on legislation and other issues before the Association, and to enjoy other privileges of

---

[47] 2018 IRS Form 990.

membership designated in the constitution and bylaws of the
Association.

**3.02.3.2 Member Conference.**  A member conference is a group of
colleges and/or universities that conducts competition among its
members and determines a conference champion in one or more
sports (in which the NCAA conducts championships or for which it is
responsible for providing playing rules for intercollegiate
competition), duly elected to conference membership under the
provisions of this article (see Constitution 3.3.3). A member
conference is entitled to all of the privileges of active members except
the right to compete in NCAA championships (see Constitution
3.3.2). Only those conferences that meet specific criteria as
competitive and legislative bodies (see Constitution 3.02.1 and
3.02.2) and minimum standards related to size and division status are
permitted to vote on legislation or other issues before the Association.

103.    The NCAA's website explains that, "[e]ach division creates its own rules
governing personnel, amateurism, recruiting, eligibility, benefits, financial aid, and playing and
practice seasons—consistent with the overall governing principles of the Association. Every
program must affiliate its core program with one of the three divisions."

104.    The NCAA "operates through a governance structure, which empowers each
division to guide and enhance their ongoing division-specific activities."[48] In Division I, the
legislative system is based on conference representation and an eighteen-member Board of
Directors that approves legislation. The governance structure also includes an Executive
Committee composed of sixteen chief executive officers that oversees association-wide issues
and is charged with ensuring that each division operates consistently with the basic purposes,
fundamental policies, and general principles of the NCAA.

### 3.    Bylaws and Enforcement

105.    The NCAA and its members govern themselves through the NCAA manual,
which is promulgated yearly and updated quarterly. The manual contains, among other things,

---

[48] NCAA Consolidated Financial Statements, August 31, 2019 and 2018.

the NCAA's Constitution and operating Bylaws, which includes nearly five hundred pages of regulations governing all aspects of college sports.

106.    The Constitution and Bylaws were adopted—and may be amended—by votes of the NCAA membership. Article 5.2.2 ("Operating Bylaws") states that "[e]ach division may adopt legislation to be included in the operating bylaws of the Association, which provide rules and regulations not inconsistent with the provisions of the constitution and which shall include, but not be limited to, the following particulars: (a) The administration of intercollegiate athletics by members of the Association; (b) The establishment and control of NCAA championships (games, matches, meets and tournaments) and other athletics events sponsored or sanctioned by the Association; (c) The procedures for administering and enforcing the provisions of the constitution and bylaws; and (d) The adoption of rules of play and competition in the various sports, and the delegation of authority in connection with such subjects to individuals, officers or committees."

107.    The manual also contains extensive provisions requiring member schools to follow NCAA rules and providing for discipline of members that fail to do so. For example, Article 1.3.2 ("Obligations of Member Institutions") states that "[l]egislation governing the conduct of intercollegiate athletics programs of member institutions shall apply to basic athletics issues such as admissions, financial aid, eligibility and recruiting. Member institutions shall be obligated to apply and enforce this legislation. . . ." Article 2.8.1 ("Responsibility of Institution") reiterates that "[e]ach institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs," and that "[m]embers of an institution's staff, student-athletes, and other individuals and groups representing the institution's

athletics interests shall comply with the applicable Association rules, and the member institution shall be responsible for such compliance."

108. Article 3.1 ("Eligibility for Membership") reinforces that "institutions or organizations must accept and observe the principles set forth in the constitution and bylaws of the Association." And Article 3.2.1.2 ("Compliance with Association Rules") mandates that each institution "shall administer its athletics programs in accordance with the constitution, bylaws and other legislation of the Association."

109. Similarly, Article 3.2.4 ("Conditions and Obligations of Membership") states that "[a]n active member institution agrees to administer its athletics program in accordance with the constitution, bylaws and other legislation of the Association." And, pursuant to Article 3.2.4.4 ("Certification of Eligibility/Declaration of Ineligibility"), every NCAA school "is responsible for certifying the eligibility of student-athletes under the terms of the constitution, bylaws or other legislation of the Association" and institutions are "obligated immediately to apply all applicable rules and withhold ineligible student-athletes from all intercollegiate competition." In other words, the NCAA mandates a collective boycott by all members of any athlete found to have deviated from the price-fixing activity alleged in this Complaint.

110. To reinforce its rules, the NCAA goes even further. For example, Article 3.2.4.11 ("Discipline of Member") states that, "active members shall refrain from athletics competition with designated institutions under the provisions of the Association's enforcement procedures." To put it another way, the NCAA mandates a collective boycott by all members of any school found to have deviated from the price-fixing activity alleged in this Complaint.

111. Article 2.8.3 ("Penalty for Noncompliance") states that "[a]n institution found to have violated the Association's rules shall be subject to such disciplinary and corrective actions

as may be determined by the Association." Article 3.2.5.1 ("Termination or Suspension") states that "[t]he membership of any active member ... failing to meet the conditions and obligations of membership may be suspended, terminated or otherwise disciplined." Article 3.01.4 ("Termination or Suspension of Membership") states that "[a]ll rights and privileges of a member shall cease immediately upon termination or suspension of its membership." And, Article 3.2.5.1.1 ("Cessation of Rights and Privileges") states that "[a]ll rights and privileges of the member shall cease upon any termination or suspension of active membership."

112.     Conferences also enforce the NCAA's rules. For example, the Pac-12's 2018-19 Handbook states that "[t]he Conference is formed for the following purposes: a. To provide its members with a jointly governed body for sponsoring, supervising and regulating intercollegiate athletics as a member of the National Collegiate Athletics Association ('NCAA') in accordance with the principles, policies, constitution and bylaws of the NCAA . . . ." The Handbook continues that "[t]he members of the Conference value: ... Compliance with Conference and NCAA rules" and that "[t]he Conference may place a member on probation or suspension, or terminate its membership, by vote of at least three-fourths of all of the members of the CEO Group eligible to vote on the matter, for one or more of the following reasons: . . . Violating rules and regulations of the NCAA, or becoming ineligible for active membership in Division I of the NCAA, by a written determination of the NCAA; . . . Such disciplinary action may also include the assessment of financial penalties." It continues that "[t]he Conference is a member of the NCAA, therefore, all member institutions are bound by NCAA rules and regulations unless the Conference rules are more demanding," and "[t]he rules of the National Collegiate Athletic Association shall govern all matters concerning financial aid to student-athletes except to the

extent that such rules are modified by the CEO Group." All of the other Conference Defendants have similar rules agreeing to abide by and enforce NCAA bylaws.

113.    In addition to controlling its members, the NCAA also regulates college athletes. Bylaw 14.01.3 ("Compliance With Other NCAA and Conference Legislation") mandates that, "to be eligible to represent an institution in intercollegiate athletics competition, a student-athlete shall be in compliance with all applicable provisions of the constitution and bylaws of the Association..." Bylaw 12.7.2 ("Student-Athlete Statement") states that each year a college athlete "shall sign a statement in a form prescribed by the Legislative Council ... related to ... eligibility ... financial aid, amateur status ... [f]ailure to complete and sign the statement shall result in the student-athlete's ineligibility for participation in all intercollegiate competition."

### B.    The Commercial Nature of Division I Sports

114.    The rapid and largely unconstrained escalation of commercialization in college sports makes it increasingly difficult to justify the ever-expanding divide between student-athletes, who have been compensated only with restrictive, in-kind benefits or expense reimbursement, and the business of the sports they play. This divide has eroded the value of the education that athletes receive and gives rise to high-profile violations of NCAA rules that highlight the pervasive influence of money in college sports and the lack of commitment to academics.

115.    In a January 2020 interview with ESPN, former NCAA Vice President of Championships, Mark Lewis explained the highly commercialized nature of big-time college sports: "The priority is to monetize the sport, that's taken precedence over everything else. If that's the model—and there's nothing wrong with that—then you can't expect the players to live by the same set of rules [as they did in the past]. To me, it's just a question of fairness." Lewis continued, "If you go back 30 or 40 years to all the ways pro sports tried to be financially

successful and compared that to college sports, you didn't check all those boxes. There were

legitimate differences ... Then, you could say the focus was an academic-oriented situation. But

in this drive for revenue now, the boxes line up the same. Colleges are doing everything that pro

sports leagues are doing to make money. So how come you're treating the participants radically

different? You can't justify it."[49]

116.    The money generated by the college sports enterprise is staggering. In 2019, the

NCAA reported total revenues of $1,118,495,545.[50] That number jumped to $1,376,591,143, in

2024.[51] And it is important to note that the revenues reported by the NCAA are only a fraction of

the total revenues brought in by Division I college sports each year. And, whether through

sponsorship arrangements, ticket sales, television contracts, apparel deals, merchandise sales, or

increasing student fees, the revenue streams for conferences and individual athletics programs

are varied and robust.

117.    College sports have also proved to be highly profitable for corporate interests that

find every way imaginable to market and exploit student-athletes. While corporations have

fueled the massive growth of the college sports industry, their profit margins have

simultaneously expanded off the backs of "amateur" college athletes.

118.    For example, television networks have capitalized on the immense profitability of

the college sports machine through substantial broadcasting deals with the NCAA and its

members. In 2016, CBS Sports and Turner Broadcasting signed an eight-year, $8.8 billion

---

[49] Dan Murphy, *Former NCAA executive Mark Lewis supports college players earning money*, ESPN.com, Jan. 21, 2020, https://www.espn.com/college-sports/story/_/id/28530364/former-ncaa-executive-mark-lewis-supports-college-players-earning-money (last visited July 25, 2021).

[50] NCAA Consolidated Financial Statements, August 31, 2019 and 2018.

[51] NCAA Consolidated Financial Statements, August 31, 2024 and 2023, available at, https://ncaaorg.s3.amazonaws.com/ncaa/finance/2023-24NCAAFIN_FinancialStatement.pdf.

extension of their existing 14-year, $10.8 billion contract, with the NCAA for broadcasting rights to the March Madness basketball tournament.[52] In the same year, the Big Ten conference signed a six-year deal with Fox, ESPN, and CBS worth $2.64 billion.[53] That contract mirrors similar deals that the other Power Five conferences and schools have made with broadcasters to launch their own channels.

119.    In 2013, the newly reconstituted Big East Conference entered into a 12-year broadcasting deal with Fox Sports and CBS reportedly worth between $500 million and $600 million, averaging approximately $41.67 million per year.[54] In June 2024, the Big East saw a significant jump in revenue—nearly double—to between $75 million and $80 million per year for six years when it entered into a new broadcasting agreement, maintaining Fox Sports as its primary network while adding games on NBC and TNT for the first time.[55]

120.    Every television deal, whether with the NCAA, its conferences, or individual programs, nets broadcasters substantial advertising revenues. With championship game ads going for $1.5 million each, corporate spending on the March Madness tournament now rivals that of the Super Bowl. It is estimated that CBS and Turner took in $1 billion from advertisements during the 2018 tournament.[56] In 2019, the University of Virginia's overtime victory over Texas

---

[52] https://www.sportsmediawatch.com/2016/04/cbs-turner-ncaa-march-madness-eight-year-extension-final-four-cable-2032/.

[53] Lev Facher, *Report: Big Ten getting $2.64 billion in new TV deal*, Indystar.com, June 20, 2016, https://www.indystar.com/story/sports/college/2016/06/20/report-espn-pay-more-than-1-billion-big-ten-footballgames/86133418/ (last visited July 25, 2021).

[54] https://www.sportsvideo.org/2013/03/21/new-big-east-celebrates-reboot-with-new-fox-sports-rights-deal/; https://www.espn.com/mens-college-basketball/story/_/id/40445093/big-east-signs-six-year-tv-deal-fox-nbc-tnt.

[55] https://www.sportspro.com/broadcast-ott/media-rights/big-east-conference-fox-nbc-tnt-sports-media-rights-deals/.

[56] Andrew Lisa, *The Money Behind the March Madness NCAA Basketball Tournament*, Finance.yahoo.com, Mar. 9, 2020, https://finance.yahoo.com/news/money-behind-march-madness-ncaa-194402803.html (last visited July 25, 2021).

Tech drew 19.6 million viewers and that game alone was reported to have generated $114 million in ad spending.[57]  Despite the fact that student-athletes contribute a substantial portion of the value that supports the massive revenues generated in these deals (through both their athletic performances and the use of their NIL rights), because of the challenged restraints agreed to by Defendants, student-athletes do not receive any share in those revenues apart from the limited scholarships and benefits that NCAA rules permit. Absent these restraints, student-athletes would receive the market value commensurate with what they contribute.

121.    With so many cameras pointed at college sporting events, corporations have also realized an opportunity to profit by associating their products and services with student-athletes. Because the NCAA has prevented them from dealing directly with individual athletes, brands have found other ways to leverage the college sports platform to their advantage, including by entering into lucrative sponsorship deals with the NCAA, conferences, schools, and coaches.

122.    The NCAA maintains an official list of "official corporate champions and official corporate partners" that currently includes 19 major corporations ranging from Coca-Cola, AT&T, and Capital One Intuit, Geico, and Buick, and Samsung. These companies gain exclusive marketing and promotional rights to all 90 NCAA championship events, including the Division I Men's Basketball Championship and Football Championships. Those rights pay dividends as each commercial or logo embedded in the NCAA's programming has the potential to reach millions. As a result, and as U.S. Senator Chris Murphy noted in his 2019 report, Madness, Inc., "Everything that can be branded has been. That iconic moment where athletes climb a ladder as

---

[57] *Id*.

they cut down the nets to celebrate a berth in the Final Four or the championship? Even the ladder is sponsored."[58]

123.    In March 2025, the Big East announced ten returning corporate sponsors for the 2025 Big East Women's and Men's Basketball Tournaments, including the presenting sponsor, Jeep, Invesco QQQ, Keurig, Dr. Pepper, Continental Tire, Gatorade, Samuel Adams, Hackensack Meridian Health, General Dynamics Electric Boat, Tropical Smoothie Café, and Stout restaurant. New corporate sponsorship partners include Acorns, Colgate, College Ave, Sun Cruiser, Visit Myrtle Beach, Proximo, Hankook Tire, and Klarna.[59]

124.    The nation's largest sports apparel companies also compete for what they recognize is prime advertising real estate—college athletes whose games are broadcast for millions to see. Because the NCAA has prohibited them from dealing directly with the athletes, instead of the athletes being compensated for the use of their NIL rights (as would occur absent the restraints), apparel companies enter into lucrative agreements with schools and coaches instead. In 2019, Nike, Adidas, and Under Armour had secured exclusive rights to outfit 97 percent of all Division I football and basketball programs, and it was reported that, in that year alone, these three companies spent over $300 million on college sponsorship contracts. Nike and its affiliated Jordan Brand also outfitted the majority of 2024 March Madness tournament participants.[60] Universities receive substantial sums from these sponsorships, and apparel

---

[58] Chris Murphy, *Madness, Inc. How Everyone is getting rich off college sports – except the players*, Murphy.Senate.gov, Mar. 28, 2019, https://www.murphy.senate.gov/download/madness-inc (last visited July 25, 2021).

[59] https://www.bigeast.com/news/2025/3/8/general-big-east-conference-announces-2025-basketball-tournament-partners.aspx#:~:text=The%20complete%20BIG%20EAST%20sponsor,Tropical%20Smoothie%20Caf%C3%A9%20and%20Stout.

[60] https://www.sportsbusinessjournal.com/Articles/2024/03/18/ncaa-tournament-jersey-shoe-sponsors/

advertising on network telecasts of college basketball games also helps, together with advertising from other sources, to support the large media rights payments to the NCAA and its members.

125.    Division I programs are now defined by the apparel company that outfits their teams. For example, the University of Michigan is a Nike school, having signed a $173.8 million contract with the company in 2016. In 2017, the Ohio State University signed a 15-year, $252 million deal with Nike that included a $20 million cash signing bonus. Villanova is a Nike school as well.[61] And UCLA signed a record-setting deal with Under Armour worth $280 million.[62]

126.    Schools can further increase their sponsorship revenues by staying loyal to a particular brand. For example, when Clemson University signed a 10-year contract extension with Nike in 2018 that granted its athletic department more than $58 million in "apparel allowances, direct cash payouts, and royalties," the school doubled its annual payout.[63] Meanwhile, Indiana University's renewed contract with Adidas nearly doubled its payments from $3.7 million per year under its prior agreement to $6.7 million.[64]

127.    Over time, major apparel retailers, predominantly Nike and Adidas, have come to dominate the funding of American Amateur Union ("AAU") basketball and other youth teams and tournaments in an effort to affiliate their brands and products with the next generation of sports stars. The value companies obtain from investing in and affiliating with youth teams is

---

[61] https://www.youtube.com/watch?v=50x7qM5F350.

[62] ESPN.com, *Breaking down college shoe and apparel deals*, Sept. 27, 2017, http://www.espn.com/mens-collegebasketball/story/_/id/20837463/a-look-colleges-apparel-shoe-deals (last visited July 25, 2021).

[63] Sports Business Journal, *Clemsons' 10-year Nike Extension Doubles Value of Previous Deal*, sportsbusinessdaily.com, Aug. 6, 2018, https://www.sportsbusinessdaily.com/Daily/Issues/2018/08/06/Marketing-and-Sponsorship/Clemson-Nike.aspx (last visited July 25, 2021).

[64] Zach Osterman, *IU to get 81% hike in apparel revenue in Adidas deal*, IndyStar.com, Aug. 17, 2015, https://www.indystar.com/story/sports/college/indiana/2015/08/17/iu-adidas-extend-apparel-agreement/31887747/ (last visited July 25, 2021).

derived from the opportunity it provides to create relationships with top prospects and those around them from a young age. These early relationships allow the companies to influence which colleges prospects will attend and, ultimately, which brands they will endorse if and when they go pro. The system creates a strong incentive for basketball coaches at all levels to remain loyal to a particular brand—and have their players do the same—while also continuing to recruit fresh talent on behalf of the company they affiliate with. As a result, AAU basketball has become a nationwide marketplace for the most talented young basketball players in the country and is now a recruiting battleground for college coaches and corporations alike.

128.    While many factors might influence the college selected by a young athlete, there is evidence demonstrating that early affiliation with a particular brand often holds significant weight in an athlete's future decisions. Between 2003 and 2017, roughly 80 percent of five-star prospects from Nike-affiliated AAU teams went on to play for a Nike-sponsored college. And of the five-star players who ultimately reached the NBA, roughly 87 percent of those who were affiliated with Nike through youth teams and colleges, continued to endorse the company as professionals.[65]

129.    In 2014, then University of Louisville head basketball coach Rick Pitino criticized the system, claiming that because Louisville was sponsored by Adidas, he couldn't recruit a player from a Nike-sponsored AAU team: "Believe me, it's a very competitive thing by these shoe companies to get players. They're going out and recruiting like us, in the summertime.

---

[65] Chris White, *By the Numbers: Once Nike gets a five-star college recruit, he's unlikely to ever leave*, USAtoday.com, Feb. 26, 2018, https://sports.usatoday.com/2018/02/26/by-the-numbers-once-nike-gets-a-fivestar-college-recruit-hes-unlikely-to-ever-leave/ (last visited July 25, 2021).

'Let's get this kid into the (Nike) EYBL. Let's get this kid in the Adidas Nations.'" It's hard for coaches to resist the system, Pitino says, because "our pockets are lined with their money."[66]

130.    In 2017, the FBI announced a sweeping corruption investigation that implicated Pitino along with other college coaches, as well as financial advisors, and Adidas executives in a conspiracy to pay five-star high school recruits to attend Louisville and other Adidas-sponsored universities. Three federal criminal complaints released in September 2017 detail some aspects of the corruption and exploitation that occurs in the current system when coaches, agents, and shoe companies work together to control a prospect's basketball career and business dealings for their own enrichment.

131.    According to Sonny Vaccaro, a retired Nike executive and the person many consider to be the godfather of basketball endorsement money: "Everybody is involved in this scandal. There's nobody left out. The most important person in the transaction is that high school kid ... and he's the poorest of all of them. And they're all bidding on his ability to play basketball—to win championships, go to the Final Four, to sell shoes, to sell suits, to put money in investments ... the universities are now co-conspirators in everything that happens... It's a willing co-conspiracy. The shoe company wants to sell shoes. The university wants to win games so they get more money from the shoe company."[67] Vaccaro acknowledges that "there's been scandals in college athletics forever. And there's been a word in college athletics forever: Amateurism. And amateurism and scandal go together."

---

[66] Associated Press, *Pitino: Shoe companies too influential*, ESPN.com, Oct. 9, 2014, https://www.espn.com/mens-college-basketball/story/_/id/11672004/rick-pitino-wants-eliminate-influence-athletic-shoe-companies-recruiting (last visited July 25, 2021).

[67] Gentry Estes, *College basketballs' trap: How agents and shoe companies team up to exploit athletes*, courier-journal.com, Feb. 25, 2018, https://www.courier-journal.com/story/news/2018/02/25/college-basketball-recruiting-scandal-system-traps-players/370215002/ (last visited July 25, 2021).

132.     While athletes have not been allowed to profit from schools' and conferences' social media activities, social media sponsorships have become a staple in negotiations of corporate partnership deals for many major college athletic programs. In addition to television deals and apparel contracts, social media plays an important role in each school's quest for more revenue, providing brand exposure, fan interaction, and increased awareness of events at a relatively low cost to athletic departments. A strong social media presence is appealing to potential sponsors, and teams can drastically increase the value of their sponsorships by creating high-quality, engaging content featuring brand logos and often the NIL rights of student-athletes.

133.     For example, it was reported in 2015 that the University of Southern California ("USC") athletics department was sending about a dozen sponsored messages each week across each of its official social media accounts, including on Twitter, Facebook, Instagram, and Snapchat. Fox Sports, the school's rights holder, confirmed at the time that revenue from those sponsored posts was approaching the mid-six-figures annually and the report further noted that "Fox and USC have seen no evidence that the presence of sponsor branding turns off Trojans' fans... it's the content in the graphic that drives views, whether a sponsor is present or not."[68]

134.     Other Division I schools negotiate similar social media sponsorship arrangements and incorporate brand logos into their own athletic posts in exchange for payment from the brands.

135.     In the 2017-18 academic year, sponsorship spending on college athletic departments, conferences, bowl games, and related properties totaled $1.24 billion.[69] In 2018, the

---

[68] Michael Smith, Colleges find revenue stream in social media, sportsbusinessdaily.com, Oct. 12, 2015, https://www.sportsbusinessdaily.com/Journal/Issues/2015/10/12/Colleges/College-social-media.aspx (last visited July 25, 2021).

[69] Sponsorship spending on College Athletics to Total $1.24 billion in 2017/2018 Season, sponsorhip.com, Mar. 19, 2018, https://www.sponsorship.com/Report/2018/03/19/Sponsorship-Spending-On-College-Athletics-To-Total.aspx (last visited July 25, 2021).

Pac-12 conference alone generated $153.13 million—15 percent of its total revenues ($1,011.97 million)—from corporate sponsorship, advertising and licensing.[70] Pac-12 schools derived similar portions of their revenues from sponsorships as well. For example, in 2018, corporate sponsorships accounted for 16 percent ($18.07 million) of ASU's total athletic department operating revenues ($113.64 million).[71]

136.    Flush with cash and unable to compete for athletes on the basis of financial remuneration, colleges invest their revenues internally. The constant drive to win, either between big-time Power Five schools or smaller programs hoping to make the jump onto the national stage, fuels an "arms race" that has inflated staff salaries and rationalized lavish athletic facilities, among other spending intended to make the school as competitive as possible in recruiting.

137.    Collegiate athletic programs invest in facilities that outshine even their most impressive professional counterparts. In 2023, Texas Tech has released artist's renderings of planned $200 million upgrades to its football facilities that include an indoor, virtual reality practice facility, a state-of-the-art weight-lifting facility, and luxury stadium seating.[72] In 2022, for example, the University of Georgia unveiled an $80 million athletic department renovation project that included upgrades to the football locker room, added an in-house barbershop, and overhauled the weight room.[73] And, in 2023, the University of Texas unveiled its crown jewel,

[70] College Athletics Financial Information (CAFI) Database, http://cafidatabase.knightcommission.org/fbs/pac-12#!quicktabs-tab-where_the_money-1 (last visited July 25, 2021).

[71] College Athletics Financial Information (CAFI) Database, http://cafidatabase.knightcommission.org/fbs/pac-12/arizona-state-university#!quicktabs-tab-where_the_money-1 (last visited July 25, 2021).

[72] https://x.com/FOS/status/1628829901364109313.

[73] https://frontofficesports.com/university-of-georgia-unveils-80m-athletic-department-renovations/#:~:text=Stadiums%20%26%20Real%20Estate-,University%20of%20Georgia%20Unveils%20%2480M%20Athletic%20Department%20Renovations,%2Dthe%2Dart%20weight%20room.

the most expensive college basketball arena in history, the Moody Center, a $375 million, 15,000-seat arena, featuring four, center-hung LED displays, interactive digital art, AI-enabled security screenings, and public Wi-Fi and wired networks.[74]

138.    The college sports industry has also become increasingly lucrative for university athletic administrators and coaches. The median salary for an athletic director at a Division I institution is now over $500,000 per year. Meanwhile, more than 150 football and men's basketball coaches at Division I schools earn over $1 million per year, with the top 25 football coaches earning an average of $5.2 million annually and the top 25 basketball coaches earning an average of $3.2million annually.[75] Today, the highest paid public employees in 41 of the 50 states are college football or basketball coaches.

139.    Since 1984, the average base salary for head football coaches at public universities has grown 750 percent (adjusted for inflation). As an example, Nick Saban, former head football coach at the University of Alabama, made $11 million in 2017—more than any NFL coach.[76]  Mike Krzyzewski, former head basketball coach at Duke, a private university, made $8.98 million in the same year. These figures represent just one aspect of the compensation that college coaches receive. On top of extravagant salaries, coaching contracts often include additional perks like complimentary flight time on private jets, personal cars, country club memberships, negotiated percentages of ticket sales, and six-figure performance bonuses.

---

[74] https://www.belden.com/blogs/smart-building/tech-powering-most-expensive-college-basketball-arena.

[75] Multiple Contributors, *The perks of being a college football coach: Cars, planes, and ... good behavior bonuses?*, ESPN.com, Aug. 16, 2017, https://www.espn.com/college-football/story/_/id/20176937/college-football-coaches-perks-sweeten-deals-nick-saban-dabo-swinney-jim-harbaugh-urban-meyer-jimbo-fisher-mike-leach (last visited July 25, 2021).

[76] Monte Burke, *Nick Saban Will Make $11 Million Next Football Season And He Is Worth Every Penny*, forbes.com, May 2, 2017, https://www.forbes.com/sites/monteburke/2017/05/02/nick-saban- will-make-11-million-next-football-season-and-he-is-worth-every-penny/#3b912a476403 (last visited July 25, 2021).

140.    Coaches also share in the revenues that their schools bring in from commercial sponsorship contracts and generate income from their own personal NIL deals, including consultation contracts with apparel companies, television and radio programs, employment by or ownership of sports camps and clinics, book deals, and commercial speaking engagements.

141.    For example, between 2014 and 2017, University of Kentucky's ("UK") then-head basketball coach John Calipari reported approximately $1.1 million in outside income on top of his $7.75 million salary from UK. The sources of this income included Calipari's personal contract with Nike, book and video royalties, and various speaking fees.[77]

142.    In 2014, Michigan State University signed an apparel deal with Nike that included a $100,000 annual cash payment to then-head football coach Mel Tucker. Men's basketball coach Tom Izzo also benefitted from the school's apparel deal, as well as from a separate personal contract with Nike that netted him a $50,000 signing bonus, $400,000 in annual compensation, $95,000 per year in equipment and apparel, and the opportunity to receive additional bonuses if his team wins in the post-season tournament. Izzo also received $35,000 in outside income from his camps and clinics.[78]

143.    University of North Carolina's ("UNC") former basketball coach Roy Williams released the details of his personal contract with Nike, which paid out $250,000 in 2018. Williams's compensation from Nike was set to increase gradually over the next ten years,

---

[77] Linda Blackford, *UK pays Coach Cal $7.75 million a year. Heres' how he makes even more*, Kentucky.com, Oct. 12, 2017, https://www.kentucky.com/news/local/education/article178430576.html (last visited July 25, 2021).

[78] Rod Beard, *Michigan States' Nike Deal worth $34M for 10 years*, detroitnews.com, July 18, 2015, https://www.detroitnews.com/story/sports/college/michigan-state-university/2015/07/18/michigan-states-nike-deal-worth-years/30325697/ (last visited July 25, 2021).

ultimately reaching $340,000 by 2028.[79]  In December 2018, four other UNC coaches also had personal service contracts with Nike. Along with Williams, Mack Brown (football), Anson Dorrance (women's soccer), Mike Fox (baseball), and Sylvia Hatchell (women's basketball) each had similar deals. UNC also has its own ten-year contract with the retailer that runs through 2028. In 2019, the school received $5.1 million in product and $3.25 million in cash from Nike.[80]

144.    While NCAA rules allow college athletes to trademark their names or slogans, they have prohibited athletes from collecting any royalties from the use of those trademarks. Meanwhile, coaches are free to profit from the licensing of their own trademarks. For example, Clemson football coach Dabo Swinney has trademarked his own name and, in 2016, he applied to trademark the phrases "BYOG" and "Bring Your Own Guts" after a post-game interview in which he said the phrases went viral. Time Magazine reported that as part of Swinney's $3.3 million compensation package, Clemson paid him $500,000 in 2015 for the rights to market his name, image, and likeness. And, thanks to the trademarks, other parties that sell Swinney trademarked products must pay 10 percent of the wholesale price to the coach for using his name, and an additional 10 percent for using BYOG or Bring Your Own Guts. The Collegiate Licensing Company, which helps manage Swinney's relationships with outside vendors, has reportedly given permission to at least 13 companies, including Nike, to sell merchandise stamped with the BYOG slogan, Swinney's name, or both.[81]

---

[79] Dane Huffman, *UNC extends deals with Roy Williams, Nike, others*, bizjournals.com, Dec. 19, 2018, https://www.bizjournals.com/triangle/news/2018/12/19/unc-extends-deals-with-roy-williams-nike-others.html (last visited July 25, 2021).

[80] *Id.*

[81] Sean Gregory, *Meet Dabo Swinney®, The Clemson Coach Who Trademarked More Than His Name*, TIME.com, Jan. 8, 2016, https://time.com/4171504/dabo-swinney-clemson-coach-who-trademarked-bring-your-own-guts/ (last visited July 25, 2021).

145.    While student-athletes were barred from receiving compensation for promotional appearances, schools can profit by selling "access" to their athletes to the highest bidder. For example, ESPN reported that, in 2013, Texas A&M auctioned a seat next to Heisman Trophy winner Johnny Manziel at an athletic department banquet to a booster for $20,000.[82]

146.    In the absence of rules limiting athletes from making similar deals, such compensation to the athletes would have been the norm. Shortly after the temporary suspension of most NIL rules on July 1, 2021, Texas A&M football players Isaiah Spiller and Demani Richardson reportedly earned $10,000 each for exclusive interviews posted to Aggies-centric website TexAgs.com.[83] In the first year following the temporary suspension, athletes earned an estimated aggregate of $917 million.[84]

147.    And, while student-athletes were prohibited from receiving compensation in exchange for their autographs, others have been free to profit from the sale of those same autographs without fear of penalty. In 2013, at the same time Manziel was being investigated by the NCAA for allegedly accepting money in exchange for signing autographs for memorabilia brokers, ESPN reported that independent merchandiser Aggieland Outfitters had "recently auctioned off six helmets signed by Manziel and Texas A&M's other Heisman Trophy winner, John David Crow, for $81,000."[85] At the time, NCAA Vice President Kevin Lennon

---

[82] Darren Rovell, Justine Gubar, *Sources: NCAA investigating Manziel*, ESPN.com, Aug. 4, 2013, https://www.espn.com/espn/otl/story/_/id/9537999/otl-ncaa-investigating-johnny-manziel-profiting-autographs (last visited July 25, 2021).

[83] Jace Evans, *Texas A&M players Isaiah Spiller, Demani Richardson make $10,000 each for interviews with fan site in NIL deal*, USAToday.com, July 18, 2021, https://www.usatoday.com/story/sports/ncaaf/sec/2021/07/17/texas-am-football-players-making-10-k-interviews-nil-deal/8005537002/ (last visited July 10, 2024).

[84] https://apnews.com/article/college-football-sports-basketball-6a4a3270d02121c1c37869fb54888ccb.

[85] Jace Evans, *Texas A&M players Isaiah Spiller, Demani Richardson make $10,000 each for interviews with fan site in NIL deal*, USAToday.com, July 18, 2021, https://www.usatoday.com/story/sports/ncaaf/sec/2021/07/17/texas-am-football-players-making-10-k-interviews-nil-deal/8005537002/ (last visited July 10, 2024).

acknowledged that "student-athletes are often asked for autographs from fans, but unfortunately, some individuals' sole motivation in seeking an autograph is for resale."[86]

148.    From what they wear, to where you can watch them and what advertisements come across your screen, in the modern world of big-time college sports, student-athletes serve the financial interests of their colleges and the corporations that have paid well to turn them into walking billboards.

149.    If not for the NCAA's restrictions on athlete NIL compensation, there would have also been (as there now is) a market for NCAA sports video games from which the athletes would share in the revenues. EA Sports produced college sports video games, which were wildly popular with fans, until former Arizona State University quarterback Sam Keller sued EA and the NCAA, arguing that they were illegally profiting from the images of college football and basketball players in such games.[87] *The Keller* case established that video games like the previously-marketed *NCAA Football* and *NCAA Basketball* titles cannot be produced without obtaining permission from the athletes to use their NIL rights. But, although EA indicated that it was willing to pay players to use their likenesses in the games, the NCAA refused to change its rules to allow such payments.[88] And, when the case ultimately settled for a total of $60 million paid to the 24,819 student-athletes whose NIL rights were featured in the games from 2003 to 2014, the NCAA ended its licensing agreement with EA and the games were discontinued after

---

[86] George Schroeder, *'No evidence' Manziel took money for autographs, A&M says*, USAToday.com, Aug. 28, 2013, https://www.usatoday.com/story/sports/ncaaf/sec/2013/08/28/johnny-manziel-suspended-for-first-half-of-texas-am-opener-vs-rice/2723767/ (last visited July 10, 2024).

[87] *Keller v. Elec. Arts Inc. (In re NCAA Student-Athlete Name & Likeness Licensing Litig.)*, 724 F.3d 1268 (9th Cir. 2013).

[88] *See* Kevin Trahan, *Court filing: EA Sports wanted to pay college football players, but couldn't*, SBnation.com, June 4, 2021, https://www.sbnation.com/college-football/2014/6/4/5779102/ea-sports-ncaa-lawsuit-pay-players (last visited July 25, 2021).

*NCAA Football 14.* Mr. Jenkins was not a member of the *Keller* class because EA did not make an NCAA basketball videogame after 2009.[89]

150.    In light of the recent developments related to college athlete NIL rights, in February 2021, EA announced its intention to revive its college sports games. And, on July 19, 2024, with the help of OneTeam Partners,[90] EA released College Football 25."[91] As additional group licensing entities have entered the market, athlete NIL rights licensing compensation is reportedly set to double for the 2026 installment of the game.[92]

### C.    The NCAA's History of Antitrust Violations

151.    Rather than permit student-athletes to engage in competition for NIL payments as the commercial nature of college sports has exploded, Defendants have combined and conspired to foreclose athletes from the market entirely. This has been accomplished by Defendants jointly adopting and imposing rules that have the purpose and effect of preventing players from offering the use of their NIL rights in competitive markets.

152.    The NCAA has a history of violating federal antitrust law. As a result, over the years, numerous parties have brought and successfully prosecuted antitrust lawsuits against the NCAA. In each of these cases, the NCAA and its members argued that loosening their anticompetitive restraints would be the death knell of amateurism and would irreparably damage consumer demand for college sports. Yet, time and time again, the NCAA's specious claims have proven false, and demand has only continued to steadily grow up through the present.

---

[89] https://www.sportico.com/business/tech/2025/ea-college-basketball-video-game-madness-1234843676/.

[90] https://www.on3.com/nil/news/report-six-schools-partner-with-new-nil-licensing-group-for-college-football-video-game-rights/.

[91] *https://www.ea.com/games/ea-sports-college-football/college-football-25/news/college-football-25-launch-week-kickoff.*

[92] *https://www.cbssports.com/college-football/news/ea-sports-college-football-26-nil-payment-more-than-doubles-for-players-opting-to-participate-in-video-game/.*

153.    In 1984, the *U.S. Supreme Court ruled in NCAA v. Board of Regents* that the NCAA had violated the Sherman Act by limiting the number of live televised football games under the media plan it adopted for the 1982-85 football seasons. In conjunction with the plan, the NCAA had announced that it would punish any member institution that abided by a competing agreement with another network to televise more games. At the Supreme Court, the NCAA decried schools freely competing to sell their broadcast rights, claiming that such activity would pose an existential threat to amateurism and consumer demand. But the Court granted injunctive relief and held that the NCAA's anticompetitive scheme unlawfully restrained the market for live broadcasts of college football games.[93] Since then, schools have engaged in such competition and generated billions of dollars in revenues as a result. And, despite the NCAA's dire predictions about the destruction of college sports, consumer demand now flourishes more than ever.

154.    In *Law v. NCAA*, the Court of Appeals for the Tenth Circuit upheld a summary judgment ruling that the NCAA's then-existing cap on part-time coaches' salaries at $16,000 per year was an unlawful restraint of trade. The NCAA opposed allowing schools to freely compete, claiming that it would be contrary to the collegiate model. The Court of Appeals held that the presence of a horizontal agreement to fix compensation was presumptively anticompetitive, and that the NCAA had failed to present even a triable issue concerning whether the salary restraint was procompetitive.[94] Today, such competition is unrestrained, assistant coaches often earn *millions*,[95] and consumer demand still flourishes.

---

[93] 468 U.S. 85, 119 (1984) (rejecting NCAA argument that restricting sale of broadcast rights was necessary "to preserve amateurism").

[94] 134 F.3d 1010, 1021 (10th Cir. 1998) (rejecting NCAA's proposed procompetitive justifications for restricting assistant coach salaries).

[95] For example, between 2009 and 2015, assistant men's basketball coaches' salaries increased by nearly 40 percent.

155.     In *White v. NCAA*, the NCAA argued against allowing schools to freely compete by offering cost-of-attendance ("COA") scholarships, calling such scholarships "pay for play."[96] Today such competition is unrestrained, and both full COA scholarships and payments above COA are ubiquitous (as discussed further below, and recently confirmed by the Ninth Circuit and Supreme Court), while consumer demand for college sports is healthier than ever.

156.     In 2009, a group of Division I men's basketball and football student-athletes brought an antitrust class action—*O'Bannon v. NCAA*[97]—challenging the NCAA's rules that prevent athletes from receiving a share of the revenue from member institutions that the NCAA and its members derive from the use of athletes' NIL rights in live game broadcasts, related footage, and video games. The district court held that the challenged rules were more restrictive than necessary to achieve any legitimate procompetitive justification and thus violated the antitrust laws. The district court enjoined the NCAA from prohibiting its schools from directly paying athletes (1) full COA scholarships and (2) $5,000 per year in deferred compensation for the game-related use of their NIL rights, through trust funds distributable after the athletes leave school. The Ninth Circuit affirmed the liability finding and COA portion of the remedy, but held that on the particular record before the district court, plaintiffs had not shown that allowing payments directly from schools in deferred compensation for game-related NIL usage would be virtually as effective as the existing restraints in preserving "amateurism"—and thus consumer demand for college sports.[98] Since the *O'Bannon* decision, based on new evidence and recent factual developments, this Court for the Northern District of California found in a decision

---

[96] *See* NCAA Memo. P&A in Support. Summ. J. 28, *White v. NCAA*, No. 06-cv-99 (C.D. Cal. Oct. 22, 2007, ECF No. 220).

[97] 802 F.3d 1049 (9th Cir. 2015).

[98] *See Id.* at 1072-79.

upheld by the Ninth Circuit and Supreme Court that the NCAA's compensation rules "'do not

follow any coherent definition of amateurism.'"[99] Moreover, since *O'Bannon*, student-athletes

regularly receive compensation from their schools that exceeds COA—including both education

and non-education-related compensation—and consumer demand for college sports has

continued to grow exponentially.

157.    After years of litigation following complaints filed in 2014, on May 18, 2020, the

Ninth Circuit Court of Appeals upheld a decision and injunction entered by this United States

District Court for the Northern District of California in favor of a nationwide class of college-

athletes challenging NCAA-imposed caps on athletic scholarships.[100] In *In re NCAA Athletic*

*Grant-in-Aid Cap Antitrust Litigation*, the Ninth Circuit affirmed the district court's holding that

NCAA's compensation restraints—agreed to by the Defendants in this Complaint—imposed

substantial anticompetitive effects in relevant markets that were not justified by procompetitive

justifications, and that there were less restrictive alternatives to the rules that would be virtually

as effective in serving any procompetitive purpose for them. The Ninth Circuit affirmed the

district court's order enjoining the NCAA from enforcing rules that restrict education-related

benefits that its member institutions may offer student-athletes.

158.    In reaching its decision in the *NCAA GIA* litigation, the Ninth Circuit held that

"[a]ntitrust decisions are particularly fact-bound," the "Rule of Reason contemplate[s] case-by-

case analysis" that is "inherently fact-dependent" and "evaluates dynamic market conditions and

---

[99] *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.* ("*NCAA GIA*"), 958 F.3d 1239, 1249 (9th Cir. 2020)
(quoting and affirming In *re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1074
(N.D. Cal. 2019)).

[100] *NCAA GIA*, 958 F.3d 1239.

consumer preferences, and, citing *O'Bannon*, that "courts must continue to subject NCAA rules, including those governing compensation, to antitrust scrutiny."[101]

>       **D.    The Supreme Court's *Alston* Decision, this Court's Motion to Dismiss and Class Certification Orders in *In re Collegiate Athletics NIL Litigation*, 4:20-cv-03919-CW, and State Laws Result in the NCAA and Conference Defendants' Interim Suspension of Many of Their NIL Restraints.**

159.    In *NCAA v. Alston*, 141 S. Ct. 2141 (2021), decided on June 21, 2021, the Supreme Court reviewed the Ninth Circuit's decision and unanimously affirmed it in full 9-0. Contrary to Defendants' argument, the Supreme Court held that the NCAA's so-called amateurism rules are subject to the same rule-of-reason analysis applicable to other businesses, especially because the "NCAA *accepts* that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition."[102] The Court further held that nothing in its decision in *Board of Regents* approved of the NCAA's limits on athlete compensation or provided the NCAA with any reduced scrutiny under, or protection from, rule of reason review.[103] Finally, the Supreme Court agreed with the Ninth Circuit's affirmance of the district court's application of the rule-of-reason, finding that the NCAA's restraints on education-related benefits violated Section 1 of the Sherman Act.[104] In a concurring opinion, Justice Kavanaugh wrote that the NCAA's remaining compensation rules (*i.e.*, those *not* at issue in *Alston*) "may lack" a legally valid procompetitive justification, that its

---

[101] *NCAA GIA*, 958 F.3d at 1253; *see also Id*. (citing Flooring Mfrs.' Ass'n v. United States, 268 U.S. 563, 579 (1925) ("[E]ach case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, and . . . opinions in those cases must be read in the light of their facts"); Phillip Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, ¶ 1205c3 (4th ed. 2018) ("Continuing contracts in restraint of trade," are "typically subject to continuing reexamination," and "even a judicial holding that a particular agreement is lawful does not immunize it from later suit or preclude its reexamine at circumstances change.").

[102] *Alston*, 141 S. Ct. at 2156 (emphasis in original).

[103] *Id*. at 2157-58.

[104] *Id*. at 2155-2160, 2166.

"current compensation regime raises serious questions under the antitrust laws," and reiterated that the "NCAA is not above the law."[105]

160.    A few days following the *Alston* decision, on June 24, 2021, the Court in *House v. NCAA* in the Northern District of California ruled on Defendants' motion to dismiss the plaintiffs' original complaints challenging Defendants' NIL rules in *In re Collegiate Athletics NIL Litigation*, 4:20-cv-03919-CW. The Court largely denied Defendants' motion to dismiss.[106]

161.    Around the same time that the *Alston* and *House* decisions were issued, the NCAA and its members were facing the prospect of an effective date of July 1, 2021, for several state laws and executive orders that would permit student-athletes to monetize their NIL rights. Indeed, at least sixteen of these laws became effective on July 1, 2021, or allowed schools to opt in immediately as of that date (Alabama, Colorado, Connecticut, Florida, Georgia, Illinois, Kentucky, Louisiana, Mississippi, Nebraska, New Mexico, Ohio, Oklahoma, Oregon, Pennsylvania, and Texas).

162.    In the face of these developments in the legal landscape, Defendants decided to adopt their new, "interim" NIL policy, which was announced on June 30 and became effective on July 1, 2021. That policy temporarily suspended enforcement of many of the NCAA's NIL restraints.

163.    The period after adoption of the NCAA's interim policy is already providing a natural experiment where student-athletes are, with certain continuing limitations, able to market their NIL rights to third parties. Indeed, NCAA President Emmert stated in a recent video that seeing "how all this unfolds" will be informative about what rules there should be and what is in

---

[105] *Id*. at 2166-69 (Kavanaugh, J., concurring).

[106] *In re Collegiate Athletics NIL Litigation*, 4:20-cv-03919-CW, Order Granting in Part and Denying in Part Motions to Dismiss, ECF No. 152.

the best interests of the athletes.[107]  What we have seen thus far is that NIL opportunities are widespread and have been taken advantage of by student-athletes across a wide variety of sports—without any harm to consumer demand. Representatives of Defendants have admitted that the suspension of most NCAA NIL rules, with the authority now vested in the individual schools and conferences, has gone well since July 1. On July 7, Purdue Athletics Director Mike Bobinski commented that, "for all the wringing of hands and other gloom and doom prognostications, I don't see (any of that) yet."[108] And Big 12 Commissioner Bob Bowlsby stated on July 14, 2021, during one of the Big 12 Media Days, that "I think relative to name, image and likeness there was a commonly held misperception that the sky was going to fall on July 1 and we were going to be in an Armageddon scenario," but "[o]bviously that hasn't happened. There have been some things that have occurred that have raised eyebrows, but generally speaking, schools are managing it."[109]

164.    In *In re Collegiate Athletics NIL Litigation*, 4:20-cv-03919-CW, on September 22, 2023, the Court granted the plaintiffs' motion for certification of an injunctive relief class.[110] On November 3, 2023, the Court granted the plaintiffs' motion for certification of three damages classes.[111]

---

[107] *See* YouTube, *Inside the NCAA, NCAA Social Series EP 65*, Twitter.com, July 15, 2021, https://twitter.com/insidethencaa/status/1415831043098112001?s=21 (last visited July 25, 2021).

[108] *See* Ray Couture, *Purdue AD addresses NIL concerns*, MDJonline.com, July 6, 2021, https://www.mdjonline.com/neighbor_newspapers/extra/news/purdue-ad-addresses-nil-concerns/article_a0bb2362-d01c-5b49-a736-03037e35d13a.html (last visited July 25, 2021).

[109] *See* Frank Bonner II, *Big 12 Commissioner Bob Bowlsby says 'anyone not getting vaccinated is taking unnecessary and unwarranted risks'*, TulsaWorld.com, July 14, 2021, https://tulsaworld.com/sports/college/osu/big-12-commissioner-bob-bowlsby-says-anyone-not-getting-vaccinated-is-taking-unnecessary-and-unwarranted/article_7b845f22-e4cf-11eb-8949-5fae51ac6d45.html (last visited July 10, 2024).

[110] *In re Collegiate Athletics NIL Litigation*, 4:20-cv-03919-CW, ECF No. 323.

[111] *Id.*, ECF No. 387.

165.    On July 26, 2024, Plaintiffs' counsel in the *House* case filed a Motion for Settlement. Plaintiffs' Class Counsel had given Mr. Jenkins and all other class members until January 31, 2025, to "opt-out" of the class, which right Mr. Jenkins has exercised and has chosen to proceed here in this individual case outside of the Class. The Final Settlement Hearing in the *House* case is scheduled for Monday, April 7, 2025, the same day as the 2025 NCAA Men's Basketball Tournament Championship Game.

**E.    The Challenged Restraints Are Not Necessary to Serve Any Purported Procompetitive Purpose.**

**1.    Any Procompetitive Justification Based on Consumer Demand for College Sports Is Legally Irrelevant Because It Concerns an Entirely Different Market.**

166.    As explained supra, Defendants' restraints have anticompetitive effects in the relevant Division I labor markets. The purported procompetitive justifications, on the other hand, concern entirely separate and distinct output markets for Division I sports and are, therefore, legally irrelevant for antitrust analysis in this case.

167.    The purported procompetitive benefit relied upon most heavily by Defendants in recent antitrust litigation challenging NCAA compensation restraints is the claim that such restraints are necessary to preserve consumer demand for college sports. But, even if the challenged restraints did have some positive effect on consumer demand—they do not—those benefits would relate to the consumer output markets for college sports, which is distinct from the relevant labor markets here that are directly restrained by Defendants' rules.

168.    The Ninth Circuit in the *NCAA GIA* litigation explained that "[i]t is not settled" whether courts may "consider a restraint's procompetitive benefits in a market outside the market

deemed relevant for the purpose of evaluating a restraint's anticompetitive effects."[112] Because

the issue was not raised by parties in that case, it was not addressed by the Court either.[113] But,

concurring in the decision, Chief Judge Smith wrote that "the underlying purpose of the Sherman

Act—promoting competition—counsels in favor of conducting a more limited Rule of Reason

analysis," confined to the market that is being restrained. "If the purpose of the Rule of Reason is

to determine whether a restraint is net procompetitive or net anticompetitive, accepting

procompetitive effects in a collateral market disrupts that balancing. It weakens antitrust

protections by permitting defendants to rely on a broader array of justifications that promote

competition, if at all, in collateral markets where the restraint under analysis does not occur."[114]

> ### 2. Even if Effects on Consumer Demand in Output Markets Were Relevant, the Restraints at Issue Are Not Necessary to Preserve Consumer Demand for College Sports.

169.    Whatever doubt there may have been about the validity of Defendants'

amateurism justification in 2019, when the *Grant-in-Aid Cap* trial was conducted, ensuing

market realities and new factual developments show that "amateurism" is no longer a legitimate

procompetitive justification for any of the Defendants' compensation restraints. Specifically,

despite the ubiquitous payment of "*Alston* benefits," the continuation and expansion of full-COA

scholarships and payments, and substantial and unlimited NIL payments from third parties, there

has been no adverse effect on consumer demand for Division I college sports. To the contrary,

the NCAA concedes that these payments and benefits to college athletes have not had any

adverse impact on consumer demand.

---

[112] *NCAA GIA*, 958 F.3d at 1257.

[113] *Id.*

[114] *Id.* at 1269 (Smith, C.J., concurring).

170.    In fact, since the NCAA has allowed these benefits and compensation, television ratings and revenues (broadcast and otherwise) for Division I college sports have increased exponentially. Accordingly, a number of NCAA and Conference officials have since admitted that amateurism is no longer a justification for their restraints.

171.    Moreover, recent public opinion surveys demonstrate that fans support student-athletes being able to profit from the use of their NIL rights, and thus that consumer demand would not be negatively affected if Defendants' anticompetitive NIL restraints were eliminated. Indeed, the growing public sentiment in support of student-athlete NIL rights indicates that the lifting of these restraints would actually improve fan interest in college sports.

172.    In June 2021, College Pulse surveyed 829 college students at 51 universities in June 2021. The results of that survey indicated that 89% of students surveyed believe that student-athletes should be able to profit off their likenesses, 88% think the athletes should be able to profit by endorsing products on social media, and 93% think the athletes should be able to profit by appearing in advertisements.[115]

173.    In December 2019, the Associated Press polled 1,053 American adults: 66% of respondents supported allowing athletes to earn money from the use of their NIL rights.[116]

174.    The results of a November 2019 Turnkey Sports Poll of more than 2,000 senior-level sports industry executives similarly indicated that consumer demand for intercollegiate athletics will not suffer if college athletes are permitted to monetize their NIL rights. Only 14%

---

[115] Jenn Hatfield, *Even Students Who Aren't Athletes Think the NCAA is a Problem*, fivethirtyeight.com, July 12, 2021, https://fivethirtyeight.com/features/college-students-dont-like-how-the-ncaa-treats-student-athletes/ (last visited July 25, 2021).

[116] Michael T. Nietzel, *Americans Now Overwhelmingly Support College Athletes Earning Endorsement and Sponsorship Money*, forbes.com, Feb. 11, 2020, https://www.forbes.com/sites/michaeltnietzel/2020/02/11/americans-now-overwhelmingly-support-college-athletes-earning-endorsement-and-sponsorship-money/ (last visited July 10, 2024).

of the respondents in that study opined that allowing student-athletes to benefit from their NIL

rights would have a negative effect on fan interest, while 45% indicated that such a change

would have "no impact" on fan interest, and 35% believed it would actually positively impact

fan interest.[117] These recent survey results indicate that if student-athletes were allowed to

monetize and profit from their own NIL rights it would likely increase fan interest in, and

consumer demand for, college sports.

  175. In May 2022, *The Washington Post* and the University of Maryland conducted a

poll in which 88% of 1,503 respondents said that allowing athletes to receive NIL compensation

either "hasn't made a difference" or had a "positive impact" on their enjoyment of college

sports.[118]

  176. More broadly, survey evidence presented by the plaintiffs in the *NCAA GIA*

litigation "tested [consumer] behavior and found that consumers would continue to view or

attend college athletics (at the same rate) even if eight types of compensation that the NCAA

currently prohibits or limits were individually implemented."[119] In fact, the survey results

indicated that consumers would tend to watch or attend more college sports events if athletes

were treated more fairly by being provided with additional compensation that the NCAA rules

currently prohibit.

  177. Indeed, the NCAA itself acknowledged in its April 17, 2020, Final Report and

Recommendations that "allowing such compensation for some promotional or commercial

---

[117] Michael Smith, Liz Mullen, *College Sports: Sharper Resolution*, sportsbusinessdaily.com, Dec. 2, 2019,
  https://www.sportsbusinessdaily.com/Journal/Issues/2019/12/02/In-Depth/NIL.aspx (last visited July 25,
  2021).

[118] Emily Giambalvo, Scott Clement, and Emily Guskin, *NIL hasnt' made a difference for most in enjoyment of
  college sports, poll finds*, The Washington Post (June 30, 2022),
  https://www.washingtonpost.com/sports/2022/06/30/nil-college-sports-fans-poll/.

[119] *See* NCAA GIA, 958 F.3d at 1250 (discussing evidence presented to district court).

activities can likely be accommodated in a manner consistent with the NCAA's model of amateur intercollegiate competition."[120]

178.    The Ninth Circuit in the *NCAA GIA* litigation affirmed that the record in the case supported the district court's findings that NCAA rules "permit a wide range of above-[cost-of-attendance] payments—both related and unrelated to education. Without losing their eligibility, student-athletes may receive, for instance: "(i) awards valued at several hundred dollars for athletic performance ('athletic participation awards')[,] which may take the form of Visa gift cards; (ii) disbursements—sometimes thousands of dollars—from the NCAA's Student Assistance Fund ("SAF") and Academic Enhancement Fund ('AEF') for a variety of purposes, such as academic achievement or graduation awards, school supplies, tutoring, study-abroad expenses, post-eligibility financial aid, health and safety expenses, clothing, travel, 'personal or family expenses,' loss-of-value insurance policies, car repair, personal legal services, parking tickets, and magazine subscriptions; (iii) cash stipends of several thousands of dollars calculated to cover costs of attendance beyond the fixed costs of tuition, room and board, and books, but used wholly at the student-athlete's discretion; (iv) mandatory medical care (available for at least two years after the athlete graduates) for an athletics-related injury; (v) unlimited meals and snacks; (vi) reimbursements for expenses incurred by student-athletes' significant others and children to attend certain athletic competitions; and (vii) a $30 per diem for 'unitemized incidental expenses during travel and practice' for championship events."[121] The Ninth Circuit's decision explained that "[t]he record indicates that the NCAA does little to regulate or monitor

---

[120] NCAA Federal and State Legislation Working Group Final Report and Recommendations, ncaa.org, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG_Report.pdf (last visited July 10, 2024).

[121] *NCAA GIA*, 958 F.3d at 1244-45.

the use of these funds" from the "Student Assistance Fund" or "Academic Enhancement Fund."[122]

179.    In its recent history, the NCAA has made many exceptions allowing for additional payments to student-athletes—both education and non-education related—beyond the cost of attendance. For example, before 2015, athletic participation awards did not take the form of cash-equivalent Visa gift cards. And, when the NCAA changed its rules to allow full COA scholarships in August 2015, the number of student-athletes receiving above-COA payments, such as cash stipends, Pell Grants, and AEF and SAF distributions, increased significantly. This expansion of above-COA payments has not coincided with any decline in consumer demand for intercollegiate athletics. To the contrary, demand for college sports has only risen, as demonstrated by the consistent and ever-growing revenues brought in by Division I basketball and FBS football. Thus, the current factual record shows that non-educational payments to student-athletes in excess of COA are no longer a "quantum leap" from NCAA practice, as the court held it would be at the time of *O'Bannon*.[123]

180.    Two-sport athletes have also received million-dollar payments as professionals in one sport while retaining NCAA eligibility in another. For example, in 2018, Kyler Murray signed a $9 million contract to play baseball for the Oakland A's while he was still playing football at the University of Oklahoma. If such compensation does not implicate "pay-for-play" or otherwise undermine the distinction between college and professional, it is hard to imagine how compensation for NIL rights would do so. And again, all these forms of compensation have been permitted, and consumer demand for college sports has only increased.

---

[122] *Id*. at 1245.

[123] *Id*. at 1255 (quoting and citing *O'Bannon*, 802 F.3d at 1078).

181.    Moreover, allowing compensation would not affect consumer demand for college sports to the extent that such demand is "driven by consumers' perception that student-athletes are students."[124] Plaintiff does not challenge any of the NCAA's existing rules and regulations that require college athletes to be students in good standing at their respective schools. And if student-athletes are allowed to receive scholarships beyond the current limits and/or compensation for their NIL rights and athletic services, schools will provide educational resources and programs designed to help their athletes learn about personal brand management and athletes will gain access to new academic opportunities to develop marketing and financial skills. This is already happening with the NCAA's current suspension of some of the NIL rules. School athletic departments across the country promptly began offering new educational programming to their athletes and as of July 1, 2021, 53 of the 65 Power Five universities had announced an NIL-related initiative partnering with companies like Opendorse, INFLCR, or Altius Sports.[125] Schools are also offering new NIL-focused classes and hiring additional staff to give their athletes an edge. That is in keeping with the NCAA's purported objective to help athletes prepare for life after college, which for the vast majority of them does not include a professional sports career. The NCAA's President agreed in a 2021 interview that providing NIL opportunities encourages student-athletes to experience and try out different professional options.[126] For example, schools are competing to build and develop financial literacy and leadership programs, such as GatorMade at the University of Florida, that NIL as a vehicle to

---

[124] *See In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1105.

[125] Lila Bromberg, *In the NIL Arms Race, Some Schools Are Going the Extra Mile to Help Their Athletes*, SI.com, July 1, 2021, https://www.si.com/college/2021/07/01/name-image-likeness-programs-schools-ncaa (last visited July 25, 2021).

[126] YouTube, *Inside the NCAA, NCAA Social Series EP 65*, Twitter.com, July 15, 2021, https://twitter.com/insidethencaa/status/1415831043098112001?s=21 (last visited July 25, 2021).

help educate their athletes to invest in themselves and expand their "influence" and "ability to impact others – in homes, communities, boardroom, industries, and [in the] world."[127]

182.    The district court in the *NCAA GIA* litigation relied on testimony by the NCAA's and conferences' own witnesses that consumer demand for Division I basketball and FBS football is actually driven by consumers' perception that student-athletes are, in fact, students. For example, University of Wisconsin-Madison Chancellor Rebecca Blank testified that fans of college sports "love seeing their fellow students out there playing" and that viewership of college sports is based on student-athletes being "students at the university." Eugene Smith, athletic director at the Ohio State University, testified to a similar point and explained the "collegiate fan is more aligned to the educational experience that college sports provide." AAC Commissioner and former CBS/ESPN executive, Michael Aresco, noted that the programming of televised college sports focuses on "the college experience," which includes the campus, academics, and community service.[128] The district court concluded (and the Ninth Circuit affirmed on appeal) that this testimony did not support, but rather undermined, the NCAA's justification for its compensation rules because, in the absence of those rules, college athletes would still be students.[129] Such testimony similarly suggests that the restraints challenged in this Complaint are not necessary to preserve consumer demand for college sports. Absent the challenged rules, college athletes would remain students and "fellow students, alumni, and neighbors of the schools would continue to identify with them."[130]

---

[127] https://floridagators.com/sports/2022/9/20/gatormade.aspx.

[128] *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1082.

[129] *Id.*

[130] *Id.*

183.    The fact that the compensation rules are not needed to preserve consumer demand is conclusively established by the natural experiment of the NCAA's interim NIL policy. Most NIL rules have been suspended and scores of Division I athletes are now receiving NIL compensation across Division I sports. Yet, there is no evidence that these dramatic and conspicuous NIL payments have in any way adversely impacted consumer interest or demand for Division I sports. To the contrary, it is precisely because so many fans are supportive of Division I athletes that the many sponsors and business are so interested in partnering with the athletes and paying for their NIL rights.

184.    Moreover, to the extent that the purported procompetitive purpose of promoting consumer demand is served by the rules at all—it is not—there are reasonable and patently less restrictive alternatives available. For example, as discussed above, an injunction could forbid enforcement of national NCAA NIL rules but permit such rules at the conference and school level. In an interview about NIL, former NCAA President Mark Emmert agreed that sports serve different functions at different schools, and that the NCAA needs to govern in a way that is more reflective of that, with consideration given to a decentralized and deregulated version of college sports, shifting power back to conferences and campuses. And the NCAA's interim policy, in fact, has adopted just such a school and conference empowerment structure as the less restrictive alternative currently in effect, without any evidence of harm to consumer demand.

185.    Fears about potential abuses of a competitive market should not be conflated with fears of competition itself, nor do they justify restrictions on a free market.

### 3.    Education and Compensation are not Mutually Exclusive.

186.    The NCAA, in other litigation, has also argued that its compensation rules somehow promote the integration of student-athletes with their academic communities and that payments for NIL rights or compensation based on athletic performance would "create a wedge"

between student-athletes and the student body at large. The NCAA has further claimed that the "chase for endorsements" could interfere with student-athletes' focus on education.

187.    To begin with, this paternalistic rationale does not constitute a legitimate procompetitive justification for a sweeping market restraint on adult student-athletes being able to commercially benefit from their own names, images, and likenesses.

188.    Moreover, in *O'Bannon*, the Court held that this purported goal is better achieved by other NCAA rules, such as those requiring athletes to attend class or forbidding more than a certain number of practice hours per week.[131] And, while the Court acknowledged the NCAA may have some interest in preventing a social "wedge" between athletes and the rest of the student body, it held that "it does not justify a total, 'sweeping prohibition' on paying student-athletes for the use of their NIL rights."[132]

189.    For one, income disparities already exist on college campuses as a result of family background and wealth derived from other sources. And, despite the existing disparities, there is no evidence that students with more financial resources are negatively impacted in terms of their integration with peers or the quality of education they receive.

190.    The ability to earn compensation will enhance, not detract from, the integration and academic experiences of college athletes. Education and pay are not mutually exclusive and are, in fact, pursued simultaneously by millions of college students across America. And as noted herein, schools now admit that marketing NIL brings its own educational benefits as it teaches students business, marketing and promotional skills that are themselves educational in nature.

---

[131] 802 F.3d at 1061.

[132] *Id*. at 1060.

191.    In the *NCAA GIA* litigation, the district court rejected the NCAA's so-called "academic integration" and "wedge" arguments,[133] and its finding was not challenged by the NCAA on appeal. Moreover, as explained above, the Ninth Circuit found a wealth of evidence showing that NCAA rules already permit athletes to receive numerous above-COA payments "related and unrelated to education."

192.    The NCAA's compensation restrictions do not promote integration and in fact create a significant divide between the rights enjoyed by purely academic students and those allowed to athletes. The NCAA itself has acknowledged that "the current rules preclude student-athletes from engaging in a wide range of promotional activities that are open to college students generally, a situation that is inconsistent with the NCAA's goal of treating student-athletes in the same manner as the student-body in general."[134]  Non-athlete students are free to exploit the full potential of their NIL rights while student-athletes have been forced to forego any NIL compensation whatsoever under the NCAA's complicated system of regulations. Allowing student-athletes to monetize their NIL rights will increase the validity of the NCAA's claim that the athletes are "students first" by treating athletes more like their peers.

### 4.    NCAA Compensation Restrictions do not Prevent Exploitation-They are Exploitative.

193.    The NCAA has also previously argued that the elimination of its compensation restrictions would lead to "over-commercialization, which transposes the collegiate model into a system that more closely resembles the professional sports approach." In particular, the NCAA

---

[133] *In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d at 1083-86.

[134] *NCAA Federal and State Legislation Working Group Final Report and Recommendations*, nacaa.org, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG _Report.pdf (last visited July 10, 2024).

has asserted that its no-endorsement rules "prevent students from becoming billboards for commercialism."

194.    To begin with, this supposed rationale does not constitute a legitimate procompetitive justification for a sweeping market restraint on college athlete compensation.

195.    Moreover, in a system where billions of dollars are generated primarily off the backs (literally, when sponsors pay to outfit athletes with branded equipment and apparel) and athletic successes of student-athletes, the restrictions on compensation do not prevent exploitation—they are exploitative. As explained above, whatever downside comes from commercialization is already impacting college athletes; the current rules merely ensure they have a limited share in the benefits from such commercialization. The unfairness in this arrangement grows exponentially with each new multi-million (or multi-billion) dollar television and sponsorship deal, coaching contract, and facility construction, while the selective and blanket restrictions on student-athletes are maintained. As it stands, the current system does far more to advance the financial interests of the NCAA, broadcasters, corporations, and athletic departments than it does for the athletes who provide the product from which everyone else profits.

196.    John Shoop, former offensive coordinator for the University of North Carolina football team, described his first-hand perspective of the inequities of this system in a 2018 documentary: "I know people say these players get everything. No they don't get everything. What they get is a facility that might have a barbershop in it, tons of flat screen TVs, they might get a bunch of Nike spikes. At this time in their life, when they really did have incredible value, I was the one absorbing all that value, not them. That didn't feel good to me. I was the one getting paid a lot, not them. For some of these young men, these are the four years where their earning

potential is higher than it's ever been. This is it. When they graduate, they're done... They're propelling a billion-dollar industry right here and they're getting a sweat suit for it."[135]

197.    The harm to student-athletes is exacerbated because only a small number of them will go on to play professionally. This fact highlights that for most Division I athletes, their college years are when they may have their greatest earning potential.

198.    The current restrictions have also created an incentive for student-athletes, boosters, agents, third parties, and others to violate the rules and enter into under-the-table deals. The absence of an above-the-board market has thus created an environment where exploitation is more, not less, likely. On the other hand, permitting payments out in the open would allow the NCAA and its members to more effectively educate the athletes on how to avoid exploitation.

     5.    **The Challenged Restraints Cannot be Justified by the Purported Need to Protect Women's Sports or Cross-Subsidize Non-Revenue Sports.**

199.    The NCAA has also sought to justify its compensation restraints based on the purported need to protect women's sports and prevent compensation to high-revenue-sport athletes from draining cross-subsidies to the non-revenue sports. This justification is legally and factually invalid.

200.    First, the justification is, once again, not procompetitive. It amounts to arguing that the efficient allocation of a competitive market is somehow undesirable and that there is a need to suppress compensation to higher-revenue-generating athletes so that they can subsidize non-revenue-generating sports. That is an argument that competition itself and allocative efficiency are undesirable, which is not a procompetitive or legally viable justification under the Sherman Act.

---

[135] HBO, Student Athlete (2018), www.hbo.com/documentaries/student-athlete (last visited July 25, 2021).

201.    Second, allowing compensation to high-revenue-sport athletes would not have a negative impact on any subsidies these sports provide to low- or non-revenue sports. The amount of these subsidies is tiny compared to the vast revenues generated by FBS football and Division I basketball, and thus any compensation for athletes in these high-revenue sports will not impact schools' ability to maintain their current subsidization of lower-revenue sports. In fact, history shows, that every time a new form of compensation has been permitted for Division I athletes—full COA, Alston education-related benefits, third-party NIL payments—there has been no adverse impact on the subsidization of low- or non-revenue sports.

202.    Further, the 2025 NCAA Women's March Madness Tournament, four years after the NCAA suspended its anticompetitive NIL policy, women's basketball teams will finally, for the first time, get an individual share of the revenue generated by the Women's Tournament. The NCAA's new media rights deal with ESPN is valued at $65 million annually, with $15 million scheduled to go to teams in year one, which goes up to $25 million in year two.[136]

203.    Third, if needed, the excessive compensation paid to coaches, athletic directors, NCAA executives, and Conference commissioners (among others) show that there is more than enough money to make up for any hypothetical revenue reallocation that could impact low- or non-revenue sport subsidies. In Division III—where there are no high-revenue sports to subsidize others—the schools themselves support all sports (which are, by definition, non-revenue), just like they do all other activities at their institutions.

204.    In short, the claim that direct NIL or broadcast NIL compensation, or college-athlete pay-for-play compensation, would harm women's sports or low- or non-revenue sports is

---

[136] https://www.foxsports.com/articles/wcbk/womens-teams-in-the-ncaa-tournament-getting-individual-revenue-share-for-1st-time-whats-a-unit..

both legally untenable and factually unsupported as a purported justification for the Defendants'

anticompetitive compensation restraints.

### F.     There is Significant Support for Allowing Athletes to Receive NIL Compensation and Plaintiff Has Been Damaged by Defendants' Anticompetitive Restraints.

205.    There is widespread support among college sports administrators, athletes,

legislators, and the public at large for the concept of allowing Division I athletes to be

compensated for their NIL rights. It is also clear that Defendants' rules prohibiting such

compensation have damaged and will continue to damage athletes absent a court-imposed

remedy.

### 1.     The NCAA and Its Members Have Made Numerous Statements Supporting NIL Compensation, in a Stark Departure from Previous Positions Taken Before Federal Courts.

206.    Even while continuing to enforce the NCAA's anticompetitive NIL restraints,

representatives of the NCAA and its member schools and conferences made a multitude of public

comments in recent years acknowledging the unfairness in the system and supporting the concept

of allowing athletes to financially benefit from their NIL rights. That led to an official NCAA

report issued on April 29, 2020, acknowledging that NCAA athletes should have the right to

benefit from their NIL rights. The NCAA then stated that it was prepared to make official

changes to its NIL rules in January 2021 that would permit some athlete monetization of NIL

rights, before it delayed those plans after the Supreme Court granted certiorari in the *Alston* case.

But, as explained above, after the NCAA lost in the Supreme Court in a unanimous decision

making it clear that it was fully subject to scrutiny under the rule of reason, and after the NCAA

had its motion to dismiss denied in this case, the NCAA enacted its new "interim" NIL policy

which permits Division I athletes to monetize their NIL rights in many (although not all)

respects.

      207.    In 2015, NCAA Vice President for Regulatory Affairs Oliver Luck was quoted as

saying, "I do believe that the name, image, likeness for an individual is a fundamental right—that

any individual controls his or her name, image and likeness—and I don't believe that a student-

athlete who accepts a grant-in-aid simply waives that right to his or her name, image,

likeness."[137]

      208.    In March 2018, Mark Emmert acknowledged that the Olympic model, in which

athletes are permitted to obtain third-party endorsement deals and other NIL-related

compensation, was under consideration by the NCAA at that time, and he suggested that such a

model could be a viable option for intercollegiate athletics: "There's a lot of discussion about the

Olympic model and I think it's well deserving of serious consideration inside the context of

college sports."[138]

      209.    A 2019 CBS Sports survey of more than 100 Division I coaches revealed that

77% of the coaches polled support an Olympic-style model for college sports that allows student-

athletes to profit off of their NIL rights.[139]

      210.    During an interview on April 24, 2020, University of Michigan Athletic Director

Warde Manuel voiced his support for the concept of allowing student-athletes to accept NIL

---

[137] Steve Berkowitz, Oliver Luck brings own perspective to NCAA on O'Bannon name and likeness issue, USAToday.com, Jan. 16, 2015, https://www.usatoday.com/story/sports/college/2015/01/16/ncaa-convention-oliver-luck-obannon-name-and-likeness-court-case/21873331/ (last visited July 25, 2021).

[138] Richard Johnson, Heres' why Mark Emmerts' comment on the NCAA embracing the Olympic mode of compensation is meaningless, SBNation.com, Mar. 3, 2018, https://www.sbnation.com/college-football/2018/3/3/17075570/mark-emmert-says-hes-open-to-olympic-model (last visited July 10, 2024).

[139] Gary Parish, Candid Coaches: Would you support an Olympic-style model for student-athletes?, cbssports.com, Sept. 3, 2019, https://www.cbssports.com/college-basketball/news/candid- coaches-would-you-support-an-olympic-style-model-for-student-athletes/ (last visited July 25, 2021).

compensation: "It's the right thing to do... I think this is good for our [student-athletes] . . . . It allows them to be considered just like any other student who would have the opportunity to profit." Manuel rejected the claim, long relied upon by the NCAA to justify its restraints, that the outright ban on NIL compensation is necessary to prevent the destruction of college sports: "Sometimes the doom and gloom gets a bit much. We adapt, we move."[140]

211.    In a 2014 interview with CBS Sports, Notre Dame's then-Athletics Director Jack Swarbrick spoke out about the inequitable effect of the existing NIL restraints: "if our standard had been what's the rule for other students, capturing name, image and likeness outside team activity, the musician at school doesn't have that limitation. I'm not sure why the student-athlete should, either... I think it would contribute to reducing so many of the problems we have which really spring from this situation we created when we say they're not going to be the same as other students."[141] Swarbrick reiterated this point as recently as April 2020, explaining that, "since regular students have the opportunity to exploit their name, image and likeness, we've always felt students who are athletes should have a version of that."[142]

212.    In October 2019, the Big South conference's then-commissioner Kyle Kallander echoed this sentiment:

> "We must provide an opportunity for student athletes to benefit from NIL.
>
> I believe it just makes common sense to allow athletes to be involved in entrepreneurship, business, modeling, online initiatives, and other

---

[140] *Aaron* McMann, *Michigan AD Warde Manuel for an NIL bill: 'Its' the right thing to do'*, mlive.com, Apr. 27, 2020, https://www.mlive.com/wolverines/2020/04/michigan-ad-warde-manuel-for-an-nil-bill-its-the-right-thing-to-do.html (last visited July 25, 2021).

[141] *Ryan Ritter, Jack Swarbrick Speaks Out on Paying Student Athletes*, herloyalsons.com, Dec. 11, 2014, https://www.herloyalsons.com/blog/2014/12/11/jack-swarbrick-speaks-paying-student-athletes/ (last visited July 25, 2021).

[142] *Dennis Dodd, Whats' ahead in the name, image and likeness rights debate as recommendations set to be submitted*, cbssports.com, Apr. 22, 2020. https://www.cbssports.com/college-football/news/whats-ahead-in-the-name-image-and-likeness-rights-debate-as-recommendations-set-to-be-submitted/ (last visited July 10, 2024).

activities where NIL may be a factor. Other students are taking
advantage of this. Ours should as well. I'm even willing to consider
some athletics-related monetization—through autograph signing,
jersey sales, video games, etc. These activities can be directly tied to
their individual NIL. It makes sense."[143]

213.    Numerous school officials have also expressed support for a change in the NIL

restraints. Nebraska's then-head football coach, Scott Frost, stated that, "regardless of what

change comes in NIL legislation, we want every Nebraska athlete to be prepared with the

blueprint for success beyond the field." Athletics Director Garrett Klassy further indicated that

Nebraska has "no concern" about changes to NIL rules. "We have the most passionate fan base

and sponsors in the country and we fully expect them to continue to support Nebraska if NIL

legislation changes."[144]

214.    University of Michigan's then-head football coach Jim Harbaugh similarly

confirmed that he and others in the UM athletic department "believe the name, image and

likeness is a very good thing. A player should have the same opportunity that a football coach has

to profit off their name, image and likeness... Again, not the best to have a rule that says you

can't. So we're all for it. We're all for name, image and likeness."[145] According to its official

budget, UM received $18.4 million in "corporate sponsorship" and $9.4 million in "licensing

royalties" in 2019.[146]

---

[143] Brian Mull, *Big South Commissioner Discusses Name, Image, Likeness*, bigsouthsports.com, Oct. 30, 2019,
https://bigsouthsports.com/news/2019/10/30/general-big-south-commissioner-discusses-name-image-
likeness.aspx (last visited July 25, 2021).

[144] J. Brady McCollough, *Nebraska prepares for student-athlete branding by partnering with Opendorse*,
latimes,com, Mar. 10, 2020, https://www.latimes.com/sports/story/2020-03-10/nebraska-opendorse-nil-athlete-
branding (last visited July 25, 2021).

[145] Clayton Sayfie, *Jim Harbaugh is 'All For 'NIL proposal*, Michigan.rivals.com, May 9, 2020,
https://michigan.rivals.com/news/jim-harbaugh-is-all-for-nil-proposal (last visited July 25, 2021).

[146] Zach Shaw, *Unpacking Jim Harbaughs' comments on NIL pay and NCAA amateurism*, 247sports.com, Oct. 8,
2019, https://247sports.com/college/michigan/LongFormArticle/Unpacking- Michigan-football-coach-Jim-
Harbaughs-comments-on-NIL-pay-NCAA-amateurism-and-the-Fair-Pay-Act-136697466/#136697466_7 (last
visited July 25, 2021).

215.    Former Ohio State basketball coach Chris Holtmann expressed a similar sentiment: "I think given the amount of money that's generated from college sports, in particular our sport the NCAA tournament, and obviously we know what a profound impact college football has on the overall economy of a university and a campus, I think it makes sense to allow guys, to allow athletes, men and women, to profit off of this. Again, I think it's going to, just like the regular marketplace, it's going to be significant for some and maybe somewhat insignificant for others. But that's also a lesson as to what life is going to look like in the marketplace beyond college."[147]

216.    Auburn men's basketball coach Bruce Pearl stated in May 2021 that "the idea that they are going to be able to be compensated for their own name, image and likeness, it absolutely makes sense. Auburn is going to kind of do everything we can to support those student-athletes and, from a compliance standpoint, manage it. There are limits to what we can do with it, but we'll pay very close attention to what's being done around the country and do everything we can to assist the kids."[148]

217.    Fresno State Athletic Director Terry Tumey also spoke out in support of student-athletes' NIL rights in March of 2021, explaining that "having folks understand how to better

---

[147] Colin Hass-Hill, *Chris Holtmann Working Proactively Behind Scenes to use Name, Image, Likeness Reform in Recruiting for Ohio State*, elevenwarriors.com, May 6, 2020, https://www.elevenwarriors.com/ohio-state-basketball/2020/05/113914/chris-holtmann-proactively- working-behind-scenes-to-use-name-image-likeness-reform-in-recruiting-for-ohio-state (last visited July 10, 2024).

[148] Jordan D. Hill, *Auburn coaches, athletic director preparing for Alabamas' name, image and likeness law*, oan.com, May 13, 2021, https://oanow.com/sports/college/auburn/auburn-coaches- athletic-director-preparing-for-alabama-s-name-image-and-likeness-law/article_186fb45c-b3ee-11eb-900e-d34b267d4e99.html (last visited July 10, 2024).

their brand is no different than a person going to business school and learning how to market a product."[149]

218.     Indeed, A-10 Conference Commissioner Bernadette McGlade explained in November 2020 that "truly exceptionally elite student-athletes will have an incentive to pursue the collegiate experience with a more permissive legislative structure and may benefit from a real-world 'internship' type experience in managing their own NIL and the associated opportunities."[150]

219.     Kristin Williams, Senior Associate Commissioner for Institutional Services/Woman Administrator for the Mid-American Conference, confirmed that "the concern that this may create a recruiting benefit to institutions that have commercial entities willing and interested in supporting the student-athlete endorsements is not unique. For instance, there was worry that the allowance of cost of attendance would be a recruiting advantage/disadvantage and certain institutions would abuse this opportunity. This was not the case as the value managed itself, as any other recruiting opportunity has, and the commercial promotions to student-athlete's name, image and likeness would also work itself out through the market. The market will settle itself."[151]

220.     Former Big South Conference Commissioner Kyle Kallander also explained that "other than the legal risks, perhaps the other biggest concern of the membership with NIL is the 'fairness' issue. What if 'his' quarterback can make more on autographs than 'mine'? Frankly,

---

[149] David Hale, *Social media stardom: How changes to NIL will benefit athlete-influencers across the NCAA*, ESPN.com, Mar. 8, 2021, https://www.espn.com/womens-college-basketball/story/_/id/30945653/social-media-stardom-how-changes-nil-benefit-athlete-influencers-ncaa (last visited July 10, 2024).

[150] Andy Wittry, *Memos obtained from 19 DI conferences shed light on name, image and likeness views*, andywittry.substack.com, Nov. 3, 2020, https://andywittry.substack.com/p/memos-obtained-from-19-di-conferences (last visited July 10, 2024).

[151] *Id*.

intercollegiate athletics isn't 'fair' now, at least when using that type of test. Institutions have

different levels of support, resources, and following. We shouldn't let the fact that student-

athletes at some institutions may command a higher monetization than others get in the way of a

common sense solution."[152]

221.    In October 2019, the NCAA announced that its governing board "voted

unanimously to permit students participating in athletics the opportunity to benefit from the use

of their name, image, and likeness in a manner consistent with the collegiate model."[153]

222.    The board's report concluded that "enhanced opportunities related to name, image

or likeness would be an appropriate extension of efforts to modernize NCAA rules in a way that

is consistent with our values and principles. We believe additional flexibility in this space can

and must continue to support the collegiate model in clear contrast to the professional sports

model."[154]

223.    The report continued:

> "the working group generally believes student-athletes should be
> permitted to use their name, image or likeness to promote their own
> work product or business, particularly when the work product or
> business is not related to athletics. Even when the work product or
> business is related to athletics, the working group believes sufficient
> controls can be developed to mitigate potential abuse, including
> current rules related to recruitment offers and inducements and extra
> benefits, and permit student-athletes to pursue opportunities in a
> manner consistent with the collegiate model... It is important to note
> that NCAA bylaws already allow for student-athletes to have outside
> employment and business activity. This framework of review and
> regulation is specific to when student-athletes wish to lend their name,

---

[152] *Id.*

[153] *Board of Governors starts process to enhance name, image and likeness opportunities*, ncaa.org, Oct. 29, 2019,
http://www.ncaa.org/about/resources/media-center/news/board-governors-starts-process-enhance-name-image-and-likeness-opportunities (last visited July 25, 2021).

[154] *Report of the NCAA Board of Governors October 29, 2019 Meeting*, ncaa.org,
https://ncaaorg.s3.amazonaws.com/committees/ncaa/exec_boardgov/Oct2019BOG_Report.pdf (last visited July 10, 2024).

image or likeness to promote a student's own enterprise or an
employer's business activity, such that name, image and likeness
become intertwined."

224.     On April 29, 2020, the NCAA announced its official endorsement of a broad

spectrum of recommendations from the working group that would allow college athletes to be

compensated by third parties for commercial use of their NIL rights in "third-party endorsements

or social media influencer activity . . . social media content creation and distribution, promotion

of student-athlete businesses (music, art, athletic lessons, etc.), and personal promotional

activities (autograph signings, etc.)."[155]

225.     Despite the fact that such compensation would not be tethered to educational

expenses or costs incidental to college athletics participation, and could be substantial, the

working group confirmed that it "has received feedback from all three divisions that illustrates

allowing such compensation for promotional or commercial activities can likely be

accommodated in a manner consistent with the NCAA's model of intercollegiate competition."[156]

Indeed, the report explains that allowing student-athletes to receive such compensation could

actually help them "directly offset their educational costs without undermining the Association's

model of intercollegiate athletics."[157]

226.     Notably, the statements by the NCAA are a complete reversal from the "sky is

falling" positions it took before the federal courts, including in the *O'Bannon* case. There, the

NCAA insisted before the Ninth Circuit Court of Appeals that NIL payments—no matter how

small—would be "anathema to amateurism," would constitute "pay-for-play," and would "blur

---

[155] *NCAA Board of Governors Federal and State Legislation Working Group Final Report and Recommendations*,
ncaa.org, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG
_Report.pdf, (last visited July 10, 2024).

[156] *Id*.

[157] *Id*.

88

the clear line between amateur college sports and their professional counterparts."[158]  The NCAA argued that permitting any NIL payments would destroy amateurism and be ruinous to consumer demand because such payments are not related to educational expenses:

> "Contrary to the [district] court's view, *amateurism is not simply a matter of the amount of any payment*. Allowing student-athletes to receive compensation for specific commercial revenue generated via use of their NILs is no less anathema to amateurism than paying football players $100 per sack."[159]

227.    In April 2020, the NCAA acknowledged that its "current rules related to NIL commercialization are in need of modernization,"[160] and directed its three divisions to draft NIL legislative proposals that are in line with the recommendations by 2021.

228.    The NCAA suggested that its policy shift demonstrated a "willingness to respond to the evolving needs of student-athletes, and its long track record of providing remarkable opportunities for student-athletes to gain access to higher education," but the NCAA's announcement made clear that it "was primarily motivated to form the working group and charge it with reviewing the NCAA's rules regarding student-athlete NIL by proposals of state and federal legislation on this topic." The report also explicitly criticizes and downplays the positive benefits for student-athletes resulting from antitrust litigation against the NCAA, including what it terms ongoing litigation to "second guess the Division I membership," and it has proposed that the NCAA "seek an exemption from federal and state antitrust laws."[161] Indeed, while the NCAA claimed to be working towards some "modernization" of the NIL rules, it was actively and

---

[158] *O'Bannon v. NCAA*, Nos. 14-16601 & 14-17068 (9th Cir.), Brief for NCAA at 57 (Nov. 14, 2014, ECF No. 13-1) ("NCAA *O'Bannon* Br."); NCAA Mem. P. & A. in Supp. Summ. J. 28.

[159] NCAA *O'Bannon* Br. at 57.

[160] NCAA Board of Governors Federal and State Legislation Working Group Final Report and Recommendations, ncaa.org, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG _Report.pdf (last visited July 10, 2024).

[161] *Id*.

aggressively seeking an exemption from federal and state antitrust law that would allow it to continue its anticompetitive practices without legal repercussion.

229.    The Associated Press also reported that the Power Five athletic conferences spent at least $350,000 in the first three months of 2020 "as part of a coordinated effort to influence Congress on legislation affecting the ability of college athletes to earn endorsement money." Those expenditures came on the heels of a combined $750,000 spent on lobbying by the NCAA, ACC, and Big 12 in 2019.[162]

230.    And the Power Five conferences on May 23, 2020, sent a letter to congressional leaders, where in the context of discussing potential federal NIL-related legislation, they requested statutory immunity from certain antitrust laws and state laws protecting NIL rights.[163] In sum, while the NCAA and its members were forced to admit that there is no legitimate basis to exclude athletes from being able to commercialize their own names, images, and likenesses— their personal property—the NCAA and its members also indicated that they would only want to permit such NIL compensation if this could be done with continued restrictions to protect the NCAA's own commercial interests and antitrust immunity.

231.    In fall 2020, the NCAA's Division I Council drafted legislation to allow athletes to commercially benefit from their NIL rights, with a final vote set to take place in January 2021. But, as also discussed above, the NCAA halted moving forward with NIL rule changes after certiorari was granted on December 16, 2020, in the *Alston* litigation. The NCAA was hoping the Supreme Court would provide a legal opinion and framework that would provide it with

---

[162] *AP Exclusive: Power Five spend big on lobbying Congress*, collegebasketball.nbcsports.com, May 19, 2020, https://apnews.com/ap-exclusive-power-five-spend-big-on-lobbying-congress-401b1cac7b8a96b2f98772ca709b79d7 (last visited July 10, 2024).

[163] *See* Brett McMurphy, Twitter.com, May 29, 2020, https://twitter.com/Brett_McMurphy/status/1266411058044035075/photo/1 (last visited July 25, 2021).

protection to continue some of the NIL restraints, without facing the prospect of continued

antitrust liability for maintaining those restrictions. Indeed, the U.S. Department of Justice sent

the NCAA a letter warning it that continued NIL restraints would be subject to antitrust review.

In response, the NCAA Board of Governors announced that it was going to delay making any

NIL rule changes while it waited for the *Alston* decision.

232.    During the period before the Supreme Court's *Alston* decision, representatives of

the NCAA and its member schools and conferences continued to make statements supporting the

concept of allowing athletes to financially benefit from their NIL rights. For example, in a

hearing before the Senate Committee on Health, Education, Labor & Pensions on September 23,

2020, University of Wisconsin Chancellor Rebecca Blank, who testified for Defendants during

the *Alston* trial that Wisconsin "would have a very serious conversation about whether we

wanted to continue under our current type of student athlete programs" if NCAA athletes were

paid, stated: "New opportunities for NIL can exist within the confines of our student-athlete

model . . . preserving the educational opportunities for hundreds of thousands, while

modernizing endorsement opportunities for all."[164]

233.    Similarly, Auburn University's then-Athletic Director Allen Greene stated in May

2021 that at Auburn, "[w]e embrace NIL and welcome the opportunities and challenges. We fully

support our student-athletes and their opportunity to utilize Auburn's national brand to put

---

[164] Utah State University Athletic Director John Hartwell likewise confirmed: "We believe there is a way to provide
additional income opportunities to student-athletes through NIL, while preserving the collegiate model and the
student-athletes' amateur status." Karen Dennis, the Director of Track & Field at Ohio State University,
distinguished NIL compensation from "pay to play" and testified: "Providing our student-athletes the
opportunity to monetize their talents through NIL will allow them to grow and use their intellectual and
creative talents beyond their athletic abilities. . . .Given the opportunity to brand themselves while in college
with technical, intellectual, tangible and legal resources at their disposal, a greater number of student athletes
will leave school better prepared for life and global citizenship." Full committee hearing and the written
testimonies of Rebecca Blank, Karen Dennis, and John Hartwell are available at:
https://www.help.senate.gov/hearings/compensating-college-athletes-examining-the-potential-impact-on-
athletes-and-institutions (last visited July 25, 2021).

themselves in the best position to capitalize on the benefits of NIL. Our mission remains to educate, support and develop our student-athletes at every moment to create Auburn men and women."[165]

234.     Even former NCAA President Mark Emmert provided testimony before the Senate Commerce Committee on June 9, 2021, that the NCAA supported providing NIL opportunities for student-athletes (contrary to the NCAA's longstanding rules to the contrary). At the same time, however, he requested federal legislation to provide a "safe harbor" against lawsuits from "lawyers using the weapon of antitrust laws" to challenge the NCAA's NIL rules.[166] The NCAA thus made clear that it still hoped to continue some of its NIL restraints without antitrust scrutiny.

## 2.     Statements from the Knight Commission on Intercollegiate Athletics.

235.     Roughly nine years ago, the Knight Commission on Intercollegiate Athletics commissioned research on the topic of student-athlete NIL rights. In May 2016, Tulane law professor and Associate Provost for NCAA Compliance Gabe Feldman presented a white paper to the Commission in which he concluded that, at very least, that "the non-game related NIL restrictions are unnecessary to the NCAA's core goals and may actually be counterproductive," and he recommended an NCAA rule change "to allow student-athletes to secure endorsement deals or otherwise receive compensation for use of their NILs, including value derived from their

---

[165] *See Auburn Athletics Launches SPIRIT, a Comprehensive Name, Image and Likeness Program*, auburntigers.com, May 20, 2021, https://auburntigers.com/news/2021/5/20/general- auburn-athletics-launches-spirit-a-comprehensive-name-image-and-likeness-program.aspx (last visited July 25, 2021).

[166] *See Hearing Before the United States Senate Committee on Commerce, Science and Transportation, Written Testimony of Dr. Mark Emmert, President, National Collegiate Athletic Association*, commerce.senate.gov, June 9, 2021, https://www.commerce.senate.gov/services/files/B28D0810-54D7-4C53-8058-B04A8ED4684B (last visited July 10, 2024).

athletic ability, as long as such use is not related to their participation in the underlying athletic event or derivative of the underlying event (including broadcast, re-broadcast, etc.)."[167]

236.    While limited, the Knight Commission report concluded, among other things, that the NCAA's prohibition on non-game-related NIL compensation is "not necessary to preserve the distinct character and product of amateur collegiate sports," that "education and NIL payments are not mutually exclusive," and that "the restrictions on non-game related NIL deals do not prevent exploitation—they are exploitative."[168]

237.    On April 3, 2020, the Knight Commission issued a follow-up statement outlining its current position on the issue of student-athlete NIL rights:

> "The Knight Commission on Intercollegiate Athletics believes an updated model of college sports is necessary to ensure the fair treatment of college athletes and to better prioritize their education, health, safety, and success. This model must maintain the two foundational elements that distinguish college sports from professional sports: college athletes must be full-time academically eligible students and institutions must be prohibited from paying them for their athletics participation."[169]

### 3.    The NCAA Has Made Exceptions for Several Years That Have Allowed Some Athletes to Profit from the Value of Their NIL Rights.

238.    Even before the NCAA's "interim" NIL policy change, more than 200 legislative relief waivers have been submitted to the NCAA since 2015 requesting to allow certain athletes to use and/or profit from the use of their NIL rights in various commercial activities. According to Atlantic 10 conference commissioner Bernadette McGlade, the NCAA has been approving

---

[167] Gabe Feldman, *The NCAA and "Non-Game-Related" Student-Athlete Name, Image and Likeness Restrictions*, Knightscommission.org, May 2016, https://www.knightcommission.org/wp-content/uploads/2008/10/feldman_nil_white_paper_may_2016.pdf (last visited July 25, 2021).

[168] *Id*.

[169] *Knight Commission on Intercollegiate Athletics Principles for New Rules on the Use of College Athletes'Name, Image and Likeness*, Knightcommission.org, Apr. 3, 2020, https://www.knightcommission.org/wp-content/uploads/2020/04/kcia-principles-new-rules-use-college-athletes-nil-040320-01.pdf (last visited July 25, 2021).

waivers at a high rate to allow athletes to earn money if they want to develop a product or write a book, for example.[170] Approximately 95% of these waivers were approved.[171]  Since 2018, institutions have also had the flexibility to apply pre-set guidelines from a list of NCAA-approved waivers. According to the NCAA, "it is not possible to accurately account for these local waivers, but they likely significantly exceed those allowed by the NCAA."[172]

239.    According to the NCAA, the waiver process has allowed athletes to use their NIL to promote products or businesses in the following types of circumstances:

a.    An athlete was allowed to use her name and picture on a website and social media accounts to promote a clothing business that she created;

b.    An athlete was allowed to use his NIL to promote a company that he created to provide personalized nutrition advice for clients; and

c.    An athlete was allowed to use her name and photo on a website to promote a photography business that she had created (and that was named after her).[173]

240.    As another example, Notre Dame women's basketball player Arike Ogunbowale was granted a waiver in 2018 that allowed her to compete on the ABC television show *Dancing with the Stars* and to accept prize money from the show (contestants earn $125,000 for appearing and $325,000 if they win) while remaining NCAA eligible. According to the NCAA, it made this exception because it considered Ogunbowale's participation on the show to be "unrelated to her

---

[170] Associated Press, *NCAA poised to move toward allowing athletes to make money*, CNBC.com, Oct. 28, 2019, https://www.cnbc.com/2019/10/28/ncaa-poised-to-move-toward-allowing-athletes-to-make-money.html (last visited July 25, 2021).

[171] *Name Image and Likeness: What Student-Athletes Should Know*, ncaa.org, https://ncaaorg.s3.amazonaws.com/ncaa/NIL/2020_NILresource_SA.pdf (last visited July 25, 2021).

[172] *NCAA Board of Governors Federal and State Legislation Working Group Final Report and Recommendations*, ncaa.org, Apr. 17, 2020, https://ncaaorg.s3.amazonaws.com/committees/ncaa/wrkgrps/fslwg/Apr2020FSLWG _Report.pdf (last visited July 10, 2024).

[173] *Id*.

basketball abilities." But it is obvious that Ogunbowale was invited specifically because of her skills on the college basketball court—she was the star player of the 2018 March Madness tournament and made a game-winning shot at the buzzer to win the national championship for Notre Dame. That performance is what landed her on the Ellen Degeneres Show and the cover of Sports Illustrated, and there is no doubt it is what earned her a spot on *DWTS*.

241.    These examples of student-athletes being able to profit from their own NIL rights, including in very publicized ways such as performing on *Dancing with the Stars*, have occurred while the revenue of college sports has continued to explode. Certainly then, it cannot be reasonably argued that allowing other athletes to obtain similar benefits would cause a decline in consumer demand.

> **4.    NCAA Division I Athletes Have Sought the Ability to Compete Without Anticompetitive Restraint in the Labor Markets and Would Receive Such Compensation Absent Defendants' Unlawful Restraints.**

242.    While some Division I student-athletes were lucky enough to obtain waivers from the NCAA prior to July 1, 2021, most were denied the opportunity to engage in any NIL-related activities and receive any NIL compensation without losing NCAA eligibility. Similar restraints have prevented them from receiving any compensation for their athletic services. Despite the NCAA's purported aim "to create an environment that allows student-athletes to reach their full potential in academics, athletics and life"—and in contrast to their non-athlete counterparts—student-athletes know that even while participating in intercollegiate sports competition at a high level and attending college as a student at the same time, they have been unable to pursue NIL opportunities or other compensation opportunities from the conferences or the schools that could significantly benefit them financially, academically, and in their future careers.

243.    On October 9, 2019, *The New York Times* reported[174]:

> "An exuberant top-scoring floor routine by UCLA's Katelyn Ohashi
> went viral this year, making her one of the most famous college
> gymnasts ever. But NCAA rules prevented Ohashi from making any
> money from the performance."

In a video op-ed featured in the article, Ohashi argues that college students should be

given the ability to earn income from their athletic achievement:

> "My senior year my routine went viral with over 100 million views.
> Along with this came a lot of attention and opportunities, but I
> couldn't capitalize on them. I was handcuffed by the NCAA rules that
> prevented me from deriving any benefit from my own name and
> likeness, despite the fact that after my final meet, I had no pro league
> to join. How different would things be for me had I been able to use
> my image and name in my last year of school in order to promote the
> things that I want to further my future? I want to make sure that the
> next person doesn't have to wonder."

> Ohashi continued: "It's not about paying salaries to college athletes,
> it's about empowering student-athletes to rightfully earn off their
> individual name and likeness without sacrificing the opportunity to
> get an education. It's about making sure if a student-athlete's jersey is
> still selling in the bookstore ten years after graduation that they get a
> cut. It's about recognizing that women only receive 4% of all
> coverage in sports media, and giving us the freedom to leverage
> sponsored deals to break through. It's about treating student-athletes
> with the same respect as the other student who can freely profit off
> their talent as writers, artists, DJs, programmers, or scientists while in
> college."

> Further she says, "critics say that allowing student-athletes to earn
> endorsement income will come at the expense of Title IX or non-
> revenue-generating sports. But from experience, allowing an athlete,
> especially a woman or Olympic sport athlete who for the most part
> are staying and graduating from NCAA institutions to take advantage
> of unexpected moments like I had, empowers us to help finally earn
> what we deserve."

---

[174] Katelyn Ohashi, *Everyone Made Money Off My N.C.A.A. Career, Except Me*, NYTimes.com, Oct. 9, 2019,
https://www.nytimes.com/2019/10/09/opinion/katelyn-ohashi-fair-play-act.html (last visited July 25, 2021).

244.     Lilly King, a world record-holder, two-time Olympic gold medalist, and the winningest breaststroke swimmer in NCAA history has also been an outspoken advocate of allowing student-athletes to benefit from their NIL rights. King attended Indiana University ("IU"). She was forced to turn down at least $60,000 in bonuses when she set two world records at the 2017 World Championships, although the NCAA did arbitrarily allow her to keep the other more than $100,000 that she was awarded by the USOC for her performance in the Olympics.

245.     In October 2019, King explained that IU, the Big Ten, and the NCAA were able to feature her in advertisements and announcements without compensation. They could promote her, she said, but she wasn't allowed to promote herself. King was quoted as saying: "I won an Olympic gold medal at 19. So I still had to wait three more years to do anything to promote myself [before finishing school]. As an athlete. As a Hoosier. These are things I'm proud of being."[175]

246.     When Katie Ledecky swam for Stanford after the 2016 Olympic Games, she could not accept an estimated $5 million-per-year endorsement deal. Her teammate, 14-time NCAA champion Simone Manuel, also forewent significant sponsorship opportunities.

247.     Less than a week after the NCAA's March 12, 2020, decision to cancel its postseason tournament basketball in the wake of the ongoing coronavirus pandemic, senior Oregon basketball player Sabrina Ionescu initiated endorsement talks with multiple brands. By the end of April, before she had even graduated from college, the 22-year-old Ionescu had secured offers worth multiple times her expected WNBA salary, some of which even outpaced

---

[175] David Woods, *Robbie Hummel, Lilly King favor college athletes profiting off their names and images*, Indystar.com, Oct. 2, 2019, https://www.indystar.com/story/sports/college/purdue/2019/10/02/lilly-king-robbie-hummel-favor-college-athletes-profiting-off-names-images/3825833002/ (last visited July 25, 2021).

the value of recent WNBA Finals MVP-level player deals. Ionescu ultimately signed a multi-year endorsement contract with Nike.

248.     If the NCAA had not prohibited her from doing so, Ionescu would have been able to benefit from the value she provided to Nike and the money she was already generating for the company and her university long before her college playing days were over. In November 2019, the UO bookstore released a "White Nike Replica # 20 basketball jersey" representing the number 20 jersey that Ionescu wore for the Ducks. The $75 jerseys sold out in less than an hour and have been reselling for twice as much ever since.[176] In mid-December, Nike released another number 20 replica jersey in green which sells for $75 at the university bookstore and on the retailer's website to this day.[177] Because of the challenged restraints, Ionescu received zero percent of the profits from these sales.

249.     Similarly, as reported by the Athletic, "For $28, you can buy a 'The Shot' T-shirt, which includes a diagram of Villanova's final play. Twenty-five dollars gets you a framed print of Jenkins in the air, in perfect form, letting the ball fly. An autographed Jenkins jersey goes for $99 on eBay, and Etsy has another, this one signed with Buzzer Beater' and '2016 NCAA Champs,' for $149. Jenkins didn't get and won't get any of that money," due to the Defendants' anticompetitive rules that were enforced against the athletes and the member schools, such as Villanova, for the duration of his career as a Wildcat.

250.     Analyses of the NIL value of student-athletes competing in several Division I sports, also demonstrate the economic harm to Mr. Jenkins caused by Defendants' restraints. On

---

[176] Nick DePaula, *Nike Signs No. 1 Pick Sabrina Ionescu to multi-year endorsement deal*, ESPN.com, Apr. 17, 2020, https://www.espn.com/wnba/story/_/id/29051284/nike-signs-no-1-pick-sabrina-ionescu-multi-year-endorsement-deal (last visited July 25, 2021).

[177] *Nike College Replica (Oregon) jersey*, available at https://www.nike.com/t/replica-oregon-basketball-jersey-d6B3WZ/P32919-OD1 (last visited July 25, 2021).

May 25, 2020, news website Axios.com reported estimates by Opendorse—a social publishing platform that helps professional athletes build their brands—of the social media earnings that student-athletes could obtain if they were not prevented from doing so by the NCAA. "Based on actual data from the last decade of providing the technology behind millions of dollars of transactions between brands and professional athletes," Opendorse estimated positive earnings for all of the student-athletes in its sample analysis, which included football players, men's and women's basketball players, and female gymnasts. The analysis looked specifically at Twitter and Instagram, evaluating the per-post value for various student-athletes. Based on its formula, Opendorse estimated, for example, the annual lost value for social media posts by Sam Ehlinger, quarterback of the University of Texas football team, at $962,000. As a second example, Morgan Hurd, a gymnast at the University of Florida, had an estimated potential earning value of $44,000 from social media. Duke Men's Basketball player, Tre Jones, had an estimated potential earning value of $250,000 per year purely from social media alone, while Cassius Winston of Michigan State Men's Basketball had a social-media estimated earning potential of $119,000 per year.[178]

251.    The website fivethirtyeight.com, which focuses on opinion poll analysis, politics, and economics, also reported estimates by Opendorse of the potential social media earnings for a different group of student-athletes. Opendorse's appraisals were "based on a decade's worth of transactional data between businesses and professional athletes, specific to each respective sport. Taking into account an athlete's current audience size, engagement rate and seven other proprietary data points, [Opendorse CEO Blake] Lawrence and his team at Opendorse distilled their estimates of an athlete's post value on Instagram and Twitter—and a potential range of

---

[178] Jeff Tracy, *How much college athletes could earn as social media influencers*, Axios.com, May 25, 2020, https://www.axios.com/college-athletes-earnings-social-media-influencers-35ce09f0-3bc2-46fa-ae5a-eba8ff61079b.html (last visited July 25, 2021).

earnings."[179] Opendorse examined the earning potential of student-athletes in nine different college sports—women's basketball, men's basketball, football, women's softball, men's wrestling, women's volleyball, women's soccer, and men's soccer—and projected positive social media earnings for each student-athlete examined. Two of the top four potential earners recognized in the study are female athletes, which is significant because women have fewer opportunities to continue their playing careers after graduating from college.[180] These analyses illustrate how the challenged restraints have had a negative economic impact on a wide range of Division I athletes.

    252.    As explained above, there is now a natural experiment occurring where one can see how the NIL market has developed post-July 1, 2021, following the NCAA's suspension of many of its NIL rules. Within only a few weeks, thousands of student-athletes, female and male, across a variety of sports, at myriad Division I schools were making money from their NIL rights. Former NCAA President Emmert recognized that he and the NCAA were learning new things by the day in the post-July 1, 2021, world, including what is in the best interests of athletes. He recognized that NIL compensation would be going to athletes across many sports and the different NCAA divisions, often disconnected to pure athletic talent, and gave examples of sports camps, commentating and social media as areas with enormous financial potential.[181] These facts demonstrate the significant damage that the challenged NIL restraints have caused to student-athletes. Indeed, there has been no indication of any negative impact of this activity on

---

[179] Josh Planos, *How Much Money Could Student-Athletes Make As Social Media Influencers?*, fivethirtyeight.com, May 15, 2020, https://fivethirtyeight.com/features/how-much-money-could-student-athletes-make-as-social-media-influencers/ (last visited July 25, 2021).

[180] *Id*.

[181] *See Inside the NCAA, NCAA Social Series EP 65*, Twitter.com, July 15, 2021, https://twitter.com/insidethencaa/status/1415831043098112001?s=21 (last visited July 25, 2021).

consumer demand. To the contrary, the explosion of interest from consumer-facing companies in using athletes as product spokespeople is a strong indication that firms believe such payment will induce more consumer spending, rather than turn consumers off.

253.    To the contrary, nearly four years into the post-July 1, 2021, world, the evidence shows that NCAA sports and the stakeholders that surround it are flourishing. The 2025 NCAA March Madness Tournament is experiencing record-setting viewership.[182] And 63% of the NCAA's $1.38 billion in revenue in 2024 was generated by the NCAA Men's Basketball Tournament.[183]

254.    According to the On3 NIL Valuation index, which "calculates the optimized NIL opportunity for athletes relative to the overall NIL market and projects outcomes over the next 12 months, the following are the top 15 earners in NCAA Men's and Women's Basketball: (1) Cooper Flagg, Duke, $4.8 million; (2) Braden Smith, Purdue, $1.9 million; (3) Maxime Raynaud, Stanford, $1.8 million; (4) PJ Haggerty, Memphis, $1.7 million; (5) Dylan Harper, Rutgers, $1.6 million; (6) Ace Bailey, Rutgers, $1.6 million; (7) Kam Jones, Marquette, $1.6 million; (8) Flau'Jae Johnson, LSU, $1.5 million; (9) Paige Bueckers, UConn, $1.5 million; (10) Eric Dixon, Villanova, $1.5 million; (11) JT Toppin, Texas Tech, $1.4 million; (12) VJ Edgecombe, Baylor, $1.4 million; (13) RJ Luis, Jr., St. John's, $1.3 million; (14) Tre Johnson, Texas, $1.3 million; and (15) Jalil Bethea, Miami, $1.3 million.[184]

255.    Moreover, as explained previously, the NCAA, conferences, and schools make an enormous amount of money from, among other things, television broadcasting agreements that

---

[182] https://sports.yahoo.com/college-basketball/article/march-madness-2025-viewership-for-first-day-of-ncaa-mens-tournament-reaches-all-time-high-010140134.html.

[183] https://www.sportico.com/leagues/college-sports/2025/march-madness-2025-ncaa-revenue-mens-tournament-1234843886/.

[184] https://sports.yahoo.com/article/15-march-madness-stars-making-090000297.html.

involve the use of student-athletes' names, images, and likenesses. Defendants have been unjustly enriched from these deals at the expense of student-athletes. In the absence of the challenged restraints, market-based competition would have led student-athletes to receive, among other things, a share of revenues for the group licensing of their broadcast NIL rights. These athletes would be able to offer group licenses to their schools and conferences, which could in turn package them to broadcast and other companies with school and conference rights. Due to the Defendants' anticompetitive, unlawful NIL restraints, Kris Jenkins has been deprived of the opportunity to receive licensing compensation for his broadcast NIL rights that he otherwise would have received from Villanova and the Big East.

> **5.    Corporate Sponsors Value Student-Athlete NIL Rights and Would Compete for the Rights to Use Kris Jenkins' and Other College Athletes' NIL Rights Absent Defendants' Anticompetitive Restraints.**

256.    Business leaders have long recognized that, absent the Defendants' anticompetitive restraints, there would be significant opportunities for college athletes, past, present, and future, to make commercial use of their NIL rights. What has occurred since July 1, 2021, shows that to be true. Senior executives at the nation's leading influencer marketing companies are enthusiastic about the prospect of being able to work with student-athletes, and even before the NCAA announced its interim policy change, many had already put strategies into place to begin as soon as possible if the rules change to allow it.

257.    According to Mae Karwowski, founder and CEO of Obvious.ly, about third party brands: "They're chomping at the bit. We're also ramping up our talent and recruitment efforts to make sure that athletes have the best possible representation and contracts as they're entering this

space. People love sports, and social media is a huge overdue opportunity for college

athletes."[185]

258.    Stephanie Stabulis, Vice President of HireInfluence, confirmed that, "in 2018-

2019 alone, our company has developed strategies for at least four to five brands targeting

student-athletes, and we have been restricted due to the NCAA regulations. The demand is

already there, so we see potential for brands to move quickly to work with student-athletes."

Regardless of their star status, Stabulis says there is money for student-athlete influencers at

every level while they are still in college: "Because it's a niche market, we can expect

influencers to be able to make about $250 to $1,000 per post, at these lower beginning ranges.

That will escalate as the athlete can reach more people through their social media outlets . . . .

For endorsement deals that rely on paying for an athlete's name, likeness and deeper partnership

or ambassadorship, we anticipate this is higher."[186] A July 21, 2021, article reporting on the

Bryce Young endorsement deals indicated that Tua Tagovailoa could have monetized his NIL at

"three to five million easy."[187]

259.    Matthew Micheli, co-founder and managing partner at Viral Nation, explained

that "some of these athletes could arguably be more popular than their pro counterparts. For

example, Tua Tagovailoa in college football would probably out-earn 90% of starting NFL

quarterbacks if given the opportunity. I could almost guarantee that." Micheli says Instagram and

YouTube are the two most valuable social media platforms for monetization right now and that a

---

[185] Kristi Dosh, *Marketers Bullish On Monetization Opportunities for NCAA Athletes with NILRights*, forbes.com, Dec. 3, 2019, https://www.forbes.com/sites/kristidosh/2019/11/25/marketers- bullish-on-monetization-opportunities-for-student-athletes-with-nil-rights/#f25fd487aa49 (last visited July 25, 2021).

[186] *Id*.

[187] Randall Williams, *Sophomore Alabama Quarterback Nears $1 Million in NIL Pay, Saban Says*, Sportico.com, July 20, 2021, https://www.sportico.com/personalities/athletes/2021/saban-bryce-youngs-nil-pay-1234634836/ (last visited July 23, 2021).

student-athlete with a following of over 25,000 could earn $2,000 to $4,000 per month between digital advertisements and local sponsorships. According to Micheli, "for athletes who produce video content, their earnings can easily be in the six-figure range annually to start."[188]

260.    Micheli also commented on the extremely limited timeframe student-athletes have to take advantage of their NIL value: "Once the college athlete's career is over and they don't go pro, their marketability essentially goes away ... Endorsements will most likely become non-existent. They become old news unless they go pro or go into another career that would require them to keep up a social presence. There could be some anomalies or outliers to this, but for the most part, all is lost for them, unfortunately."[189]

261.    Former Fresno State basketball players Hanna and Haley Cavinder had as of March 8, 2021, 2.7 million followers on TikTok. According to the CEO of Opendorse, they have as much value as star quarterback Trevor Lawrence. A March 8, 2021, ESPN article reporting on the twins indicated they were being contacted by companies "every single day."

262.    On July 1, 2021 Jim Cavale, CEO of INFLCR, spoke to the Athletic about the opportunity future March Madness stars will have to capitalize on what he called "One Shining Moment" situations, and lamented the lost opportunities of those March Madness stars whose Shining Moments occurred before the NCAA suspended its anticompetitive prohibition on college athletes monetizing their NIL—especially Kris Jenkins. Cavale said March Madness shooting stars are particularly "appealing for companies looking for brand ambassadors." He explained, "The way the world is wired, people are almost preconditioned to head directly to Google when a big moment happens. For years, the beneficiaries of March's most memorable

---

[188] *Id*.

[189] *Id*.

moments have been the schools. After Farokhmanesh's brazen shot ousted Kansas, Northern

Iowa's page views quadrupled and calls to the admissions office jumped 30 percent. But that was

in 2010, Instagram's first year of existence. Searching for Farokhmanesh himself would have led

merely to a bio page on the school website." Fast-forwarding several years, he continued, "Three

years later, after Michigan's Spike Albrecht dropped 17 points in the first half against Louisville

in the 2013 national title game (and brazenly tweeted at Kate Upton) he gained 22,000 Twitter

followers overnight. In March, Max Abmas helped push Oral Roberts into the Sweet 16. He

started his NCAA Tournament run with 2,400 Instagram followers. He currently [as of July

2021] has more than 19,000." "In the minutes and hours after a March hero is born, the people

who flock to his or her Instagram page are looking for information — who the player is, what

they're about, what they stand for." This, Cavale explained, is "what makes March shooting stars

so appealing for companies looking for brand ambassadors." But, "The window is so small," he

cautioned. If a player hits "That Shot" and isn't able to capitalize on it right away," like Kris

Jenkins because of the Defendants' anticompetitive restraints, the player will miss their

opportunity.[190]

263.     Certain school officials now admit that allowing athletes to market their NIL

enhances their educational experience. For example, Fresno State Athletic Director Terry Tumey

stated, "Having folks understand how to better their brand is no different than a person going to

business school and learning how to market a product."[191]

###     6.     When the NAIA Withdrew NIL Restrictions, Athletes Prospered Financially and Academically.

---

[190]https://www.nytimes.com/athletic/2682410/2021/07/01/one-shining-payment-with-nil-march-heroes-like-kris-jenkins-could-cash-in/.

[191] David M. Hale, *Social media stardom: How changes to NIL will benefit athlete-influencers across the NCAA*, ESPN.com, Mar. 8, 2021, https://www.espn.com/womens-college- basketball/story/_/id/30945653/social-media-stardom-how-changes-nil-benefit-athlete-influencers-ncaa (last visited July 10, 2024).

264.    In November 2020, the NAIA amended its NIL restrictions as follows:

**SUBJECT: AMATEUR CODE – NAME, IMAGE, AND LIKENESS COMPENSATION**

**VII.    SECTION B: ACTS PERMITTED BY NAIA AMATEUR CODE**

265.    The following acts will NOT cause an athlete to lose amateur standing.

---

6.    Participating in radio or television programs for the purpose of promoting an amateur athletic event.

7.    Receiving reasonable compensation for supervision of physical education, playground or recreational activities.

8.    Receiving compensation for use of name, image or likeness to promote any commercial product or enterprise, or public or media appearance. It is the responsibility of the student-athlete to notify their institution's athletics director in writing of any compensation the student receives from the use of their name, image or likeness in relation to their school or status as a student-athlete.

266.    NAIA athletes immediately began to market their NIL rights and they have been incredibly successful in the new world of opportunities available to them. Then freshman Aquinas Volleyball player, Chloe Mitchell, became the first NAIA athlete to monetize her NIL in December 2020 when she turned a home project DIY video into a successful online brand. Since then, Mitchell has received numerous sponsorship deals that have allowed her to pay off her student loans, buy a computer and a car, and start saving for her first house. She also started a company called PlayBooked, which connects college athletes with fans and brands interested in doing NIL deals with them. As of March 2021, PlayBooked was already working with more than 200 NAIA athletes.[192] Mitchell says that her experience with NIL has been nothing but positive. Not only is she making money, but she says it has also made her a better student and is teaching

---

[192] *Id.*

her valuable marketing and business skills, and that the new opportunities have made her feel more connected with her teammates and peers on campus.

267.    Hundreds of other NAIA athletes are also taking advantage of their new NIL opportunities. For example, basketball player Victor Faria is creating content on YouTube and using the money he has earned to pay for his tuition at Northern New Mexico College. Track and Field athlete Connor Clemens has already earned money from two promotional videos he created, and says that having the opportunity to monetize his NIL has been extremely helpful to be able to pay his bills and develop professional networking skills. And Clarke University lacrosse player, Tucker Labelle has also had a very positive experience in the new world of NIL

## VIII.   ANTITRUST ALLEGATIONS

268.    Defendants' contract, combination, and conspiracy described herein consisted of a continuing horizontal and vertical agreement, understanding, and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to artificially fix, depress, maintain, and/or stabilize prices received by Kris Jenkins and other college athletes for their NIL rights and athletic services, and to restrict scholarships available to college athletes in the United States, its territories, and possessions.

269.    In formulating and effectuating the contract, combination, or conspiracy, Defendants and their co-conspirators did those things that they unlawfully combined and conspired to do, including, among other things:

    a.    agreeing to artificially fix, depress, maintain, and/or stabilize prices paid to Kris Jenkins and other college athletes for the use of their names, images and/or likenesses;

    b.    agreeing to artificially fix, depress, maintain, and/or stabilize prices paid to Kris Jenkins and other college athletes for their athletic services;

107

c.      agreeing to artificially fix, depress, maintain, and/or stabilize the number of scholarships available to college athletes; and

d.      implementing and monitoring the conspiracy among cartel members.

270.    The activities described above have been engaged in by Defendants and their co-conspirators for the purpose of effectuating the unlawful agreement to fix, depress, maintain, and/or stabilize prices paid to and scholarships available to Kris Jenkins and other college athletes.

271.    Defendants' actions constitute an unreasonable restraint of trade.

## IX.    DEFENDANTS' ILLEGAL, ANTICOMPETITIVE CONDUCT CAUSED GREAT HARM TO PLAINTIFF KRISTOPHER FARRELL JENKINS

272.    Plaintiff Kris Jenkins, worked as a college basketball player at Villanova University from 2013 to 2017.



273.    The labor provided by Mr. Jenkins was of great value to Defendants. Mr. Jenkins

committed extensive time and effort to his craft year-round. His schedule demanded 60-80 hours

per week in-season, with practices, meetings, film study, workouts, academic classes, and travel,

often working 12-14-hour days. Off-season training still required 40-50 hours weekly, and true

vacations were rare. On top of this, Mr. Jenkins was expected to participate in media appearances

and community events, with very limited time off, all under the direction and/or supervision, implicitly or explicitly, of his coaches or others in the athletic department.

274.    A typical off-season schedule for Mr. Jenkins looked like the following:

- Must be in the facility 30 minutes before the team lift starts
- 6:00 or 6:30 a.m. team lift/workout
- Recovery
- Breakfast
- Classes
- Individual shooting practice with team manager or coach (every day before team practice, you are required to shoot and chart 100 three-pointers and 100 free throws)
- Must be in the facility 45 minutes before team practice starts
- 3:00 or 3:30 team practice
- Recovery, cold tubs or treatment
- Team dinner
- Film study
- Academics
- Day ends

275.    A typical in-season schedule for Mr. Jenkins—including "Christmas break"—

looked like the following:

- Breakfast and film study at 8:00 a.m.
- Individual shooting practice, either before or after practice
- 10:00-12:45 official practice start time
- Post-practice recovery (however long it took)
- Team lunch/film scout (however long it took)
- Classes
- During Christmas Break or when there are no classes, we were typically in the Davis Center from 8:00 a.m. until 5:00 p.m. in addition to any travel time or if there was a game
- Mr. Jenkins never got a spring break due to the Big East Tournament at Madison Square Garden in New York City and the NCAA Men's Basketball Tournament, both of which were all-consuming.
- Mr. Jenkins got, at most, two days at home for Christmas most years.
- Mr. Jenkins spent most Thanksgivings during his career at a preseason basketball tournament, such as the Battle 4 Atlantis in the Bahamas.
- And, Mr. Jenkins and his teammates were required to attend both sessions of summer school with classes and intense summer workouts every day.

276.     While Mr. Jenkins became a household name after making "The Shot" that lifted

the Wildcats over the UNC Tarheels 77-74 in the 2016 NCAA Men's Basketball Tournament

Championship Game, Mr. Jenkins was already a highly touted recruit out of Gonzaga College

High School in Washington, D.C., where he attended with UNC's Nate Britt, Jr. (whom he

considers his brother - Nate's parents became Kris's guardians through middle school and high

school, although Kris remained close with his biological mother, Felicia Jenkins). In high school,

Mr. Jenkins led the Gonzaga Eagles to a 30-9 season his senior year, averaging 18.3 points and

10.3 rebounds and 3.3 steals per game. He scored 31 points and added 12 rebounds in a

nationally televised victory over Salesian High School (Cal.) as a senior. Mr. Jenkins was named

the 2012-13 Boys Basketball All-Met Player of the Year by the Washington Post and was a two-

time WCAC and District of Columbia Gatorade Player of the Year. As a junior, he averaged 20.6

points and 10.4 rebounds per game. Mr. Jenkins committed to Villanova over the University of

Miami, the University of Pittsburgh, the University of South Carolina, Clemson, Xavier, Virginia

Tech, Boston College, Rutgers, George Mason, and Richmond Utah, Hawaii, and Utah State.

Head Coach Jay Wright presciently spoke highly of Mr. Jenkins before he even arrived at

Villanova as a freshman, "[Kris] brings incredible skill, toughness and great basketball IQ to our

team. He comes from a tremendous program with a great coach in Steve Turner. He will be a

favorite of the Nova Nation."[193]

277.     Mr. Jenkins' job as a college basketball player required at least full-time hours and

was an important and valuable role. Even prior to making The Shot, Mr. Jenkins was known at

Villanova as one of the team's best shooters, described on the team website as follows: "A gifted

offensive player with soft hands and an accurate shooting stroke ... A quality 3-point shooter who

---

[193] https://villanova.com/news/2012/11/15/hart_and_jenkins_ink_national_letters_of_intent.aspx.

also sees the floor well ... Can operate on the interior or the perimeter ... Brings an excellent feel

for the game that helps him make plays for others... Took his game to another level over the final

two months of his junior season."[194]

278.     Throughout his career at Villanova, before graduating in 2017, Mr. Jenkins

amassed 1,383 points after moving past the 1,000-point plateau on Nov. 29, 2016. He was part of

a senior class that never suffered consecutive losses in its four seasons and established a new

program record for wins (129) Mr. Jenkins was named first team All-Philadelphia Big Five and

Honorable Mention All-BIG EAST.

279.     Mr. Jenkins always seemed to shine the brightest when the lights did too. He

started in both of the games in the 2017 NCAA Tournament and was named to the All Big East

Tournament squad, contributing 24 points and 2 assists in Villanova's 108-67 dismantling of St.

John's on March 9, 2017, in the tournament quarterfinals.

280.     Mr. Jenkins' shining moment, of course, was hitting The Shot to win the 2016

NCAA March Madness Tournament for Villanova in 2016, but even before that, he played a key

role in Villanova's championship run.  Mr. Jenkins contributed 18 points to a 95-51 semifinal win

over Oklahoma on April 2 in Houston. He was tabbed the Most Outstanding Player at the South

Regional. He scored 13 points to help lead Villanova past Kansas 64-59. He sank 8-of-10 field

goal attempts to finish with 21 points in an NCAA Tournament win over Miami and contributed

15 points and six assists to the 87-68 NCAA Tournament second round win over Iowa on March

20, 2016.

281.     Mr. Jenkins also performed exceptionally well in the 2016 Big East Tournament at

Madison Square Garden. He was named to the BIG EAST All-Tournament squad after averaging

---

[194] https://villanova.com/sports/mens-basketball/roster/kris-jenkins/408.

19.7 ppg in the event, including a 23-point outburst in the championship game vs. Seton Hall. He helped lead Villanova to a 76-68 victory over Providence in the semifinals on March 11 with 21 points and four assists and produced 15 points and four rebounds in a 81-67 win over Georgetown in a quarterfinal on March 10, 2016.

282.    These impressive postseason performances capped a sparkling 2016 regular season for Mr. Jenkins. Mr. Jenkins put up 17 points and eight rebounds in an 84-71 win over Georgetown on March 5 at Wells Fargo Center in the team's season finale. He recorded a career-high 31 points, including a record tying eight 3-pointers, in an 83-62 win over DePaul on March 1 at the Pavilion, and delivered 19 points and five rebounds to help Villanova defeat Marquette 89-79 on Feb. 27 in Milwaukee. Mr. Jenkins led the Wildcats with 22 points in a 90-83 loss at No. 5 Xavier on Feb. 24 and supplied 20 points and six rebounds to help the Wildcats defeat Butler 77-67 on Senior Day, February 20. He contributed 13 points and five rebounds in an 86-59 win at DePaul on Feb. 9 and delivered his second double (10 points, 10 rebounds) in six days as Villanova downed Providence 72-60 on February 6. Mr. Jenkins led the Wildcats to an 83-58 win over Creighton with 22 points, three rebounds and two assists and delivered his first career double-double with 14 points and 11 rebounds in a 68-53 win at St. John's on January 31. Mr. Jenkins' seven assists against Providence were a new career high. And, he contributed 12 points, four assists, and three rebounds in 33 minutes of a 72-71 win at Seton Hall on January 20. Mr. Jenkins led the Wildcats with 20 points in an 83-68 victory over Marquette on January 13 and added 13 points, four rebounds, and two assists to a 95-64 win over No. 6 Xavier on December 31, 2015.

283.    With Mr. Jenkins playing a key role on the team, culminating in the iconic Shot, Villanova emerged as a true blue blood. Mr. Jenkins' impact cannot be overstated. As a result of

Mr. Jenkins' play, especially after The Shot, and the team's success, Villanova and Big East Basketball enjoyed increased media attention, heightened fan engagement, and an expanded national profile.

284.    Due to the NCAA's anticompetitive rules, Mr. Jenkins' was restrained from earning compensation that could have enabled his biggest supporters to witness his rise. Mr. Jenkins' biological mother, who lived in South Carolina until she moved to New Jersey during his senior year at Villanova, was only able to attend the first game of his Villanova career his freshman year, and was not able to watch him play in person again until the Final 4 and the National Championship game in 2016. Among other damages, if Mr. Jenkins had not been prohibited by the NCAA's unlawful restraints from sharing in the revenue he helped generate or monetizing his NIL, he (or the team) could have facilitated visits from his mother, who was his first basketball coach, to attend more of his games during his Villanova career.

285.    As set out above, in front of a packed house of 74,340 in-person fans and 17.8 million watching on screens around the world, Mr. Jenkins sunk The Shot that won the 2016 NCAA Tournament Championship game for Villanova, 77-74, over his brother, Nate Britt's, UNC Tarheels. Throughout his basketball career at Villanova, Mr. Jenkins' NIL and performance were and are prominently featured in Defendants' and the school's promotional materials, social media campaigns, and broadcasts. Especially after The Shot, the NCAA's, the Big East's, and Villanova's social media platforms frequently highlighted Mr. Jenkins, promoting his accomplishments and using his name, image, and likeness to enhance their visibility and appeal to fans, donors, and recruits. His work directly helped increase fan engagement, drive ticket sales, and boost television viewership. For instance, he was often featured in promotional content, interviews, and highlight reels that helped drive attendance, viewership, and

merchandise sales. As set out above, approximately two weeks after the 2016 national championship win, Villanova Athletics received its largest donation then to date for renovating the Pavilion and supporting the Men's and Women's Basketball Program. While Mr. Jenkins never got to play in the renovated Pavilion during his playing career, his NIL is featured prominently in a crystal plaque at the entrance, with the imprint of his sneakers replicated in the championship floor in the season-ticket-holder lounge, in images all over the arena, including a mural emphasizing community service from when he was an underclassman, and nightly in the promotional video that plays for fans during current Villanova player introductions.

286.     For its part, as set out above, the Big East continues to feature Mr. Jenkins on its website along with embedded commercial content to this day. The Big East reportedly earned approximately $19.1 million from Villanova winning the 2016 NCAA Tournament, and, per Big East Commissioner Val Ackerman, Mr. Jenkins' Shot and that win put the newly reconstituted Big East Conference back on the map. [195]

287.     In 2016, the NCAA earned $740 million in revenue from its CBS/Turner media rights deal, which increased to $804 million in 2019, decreased to $113 million in 2020 when the NCAA did not hold March Madness due to Covid, and back up to $850 million in 2021 and to $873 million in 2024.[196]

288.     For their part, CBS and Turner, who make their money by selling ads during their broadcasts, and especially during March Madness, reportedly made $1.05 billion in ad revenue during the 2022 March Madness Tournament. That was an increase from $865.1 million from

---

[195]https://www.indystar.com/story/sports/college/butler/2016/04/06/ncaa-tournament-worth-191-million-big-east/82709442/.

[196]https://www.indystar.com/story/sports/college/butler/2016/04/06/ncaa-tournament-worth-191-million-big-east/82709442/.

2019's NCAA March Madness Tournament. Every year, leading up to the NCAA Tournament and during the Tournament, CBS and the Turner networks broadcast promotional spots featuring Mr. Jenkins' iconic Shot. This year it was featured during the 2025 AFC Championship game during CBS's primetime broadcast, during the 2025 Sweet 16, and during the 2025 Elite 8.

289.    As also set out above, NCAA also prominently features articles, videos and images from every angle, and social media posts featuring Mr. Jenkins' NIL, including the #1 and #3 all-time watched videos on its YouTube channel, https://www.youtube.com/user/ncaa, and an X post on 4/4/2025, the 9th anniversary of The Shot, featuring a :55 clip of Nantz and Hill on the call, and tagging Mr. Jenkins @Smoove2you_, that, as of 7:30 a.m. on 4/5/2025 had 124,000 views.

290.    Despite his considerable marketability and the substantial revenue he helped generate for the Defendants and Villanova, due to the NCAA's anticompetitive restrictions, Villanova was prohibited from sharing any of that revenue with Mr. Jenkins, and Mr. Jenkins was denied any share of that revenue from any source. Not only that, but the NCAA's unlawful restraints prohibited him from profiting from his NIL as well. During his tenure at Villanova, because of Defendants' anticompetitive rules, he was prevented from securing endorsement deals or other opportunities that would have been available in a competitive, open market. Had the NCAA's unlawful restrictions not been in place, Mr. Jenkins could have capitalized significantly on his status as an NCAA, Big East, and Villanova Basketball legend and icon.

291.    The success of the Villanova Men's Basketball program during Mr. Jenkins' time translated directly into financial gains for the university and the Defendants. Villanova and the Defendants earned tens of millions in revenue from ticket sales, broadcast deals, and merchandise—revenue driven in large part, especially after April 4, 2016, by Mr. Jenkins

contributions on the court. These earnings were further bolstered by the Big East's media rights

contract with Fox Sports, NBC, and TNT, and the NCAA's media rights contract with

CBS/Turner.

292. Yet, due to the NCAA's unlawful restrictions, Mr. Jenkins received none of that

revenue, despite his pivotal role in generating it, and despite the NCAA's and Big East's

continuing use. During his time in college, due to the NCAA's unlawful restrictions, Mr. Jenkins

was completely barred from receiving money for use of his NIL, whether from Defendants,

Villanova, or third parties.

293. In stark contrast to the prohibitions imposed on Mr. Jenkins by the NCAA's

anticompetitive rules, as set out above, today's well-known college athletes routinely command

NIL deals worth hundreds of thousands to millions of dollars annually. For example, the top-

ranked college basketball player on On3's NIL valuation rankings is Duke's Cooper Flagg, with

an estimated annual value of $4.8 million based in part on confirmed deals with Gatorade and

Fanatics. BYU's AJ Dybantsa is next with an estimated annual value of $3.8 million, citing

confirmed deals with Red Bull and Nike. Reportedly, NIL contract offers for top college

basketball transfer portal prospects are as high as $3 million for elite prospects, and as many as

50-100 players are likely to receive deals worth $1 million per year or more.[197]  These athletes

benefit from an open NIL marketplace that was unavailable to Mr. Jenkins—and all the former

college athletes who have opted out of the *House v. NCAA* settlement—during the prime of his

career, when anticompetitive NCAA-imposed restrictions barred him from monetizing his NIL.

---

[197] https://bleacherreport.com/articles/25175676-cbb-pg-reportedly-has-3m-nil-contract-offers-transfer-portal-top-
rosters-cost-7m.

117

294.    Following his Villanova career, Mr. Jenkins played in the 2017 NBA Summer League,[198] and was picked 14th overall in the 2017 NBA G League Draft,[199] before a stint in Germany with Eisbären Bremerhaven.[200] Tragically, due in part to a serious hip injury suffered in 2019, Mr. Jenkins' professional career was cut short. Like so many college athletes, due to the NCAA's anticompetitive rules, he was completely restrained from earning compensation during the peak earning years of his career.

295.    Additionally, Mr. Jenkins works with Brad Humphreys of TCH Humphreys LLC on post-collegiate signing events and memorabilia deals. Mr. Humphreys has been in the sports memorabilia space for over twenty years. In addition to Mr. Jenkins, Mr. Humphreys works with other high-profile college and professional athletes like Penn State Quarterback, Drew Allar, who led the Nittany Lions to the Big Ten title game and a No. 6 seed in the College Football Playoffs. He also works with recently retired Philadelphia Eagle, Jason Kelce. In 2016, following the NCAA March Madness Tournament Championship win, Mr. Humphreys worked with Mr. Jenkins' teammates, seniors Ryan Arcidiacono, Daniel Ochefu, and Kevin Rafferty who, because their NCAA basketball careers were over, were able to capitalize on their most profitable year for signing events. Mr. Jenkins, only a junior, was let out in the cold. While Mr. Humphreys worked with Mr. Jenkins after the 2016-2017 season and still paid him $100,000 – $7,500 per deal for 15 deals that year—had Mr. Jenkins not been restrained by the NCAA's anticompetitive rules from monetizing his NIL the year before, in the afterglow of The Shot, he would have earned $400,000 to $500,000 for the same 15 deals.

---

[198] https://www.inquirer.com/philly/sports/colleges/villanova/kris-jenkins-villanova-basketball-washington-wizards-nba-free-agent-20170623.html.

[199] https://espnsiouxfalls.com/g-league-draft-yields-three-new-skyforce-players/.

[200] https://www.nytimes.com/athletic/2337399/2021/01/22/kris-jenkins-villanova-basketball-stories-injury-rehab/.

296.    Mr. Jenkins, like many other college athletes, was denied the opportunity to receive fair compensation for his work and NIL by the NCAA's anticompetitive rules and conduct. Despite playing a pivotal role in Villanova and the Big East's basketball success and helping generate millions, if not billions, of dollars in revenue for the university and the Defendants, the NCAA's unlawful restrictions prevented Mr. Jenkins from sharing in that revenue. The NCAA's unlawful rules deprived him of his rightful place in an open and competitive market. Had those restrictions not been in place, Mr. Jenkins would have received substantially greater remuneration for his services and the use of his NIL. The NCAA's conspiracy directly harmed him, limiting his ability to profit from his extraordinary talent and popularity during his time as a college athlete.

297.    Defendants' conspiracy greatly harmed Mr. Jenkins. It prevented him from enjoying the benefit of bargaining for competitive remuneration and benefits in an open market. But for the illegal and unfair restraints put in place by the NCAA and required by the Conference Defendants and imposed upon the member universities, he would have received remuneration for his services as a college basketball player and for his NIL from third parties. Absent Defendants' agreement to adopt, enforce, and abide by the NCAA's anti-competitive bylaws, he would have received a competitive share of the television and other revenue being brought in by Defendants and their member conferences and schools. Thus, Defendants' scheme directly injured Mr. Jenkins.

# X.    CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1
### Unreasonable Restraint of Trade

298.    Mr. Jenkins adopts and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

299.    Defendants and their co-conspirators, by and through Defendants' and co-conspirators' officers, directors, employees, agents, or other representatives, have entered into a continuing horizontal and vertical contract, combination, and conspiracy in restraint of trade in the relevant markets to artificially depress, fix, maintain, and/or stabilize the prices paid to Mr. Jenkins for the use of, and to limit supply for the licensing and sale of his image, likeness, and/or name and for his athletic services in the United States and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

300.    Defendants' unlawful conduct deprived Mr. Jenkins of compensation for the use of his name, image, and likeness and his athletic services. This unreasonable restraint on competition has artificially limited supply and depressed compensation paid to Mr. Jenkins for the use of his image, likeness, and/or name and for his athletic services.

301.    Mr. Jenkins received less than he otherwise would have received for the use of his image, likeness, and/or name and his athletic services in a competitive marketplace, and was thus damaged, and seeks to recover for those damages.

302.    Defendants and their co-conspirators' abridgment of compensation rights for current and former student-athletes, including Mr. Jenkins, is not connected to any legitimate non-commercial goal. Defendants' actions are solely to enhance revenue for themselves and their for-profit business partners by, for example, being able to take all of the revenue related to the

commercial use of student-athletes', like Mr. Jenkins', names, images, and likenesses for themselves. Defendants' actions have no relationship to any alleged goal of "amateurism," or any legitimate procompetitive purpose. The NCAA's actions directly regulate commercial markets and therefore are illegal.

303.    As a direct and proximate result of Defendants' scheme, Mr. Jenkins has been injured and financially damaged. Mr. Jenkins' injuries consist of receiving lower prices— approaching nothing beyond COA scholarships and incidental costs—for use of his NIL and for his athletic services than he would have received absent Defendants' conduct. Mr. Jenkins' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

304.    Defendants and their co-conspirators have collectively conspired to illegally limit and depress the compensation to student-athletes, including Mr. Jenkins, for the use of their NIL rights and athletic services. This anticompetitive and illegal scheme has unreasonably restrained trade.

305.    The anticompetitive effects of Defendants' scheme substantially outweigh any alleged procompetitive effects that may be offered by Defendants, including that their collusive conduct is shielded by the NCAA's concept of "amateurism." Moreover, reasonable and less restrictive alternatives are available to Defendants' current anticompetitive practices.

306.    The amount of damages suffered by Mr. Jenkins has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, Mr. Jenkins is entitled to recover from Defendants treble the amount of actual damages, as well as an award of reasonable attorneys' fees and costs of suit.

307.    Mr. Jenkins is entitled to a declaratory judgment declaring the challenged restraints unlawful and injunctive relief as justice requires to fully compensate him for the violations alleged in this Complaint.

## SECOND CLAIM FOR RELIEF

**Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1**
**Unreasonable Restraint of Trade – Group Boycott / Refusal to Deal**

308.    Mr. Jenkins adopts and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

309.    Defendants and their co-conspirators, by and through Defendants' and co-conspirators' officers, directors, employees, agents, or other representatives, entered into a continuing horizontal and vertical contract, combination, and conspiracy in restraint of trade to effectuate a horizontal group boycott of Plaintiffs. Defendants' group boycott/refusal to deal encompasses Defendants' concerted acts to prevent Mr. Jenkins from being compensated for the use of his image, likeness, and/or name and athletic services in the United States and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

310.    Defendants' group boycott/refusal to deal includes Defendants' concerted action to require all current student-athletes during Mr. Jenkins' Villanova career to abide by regulations. This concerted action is in effect a refusal to deal with Mr. Jenkins and similarly situated college athletes on compensation rights issues, and foreclosed them from full access to the marketplace. Defendants use the eligibility rules as a threat of a boycott to force all student-athletes to abide by the rules.

311.    Mr. Jenkins received less than he otherwise would have received in a competitive marketplace, was thus damaged, and seeks to recover for those damages.

312.    As a direct and proximate result of Defendants' group boycott, Mr. Jenkins has been injured and financially damaged. Mr. Jenkins' injuries consist of denial of compensation for use of his image, likeness, and/or name and athletic services. Mr. Jenkins' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

313.    The anticompetitive effects of Defendants' group boycott substantially outweigh any alleged procompetitive effects that may be offered by Defendants, including that their collusive conduct is shielded by the NCAA's concept of "amateurism" or any procompetitive purpose. Moreover, reasonable and less restrictive alternatives are available to Defendants' current anticompetitive practices.

314.    The amount of damages suffered by Mr. Jenkins has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, Mr. Jenkins is entitled to recover from Defendants treble the amount of actual damages, as well as an award of reasonable attorneys' fees and costs of suit.

315.    Mr. Jenkins is entitled to a declaratory judgment declaring the challenged restraints unlawful and injunctive relief as justice requires to fully compensate him for the violations alleged in this Complaint.

**THIRD CLAIM FOR RELIEF**

**Unjust Enrichment**

316.    Mr. Jenkins adopts and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

317.    Defendants have been unjustly enriched as a result of the unlawful conduct detailed herein at the expense of Mr. Jenkins. Under common law principles of unjust

123

enrichment, Defendants should not be permitted to retain the benefits conferred upon them via their wrongful conduct, and it would be unjust for them to be allowed to do so.

318.    Mr. Jenkins seek disgorgement of all Defendants' profits resulting from the wrongful conduct described herein and establishment of a constructive trust from which Mr. Jenkins may seek restitution.

## XI.    REQUEST FOR RELIEF

319.    WHEREFORE, Mr. Jenkins requests judgment as follows:

A.    For actual damages according to the proof at trial;

B.    For treble damages pursuant to 15 U.S.C. § 15;

C.    For a declaratory judgment declaring as void the NCAA's Bylaws that operate to impose restrictions on the compensation Division I student-athletes can receive from the schools, conferences, or third parties for their NIL rights or athletic services;

320.    For injunctive relief as justice requires to fully compensate him for the violations alleged in this Complaint;

D.    For Plaintiff's attorneys' fees, costs, and expenses; and

E.    For other such relief that the Court may deem just and equitable.

## XI.    JURY DEMAND

321.    Plaintiff hereby requests a jury trial on any and all claims so triable.

DATED this 5th day of April, 2025            Respectfully submitted,


*Counsel for Plaintiff*                /s/ Kevin Thomas Duffy, Jr.
                        Bar No. 28134

124